## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS<br>   One Ashburton Place, 18th Floor<br>   Boston, MA 02108<br><br>PEOPLE OF THE STATE OF CALIFORNIA *ex rel.*<br>XAVIER BECERRA, Attorney General<br>   300 South Spring Street, Suite 1702<br>   Los Angeles, CA 90013<br><br>STATE OF CONNECTICUT<br>   P.O. Box 120<br>   Hartford, CT 06141<br><br>STATE OF DELAWARE<br>   820 North French Street<br>   Wilmington, DE 19801<br><br>DISTRICT OF COLUMBIA<br>   441 4th Street, N.W., 6th Floor<br>   Washington, DC 20001<br><br>STATE OF HAWAII<br>   425 Queen Street<br>   Honolulu, HI 96813<br><br>PEOPLE OF THE STATE OF ILLINOIS<br>   100 West Randolph Street<br>   Chicago, IL 60601<br><br>STATE OF IOWA<br>   1305 E. Walnut Street<br>   Des Moines, IA 50319<br><br>STATE OF MARYLAND<br>   200 St. Paul Place, 16th Floor<br>   Baltimore, MD 21202<br><br>STATE OF MINNESOTA<br>   445 Minnesota Street, Suite 1100<br>   St. Paul, MN 55101-2130<br><br>STATE OF NEW MEXICO<br>   408 Galisteo Street<br>   Santa Fe, NM 87501<br><br>STATE OF NEW YORK<br>   120 Broadway, 3rd Floor<br>   New York, NY 10271 | **COMPLAINT**<br>**CIVIL ACTION NO:** _____ |

1

STATE OF NORTH CAROLINA *ex rel.*
JOSH STEIN, Attorney General
    114 W. Edenton Street
    Raleigh, NC 27603
    P.O. Box 629
    Raleigh, NC 27602

STATE OF OREGON
    Oregon Department of Justice
    1162 Court Street, NE
    Salem, OR 97301

COMMONWEALTH OF PENNSYLVANIA
    15th Floor, Strawberry Square
    Harrisburg, PA 17120

STATE OF RHODE ISLAND
    150 South Main Street
    Providence, RI 02093

STATE OF VERMONT
    109 State Street
    Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R.
HERRING, Attorney General
    Barbara Johns Building
    202 N. Ninth Street
    Richmond, VA 23219

      and

STATE OF WASHINGTON
    Office of the Washington Attorney General
    1125 Washington Street SE
    P.O. Box 40100
    Olympia, WA 98504,
                   Plaintiffs,
    v.

UNITED STATES DEPARTMENT OF EDUCATION,
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202

      and

BETSY DEVOS, *in her official capacity as Secretary of Education,*
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202,
                Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The Commonwealth of Massachusetts, by and through Attorney General Maura Healey; the People of the State of California, by and through Attorney General Xavier Becerra; the State of Connecticut, by and through Attorney General George Jepsen; the District of Columbia, by and through Attorney General Karl A. Racine; the State of Hawaii, by and through Attorney General Douglas S. Chin; the People of the State of Illinois, by and through Attorney General Lisa Madigan; the State of Iowa, by and through Attorney General Thomas J. Miller; the State of Maryland, by and through Attorney General Brian E. Frosh; the State of Minnesota, by and through Attorney General Lori Swanson; the State of New Mexico, by and through Attorney General Hector Balderas; the State of New York, by and through Attorney General Eric T. Schneiderman; the State of North Carolina *ex rel.* Josh Stein, Attorney General; the State of Oregon, by and through Attorney General Ellen F. Rosenblum; the Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro; the State of Rhode Island, by and through Attorney General Peter F. Kilmartin; the State of Vermont, by and through Attorney General Thomas J. Donovan, Jr.; the Commonwealth of Virginia, by and through Attorney General Mark R. Herring; and the State of Washington, by and through Attorney General Robert W. Ferguson (the "States"), file this Complaint against Defendants Secretary of Education Betsy DeVos and the United States Department of Education (the "Department"), alleging the following:

## INTRODUCTION

2.      This lawsuit challenges the Department's summary and unlawful rescission of a final agency regulation known as the "Borrower Defense Rule" (the "Rule") that was designed to

hold abusive postsecondary institutions accountable for their misconduct and to relieve their

students from federal loan indebtedness incurred as a result of that misconduct.

3.      The Department duly promulgated the Rule on November 1, 2016, after an

extensive negotiated rulemaking process in which the Department reviewed over 10,000

comments, including those of students, postsecondary institutions, state government actors, and

consumer advocates. The Department, moreover, allowed affected schools more than half a year

to prepare for implementation of the Rule, making it effective on July 1, 2017.

4.      The Rule was designed to ensure "that students who are lied to and mistreated by

their school get the relief they are owed, and that schools that harm students are held responsible

for their behavior." Press Release, Department of Education, *U.S. Department of Education*

*Announces Final Regulations to Protect Students and Taxpayers from Predatory Institutions*

(Oct. 28, 2016) ("October 2016 Press Release"), *available at* https://www.ed.gov/news/press-

releases/us-department-education-announces-final-regulations-protect-students-and-taxpayers-

predatory-institutions. The Rule deters institutions from engaging in predatory behavior and

restores the rights of students injured by a school's misconduct to seek relief in court.

5.      Despite the pendency of the Rule for more than seven months, on June 14, 2017,

little more than two weeks before the effective date, the Department issued a short notice

purporting to delay the effective date of large portions of the Rule indefinitely (the "Delay

Notice"). The Department simultaneously announced its intent to issue a new regulation to

replace the Rule. By "delaying" the Rule, the Department effectively canceled a duly

promulgated regulation without soliciting, receiving, or responding to any comment from any

stakeholder or member of the public, and without engaging in a public deliberative process.

6.      The Delay Notice cites the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, and states that a delay is necessary pending the resolution of litigation challenging the Rule. However, both the language of the Delay Notice and the circumstances of its announcement belie this rationale and make clear that the Department's reference to the pending litigation is a mere pretext for repealing the Rule and replacing it with a new rule that will remove or dilute student rights and protections.

7.      The Delay Notice operates as an amendment to or rescission of the Rule.

8.      The APA does not permit the Department to delay a duly promulgated regulation in order to work on a replacement, without first satisfying the statute's substantive standards for a stay of agency action.

9.      The Delay Notice violates the APA in at least the following respects: (1) the Department failed to undertake notice and comment rulemaking prior to issuing the Delay Notice which operates as an amendment to or rescission of the Rule; (2) the Department failed to apply, or even acknowledge, the requisite legal standard for a stay of agency regulations; (3) the Department did not adequately base its justification for delaying the Rule on the pending litigation referenced in the Delay Notice; and (4) the Department failed to offer a reasoned analysis explaining its change of position regarding the Rule. The Delay Notice should therefore be vacated and set aside pursuant to 5 U.S.C. § 706(2).

## JURISDICTION

10.     This action arises under the APA, 5 U.S.C. §§ 553, 701-706. This Court has subject matter jurisdiction over this action because it is a case arising under federal law, 28 U.S.C. § 1331.

11.     This is an action against an officer and agency of the United States. Therefore, venue is proper in this Court under 28 U.S.C. § 1391(e). Additionally, venue is proper in this Court because Defendant Department of Education resides in this judicial district, Defendant Secretary Betsy DeVos performs her official duties in this judicial district, and the events giving rise to this action took place in this judicial district.

## THE PARTIES

12.     Plaintiff the Commonwealth of Massachusetts brings this action by and through Attorney General Maura Healey.

13.     Plaintiff People of the State of California brings this action by and through Attorney General Xavier Becerra.

14.     Plaintiff the State of Connecticut brings this action by and through Attorney General George Jepsen.

15.     Plaintiff the State of Delaware brings this action by and through Attorney General Matthew P. Denn.

16.     Plaintiff the District of Columbia brings this action by and through Attorney General Karl A. Racine.

17.     Plaintiff the State of Hawaii brings this action by and through Attorney General Douglas S. Chin.

18.     Plaintiff People of the State of Illinois brings this action by and through Attorney General Lisa Madigan.

19.     Plaintiff the State of Iowa brings this action by and through Attorney General Thomas J. Miller.

20.     Plaintiff the State of Maryland brings this action by and through Attorney General Brian E. Frosh.

21.     Plaintiff the State of Minnesota brings this action by and through Attorney General Lori Swanson.

22.     Plaintiff the State of New Mexico brings this action by and through Attorney General Hector Balderas.

23.     Plaintiff the State of New York brings this action by and through Attorney General Eric T. Schneiderman.

24.     Plaintiff the State of North Carolina brings this action by and through Attorney General Josh Stein.

25.     Plaintiff the State of Oregon brings this action by and through Attorney General Ellen F. Rosenblum.

26.     Plaintiff the Commonwealth of Pennsylvania brings this action by and through Attorney General Josh Shapiro.

27.     Plaintiff the State of Rhode Island brings this action by and through Attorney General Peter F. Kilmartin.

28.     Plaintiff the State of Vermont brings this action by and through Attorney General Thomas J. Donovan, Jr.

29.     Plaintiff the Commonwealth of Virginia brings this action by, through, and at the relation of Attorney General Mark R. Herring.

30.     Plaintiff the State of Washington brings this action by and through Attorney General Robert W. Ferguson.

31.     Plaintiff the District of Columbia brings this action by and through Attorney General Karl A. Racine.

32.     The States herein, by and through their Attorneys General, are charged with enforcing their respective state consumer protection statutes. These statutes prohibit unfair and deceptive acts or practices.[1]

33.     The States have initiated numerous costly and time-intensive investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes.

34.     State investigations and enforcement actions are afforded a legally significant status under the Rule. *See* 34 C.F.R § 685.222(b) (providing that a judgment obtained by a governmental agency against a postsecondary institution based on state law will give rise to a borrower defense to loan repayment); 34 C.F.R §§ 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C), and 685.206(c)(4)(iii) (providing that a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to commence a collection action against the school).

35.     The States have an interest in the timely implementation of the Rule, which enhances the effectiveness of state enforcement efforts, improves the remedies available for

---

[1] *See, e.g.*, Cal. Bus. & Prof. Code § 17200 *et seq.*; 815 ILCS 505/2; Conn. Get. Stat. Sec. 42-110b; Iowa Consumer Fraud Act, Iowa Code § 714.16; Md. Code Ann., Com. Law §§ 13-101 *et seq.*; Massachusetts Consumer Protection Act, M.G.L. c. 93A; Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 and Minnesota's Deceptive Trade Practices Act, Minn. Stat. § 325D.44; New York General Business Law §§ 349 and 350; NMSA 1978, §§ 57-12-1 to -26 (1967, as amended though 2017); New York Executive Law § 63(12); N.C. Gen. Stat. Chapter 75; Oregon Unlawful Trade Practices Act, Oregon Revised Statutes 646.605 *et seq.*; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*; Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §6-13.1-1, *et seq.*; Virginia Consumer Protection Act, Va. Code §§ 59.1-196 through 59.1-207; 9 V.S.A. §§ 2451, *et seq.*; Washington Consumer Protection Act, RCW 19.86.010, et seq.; Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

violations of state law, deters misconduct by educational institutions, and protects the wellbeing

of the States' respective residents. The Rule provides a joint federal and state process for

protecting students and providing relief to injured students. The Department's stay of the Rule

deprives the States of benefits to their enforcement systems and injures the States' residents by

removing the rights and protections provided by the Rule.

36.     Defendant United States Department of Education is an executive agency of the

United States government. The Department's principal address is 400 Maryland Avenue, SW,

Washington, D.C. 20202.

37.     Defendant Betsy DeVos is the Secretary of the United States Department of

Education and is being sued in her official capacity. Her official address is 400 Maryland

Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

### A.  Federal Student Loans and For-Profit Schools

38.     The federal government provides financial assistance in the form of loans to

students pursuing higher education under Title IV of the Higher Education Act of 1965, as

amended ("HEA"), 20 U.S.C. § 1071 *et seq.* The federal student loan programs are central

components of the financial aid provided to students under Title IV. These programs are

designed to provide critical assistance to prospective students and expand access to higher

education to students who could not otherwise afford to pursue a degree or certificate.

39.     The Department administers multiple programs under Title IV, including the

Federal Family Education Loan Program ("FFEL Program") and the William D. Ford Direct

Student Loan Program ("Direct Loan Program").

40.     Title IV student loans have become a significant source of revenue for many

postsecondary institutions, including and especially for-profit schools.

41.     For-profit schools, which award various degrees and certificates, are owned and

operated as businesses. Several of them are publicly traded. Like any for-profit businesses, a

principal function of these schools is to produce returns for owners and shareholders. *For Profit

Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student

Success*, United States Senate, Health, Education, Labor and Pensions Committee, at 1 (July 30,

2012) ("Senate Report") *available at*

https://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.

42.     For-profit schools receive the vast majority of their revenue from the federal

government in the form of federal student loans and grants. In 2009, the fifteen publicly traded

for-profit education companies received 86 percent of their revenues from taxpayer-funded

loans. *Id.* at 3. Taxpayers invested $32 billion in for-profit schools in the 2009-10 academic year,

more than the annual budget of the U.S. Department of Justice and the U.S. Department of State

during that time period. *Id.* at 15; Office of Mgmt. & Budget, Exec. Office of the President,

Historical Tables, Budget of the United States Government, Fiscal Year 2012 (2011), Table 4.1

*available at* https://www.gpo.gov/fdsys/pkg/BUDGET-2012-TAB/pdf/BUDGET-2012-

TAB.pdf.

43.     For-profit schools typically advertise themselves to students with modest financial

resources who are eligible for federal funds in the form of grants and loans. Many such students

are the first in their families to enroll in an institution of higher education. For-profit schools

have directed their marketing toward low-income and minority students, particularly low-income

women of color.

44.     Nationwide, in 2011-2012, 26 percent of undergraduates at for-profit schools were African American, as compared with 15 percent of students at public institutions and 14 percent of students at private nonprofit institutions. *A Profile of Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions*, U.S. Department of Education, National Center for Education Statistics (2007) at 13, *available at* https://nces.ed.gov/pubs2017/2017416.pdf. Certificate programs at for-profit schools enroll a greater percentage of African American, Hispanic, and female students as compared with certificate programs at nonprofit and public institutions. Kevin Lang & Russell Weinstein, *Evaluating Student Outcomes at For-Profit Colleges*, National Bureau of Economic Research (2012) at 10, *available at* http://www.nber.org/papers/w18201.pdf.

45.     Additionally, for-profit schools recruit people who are unemployed and thus eligible for federal workforce retraining monies, and veterans who are eligible for federal veteran benefits.

46.     The vast majority of students in for-profit institutions take out federal loans to pay for their education. In 2009 and 2010, for-profit schools enrolled about 10 percent of post-secondary students, but these schools accounted for nearly a quarter of all federal educational loans and grants. Senate Report at 3 and 15.

47.     For-profit programs are typically expensive for the students who attend them. The Senate Report found that the average certificate programs at a for-profit school cost 4.5 times more than a comparable program at a community college. *Id.* at 36. The tuition charged by for-profit schools is often a product of company profit goals, rather than anticipated academic and instructional expenses. *Id.* at 3.

48.     Profit goals also drive and the types of expenses incurred at for-profit schools. For-profit schools spend relatively little on education; the Senate Report found that only 17.2 percent of for-profit schools' revenue was spent on instruction, less than the amount allocated for marketing, advertising, recruiting, and admissions staffing, and less than the amount allocated as profit. *Id.* at 6.

49.     Despite the high costs of for-profit programs, students attending for-profit institutions often fail to realize the returns on their investment in education—facing high default rates on their loans and high unemployment rates after leaving school. Nearly a quarter of students who attend for-profit schools default on their loans within three years of graduation, and approximately half of such students will default over the lifetime of their loans. *Id.* at 8 and 18. Overall, students at for-profit schools nationally accounted for about half of all federal student loan defaults in 2009. *Id.* at 8. Furthermore, students who attend for-profit schools are more likely to face unemployment after leaving their schools. *Id.*

50.     While for-profit schools benefit from the loans their students incur to finance tuition, the students themselves struggle under the burden of student loan debt they cannot afford after working towards expensive degrees or certificates that may be of questionable value to them.

51.     Nonetheless, enrollment in for-profit schools grew significantly in the past two decades. From 2000 to 2010, undergraduate enrollment at degree-granting private for-profit institutions quadrupled. *The Condition of Education at a Glance*, Department of Education, National Center for Education Statistics, (May 2017), *available at* https://nces.ed.gov/programs/coe/indicator_cha.asp.

**B.  Institutional Misconduct and State and Federal Enforcement Actions**

52.     In order to maintain and increase their revenue from Title IV student loans, some for-profit schools engage in a variety of abusive and deceptive practices. Such practices include coercive and harassing recruitment tactics, deceptive marketing, and misrepresentations about students' future career prospects, completion rates, and the reputation or accreditation of the school. For-profit recruiters are trained to use aggressive tactics and often create a false sense of urgency to enroll. Some for-profit colleges train and encourage recruiters to identify prospective students in dire financial straits, and then use that fact to pressure the individuals to enroll.

53.     Prospective students may be misled by for-profit schools about their likelihood of finding employment upon completion of their programs. Although most programs at for-profit schools are career or vocational programs, many students are unable to obtain jobs in their career fields after completing their programs.

54.     Additionally, students who are harmed by the misconduct of for-profit schools are often unable to seek a remedy in court. For-profit schools have used mandatory arbitration agreements and class action waivers to avoid negative publicity and to thwart legal actions by students who have been harmed by their schools' abusive conduct.

55.     The States, by and through their Attorneys General, initiate numerous investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes. Many of these actions have resulted in judgments against the schools.

56.     State enforcement actions initiated against for-profit schools since 2012 include:

- **Career Education Corporation (including the Sanford Brown schools)**
  - Assurance of Discontinuance obtained by New York on August 19, 2013. *See* Press Release, A.G. Schneiderman Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit

Education Company That Inflated Job Placement Rates To Attract Students (Aug. 19, 2013) *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-groundbreaking-1025-million-dollar-settlement-profit.

- **The Career Institute, LLC.**
  - o Complaint, Massachusetts v. The Career Institute, LLC. *et al.*, No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015) *available at* http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf; Final Judgment by Consent, Massachusetts v. The Career Institute, LLC. *et al.*, No. 13-4128H (Mass. Super. Ct. June 1, 2016) *available at* http://www.mass.gov/ago/docs/consumer/aci-consent-judgment.pdf.

- **Corinthian Colleges, Inc. ("Corinthian")**
  - o Complaint, Massachusetts v. Corinthian Colleges, Inc. *et al.* No. 14-1093 (Mass. Super. Ct. Apr. 3, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/everest-complaint.pdf.
  - o $1.1 billion judgment, *People of the State of California v. Corinthian Colleges, Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016) *available at* https://oag.ca.gov/system/files/attachments/press_releases/Corinthian%20Final%20Judgment_1.pdf.
  - o California's Objection to Bankruptcy Plan Confirmation, *In re Corinthian Colleges, Inc. et al.*, No. 15-10952, Doc. No. 824 (Bankr. D. Del., Aug. 21, 2015).
  - o Illinois investigation initiated on 12/14/2011; Opp. to Debtor's Obj. with findings, Doc. No. 1121, In re: Corinthian Colleges, Inc. *et al.* No. 15-10952 (KJC) (U.S. Bankr. Ct. Dist. of Del., Dec. 9, 2015).

- **DeVry University**
  - o Assurance of Discontinuance obtained by New York on January 27, 2017. See Press Release, A.G. Schneiderman Obtains Settlement with DeVry University Providing $2.25 Million in Restitution for New York Graduates Who Were Misled About Employment and Salary Prospects After Graduation (January 31, 2017); *available at* https://ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-devry-university-providing-225-million-restitution.
  - o Assurance of Discontinuance obtained by Massachusetts on June 30, 2017. See Press Release, AG Healey Secures $455,000 in Refunds for Students Deceived by Online For-profit School (July 5, 2017); available at http://www.mass.gov/ago/news-and-updates/press-releases/2017/2017-07-05-refunds-for-students-deceived-by-online-for-profit-school.html.

- **Education Management Corporation** (including The Art Institutes and Brown Mackie College)
  - Complaint, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consent Judgment, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015).
  - Consumer Protection Division v. Education Management Corporation, *et al*. Case No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015).
  - Complaint, State of New York v. Education Management Corp., *et al*., No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Consent Order and Judgment (N.Y. Sup. Ct. Jan. 14, 2016).
  - Complaint, State of North Carolina v. Education Management Corporation, *et al*, No. 15-CV-015426 (N.C. Sup. Ct. Wake County Nov. 16, 2015); Consent Judgment, State of North Carolina v. Education Management Corporation, *et al*, No. 15-CV-015426 (Sup. Ct. Wake County Nov. 16, 2015).
  - Complaint, State of Washington v. Education Management Corp., *et al*., Case No. 15-2-27623-9 SEA (King County Sup. Ct. Nov. 16, 2015); Consent Decree (King County Sup. Ct. Nov. 16, 2015).
  - District of Columbia v. Education Management Corporation, *et al.* Case No. 2015 CA 8875 B (D.C. Sup. Ct.) (Consent Order entered on January 20, 2016).
  - $95.5 million global settlement, intervention by States of California, Illinois, Minnesota, and others, *United States ex rel. Washington v. Education Management Corp., et al.*, No. 07-00461 (W.D. Pa., Nov. 13, 2015).

- **ITT Educational Services, Inc.**
  - Complaint, Massachusetts v. ITT Educ. Servs. Inc., No. 16-0411 (Mass. Super. Ct. Mar. 31, 2016).

- **Kaplan Higher Education, LLC**
  - Assurance of Discontinuance, In the Matter of Kaplan, Inc., Kaplan Higher Education, LLC, No. 15-2218B (Mass. Super. Ct. July 23, 2015) *available at* http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf.

- **Lincoln Technical Institute, Inc.**
  - Complaint, Massachusetts v. Lincoln Tech. Inst., No. 15-2044C (Mass. Super. Ct. July 8, 2015); Consent Judgment, Massachusetts v. Lincoln Tech. Inst., No. 15-2044C (Mass. Super. Ct. July 13, 2015) *available at* http://www.mass.gov/ago/docs/press/2015/lincoln-tech-settlement.pdf.

- **MalMilVentures, LLC, d/b/a Associated National Medical Academy**
  - Statement of Charges, Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, *et al.*, CPD Case No.: 10-009-182059 (In the Consumer Protection Division, Feb. 22, 2010); Final Order by Consent, Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, *et al.*, OAG Case No.: 041006571 (In the Consumer Protection Division, June 7, 2010).

- **Minnesota School of Business, Inc. and Globe University, Inc.**
  - Complaint, Minnesota v. Minnesota School of Business, Inc. *et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014); Findings of Fact, Conclusions of Law and Order, Minnesota v. Minnesota School of Business *et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. September 8, 2016).

- **The Salter School**
  - Complaint, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 9, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-complaint.pdf; Final Judgment by Consent, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 11, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-judgment-by-consent.pdf.

- **Sullivan & Cogliano Training Centers, Inc.**
  - Complaint, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No. 13-0357B (Mass. Super. Ct. Apr. 3. 2013) *available at* http://www.mass.gov/ago/audioandvideo/s-and-c-complaint.pdf; Consent Judgment, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No. 13-0357B (Mass. Super. Ct. Oct. 28, 2013).

- **Westwood College, Inc.**
  - Complaint, People of the State of Illinois v. Westwood College, Inc. *et al.*, No. 12 CH 01587 (Cir. Ct. Cook County Jan. 18, 2012); Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (U.S. Dist. Ct., N. Dist. Ill. Sept. 30, 2014); Settlement entered on October 9, 2015.

57.     Through these investigations and enforcement actions, the States have uncovered a wide array of predatory practices employed by abusive for-profit schools. These practices commonly include unfair and harassing recruitment tactics, false and misleading representations to consumers and prospective students designed to induce enrollment in the schools, the

recruitment and enrollment of students unable to benefit from the education sought, and the creation, guarantee, and funding of predatory private student loans.

58.     In fact, the Rule was promulgated in large part as a result of state and federal investigations into for-profit schools, in particular with respect to the misconduct of Corinthian, formerly one of the largest educational institutions in the United States with over a hundred thousand students at campuses throughout the country.

59.     State and federal investigations uncovered that Corinthian committed numerous violations of state and federal law in advertising, recruiting, enrolling, and providing financing to students. The judgments against Corinthian of well over a billion dollars, largely for restitution of tuition and fees paid by students injured by Corinthian's misconduct, were never paid when Corinthian closed its schools and subsequently filed for bankruptcy.

60.     In the wake of such investigations and enforcement actions against for-profit schools, state attorneys general have attempted to help students affected by institutional misconduct obtain federal student loan forgiveness.

**C. Promulgation of the Borrower Defense Rule**

61.     Recognizing the damaging impact of institutional misconduct on student borrowers, Congress called on the Secretary of Education to promulgate regulations governing the process by which students could seek loan discharges based on the conduct of their schools. *See* 20 U.S.C. § 1087e(h).

62.     Pursuant to Section 492 of the HEA, the Secretary of Education was required to undertake a negotiated rulemaking process and obtain public involvement in the development of proposed regulations relating to Title IV programs. 20 U.S.C. § 1098a.

63.     In August 2015, the Department announced that it would begin a new negotiated rulemaking. 80 Fed. Reg. 50,588 (Aug. 20, 2015). One goal of the new rulemaking was "to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." 81 Fed. Reg. 75,926 (Nov. 1, 2016).

64.     The Department held public hearings in September 2015 to solicit comments on the topics to be included as part of the rulemaking. The Department also invited parties to submit written comments. 80 Fed. Reg. at 50,589.

65.     After soliciting nominations for negotiators, the Department established a negotiated rulemaking committee comprised of individuals representing students/borrowers, private/nonprofit institutions, two-year public institutions, four-year public institutions, private/for-profit institutions, minority-serving institutions, FFEL Program lenders and loan servicers, FFEL Program guaranty agencies and guaranty agency servicers, state attorneys general, state higher education executive officers, financial aid administrators, accreditors, legal assistance organizations, consumer advocacy organizations, and U.S. military service members and veterans. The rulemaking committee met three times to develop regulations. 81 Fed. Reg. 39,329 (June 16, 2016), at 39,333-34.

66.     The Department received and reviewed more than 10,000 comments prior to promulgating the Rule.

67.     State attorneys general participated in the negotiated rulemaking that resulted in the Rule, serving on the negotiating committee, providing input on draft provisions through the state attorney general representatives on the negotiating committee, and submitting comments to

18

the Department throughout the process. *See* 81 Fed. Reg. at 39,333-34 (announcing Bernard

Eskandari of the Office of the Attorney General of California as a member of the negotiating

committee and Mike Firestone of the Massachusetts Office of the Attorney General as an

alternate member of the negotiating committee).

68.     The Department promulgated the Rule on November 1, 2016, 81 Fed. Reg.

75,926 (Nov. 1, 2016), and added supplemental "Borrower Defense Procedures" to the Rule on

January 19, 2017, 82 Fed. Reg. 6253 (Jan. 19, 2017).

69.     The effective date of the Rule is July 1, 2017.

70.     The Rule was designed to "protect student loan borrowers from misleading,

deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions

participating in the Department's student aid programs," 81 Fed. Reg. at 75,926, by (*inter alia*):

- creating standards for loan discharge and clarifying the process by which
  students can seek to have their federal loans discharged on the basis of their
  schools' misconduct;

- providing students with access to "consistent, clear, fair, and transparent
  processes to seek debt relief . . . ," *Id.*;

- "[e]mpowering the Secretary to provide debt relief to borrowers without
  requiring individual applications in instances of widespread
  misrepresentations," (October 2016 Press Release), an important
  accompaniment to the state enforcement process;

- "protect[ing] taxpayers by requiring that financially risky institutions are
  prepared to take responsibility for losses to the government" when their illegal
  conduct results in discharges of borrowers' loans, 81 Fed. Reg. at 75,926;

19

- requiring institutions with poor loan repayment outcomes to provide warnings about their loan repayment rates in plain language in advertising and promotional materials in order to help students make more informed decisions concerning their educational choices, 81 Fed. Reg. at 75,927; and

- prohibiting schools participating in the Direct Loan Program from using mandatory predispute arbitration agreements or class action waivers to resolve claims with students.  81 Fed. Reg. at 75,926-27.

71.     The Rule affords a legally significant status to enforcement actions and investigations undertaken by state attorneys general. A successful enforcement action brought against a postsecondary institution by a state attorney general gives rise to a borrower defense to loan repayment. *See* 81 Fed. Reg. at 76,083; 34 C.F.R. § 685.222(b). Additionally, a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to seek repayment from the school for any amounts forgiven. *See* 81 Fed. Reg. at 76,085; 34 C.F.R. §§ 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C), and 685.206(c)(4)(iii).

72.     By incorporating state enforcement actions and investigations into the Department's borrower defense framework, the Rule enhances the effectiveness of state enforcement efforts and the remedies available for violations of state law.

73.     The Rule provides additional important assistance to the States' enforcement efforts by substantially increasing deterrence of institutional misconduct through provisions that allow the Department to recoup the cost of borrower defense discharges from schools engaging in misconduct and provide for mass discharge of student debt in cases of widespread misconduct,

and by requiring public disclosures concerning a school's financial condition and loan repayment rates in certain contexts. *See* 81 Fed. Reg. at 75, 960, 75,964-65, 76,070-71, and 76,085.

74.     Additionally, by enabling borrowers to seek redress in court for their schools' misconduct, the Rule's prohibitions on mandatory arbitration and class-action waivers restore an important component of the States' consumer protection frameworks, which incorporate private lawsuits to supplement government enforcement efforts and facilitate greater enforcement of state laws. *See* 81 Fed. Reg. at 76,087-89.

**D. Pending Litigation and the Department's Delayed Implementation of the Rule**

75.     On May 24, 2017, Secretary DeVos announced that the Department was reevaluating the Rule. In her testimony before a congressional subcommittee, Secretary DeVos referred to the Rule and stated "that is something that we are studying carefully and looking at and we will have something further to say on that within the next few weeks." *See*, Elisabeth DeVos testimony before House Appropriations Subcommittee, at 1:20 in response to question by Rep. Katherine Clark, https://www.c-span.org/video/?428714-1/education-secretary-betsy-devos-pressed-accountability-charter-schools (last accessed June 26, 2017).

76.     The same day, the California Association of Private Postsecondary Schools ("CAPPS"), a trade organization including mostly for-profit schools, filed a lawsuit challenging the Rule.

77.     On June 2, 2017, CAPPS moved for a preliminary injunction to bar implementation of specific provisions prohibiting participating schools from using mandatory arbitration agreements and class action waivers to block students from bringing private suits in court.

78.     On June 14, 2017, the Department issued the Delay Notice—a final rule delaying

the implementation of numerous provisions included in the Rule. Dept. of Educ., Notification of

Partial Delay of Effective Dates (June 14, 2017), at 4, https://s3.amazonaws.com/public-

inspection.federalregister.gov/2017-12562.pdf. The two-page Delay Notice was formally

published in the Federal Register on June 16, 2017. 82 Fed. Reg. 27,621 (June 16, 2017).

79.     The Department did not engage in notice and comment rulemaking regarding its

delay of the Rule prior to issuing the Delay Notice.

80.     As authority to delay its implementation of the Rule, the Department sought to

rely on 5 U.S.C. § 705, which provides:

> When an agency finds that justice so requires, it may postpone the effective
> date of action taken by it, pending judicial review. On such conditions as
> may be required and to the extent necessary to prevent irreparable injury, the
> reviewing court . . . may issue all necessary and appropriate process to
> postpone the effective date of an agency action or to preserve status or rights
> pending conclusion of the review proceedings.

81.     The Delay Notice cursorily states that the Department's delay of the Rule was

initiated due to the pending CAPPS litigation.

82.     Despite invoking the CAPPS litigation, the Delay Notice stays the

implementation of specific provisions of the Rule that have not been explicitly challenged and

which are not clearly at issue in the CAPPS litigation. For example, the Delay Notice stays the

implementation of provisions that govern automatic discharges for students who attend a school

that closes. See 34 C.F.R. §§ 674.33, 682.402, and 685.214. The Department failed to provide

any explanation or justification for delaying the particular assortment of provisions specified in

the Delay Notice.

83.     The language of the Delay Notice and the Department's official announcements

indicate that the Department's invocation of 5 U.S.C. § 705 and the CAPPS litigation is a pretext

to avoid the required notice and comment process and allow the Department to defer

implementation of the Rule pending the Department's wholesale reevaluation of the Rule.

84.     The Delay Notice, by its own terms, is intended to facilitate a new rulemaking and

operates as an amendment to or a rescission of the Rule. The Delay Notice expressly states that

the Department intends to use the implementation delay to replace the Rule:

> [T]he Department is announcing its plan to review and revise the regulations
> through the negotiated rulemaking process required under section 492 of the
> HEA. The postponement will allow the Department to consider and conduct a
> rulemaking process to review and revise the final regulations and ensures
> regulated parties will not incur costs that could be eliminated under any future
> regulations the Department promulgates on these matters.

82 Fed. Reg. at 27,6222.

85.     In the first official statement announcing the Delay Notice, the Department stated

that it would undertake a "regulatory reset" and initiate a new negotiated rulemaking process

regarding the Rule. The Secretary referred to the Rule as establishing "a muddled process" and to

the rulemaking effort that led to the Rule as a "missed opportunity." Press Release, Department

of Education, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers,*

*Higher Ed Institutions*, (June 14, 2017) ("June 2017 Press Release") *available at*

https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-

students-taxpayers-higher-ed-institutions. This press release demonstrates that the delay and

effective rescission of the Rule is part and parcel of the Department's new rulemaking initiative

and not a bona fide response to pending litigation.

86.     The Delay Notice, which has the status of law, affects regulated parties' rights

and obligations and has a direct impact on the States.

87.     Failure to implement the Rule on its effective date deprives the States of benefits

to their respective consumer protection enforcement schemes, which benefits include, *inter alia*,

the Rule's: (1) incorporation of state investigations and enforcement actions into the borrower

defense framework, (2) restoration of private rights of actions for students, and (3) deterrence of

misconduct by for-profit schools. Such a failure also deprives the States of the economic

contributions of students harmed by the misconduct of postsecondary institutions.

88.     Delayed implementation of the Rule also denies critical rights and protections to

the States' residents and disproportionately harms the States' low-income families and residents

of color—who are more likely to be subjected to the abuses of for-profit schools. The loss of the

rights and protections established by the Rule causes a substantial injury to students who are

unable to bring actions against abusive institutions because of mandatory arbitration agreements

and class action waivers that remain in effect in the absence of the Rule. The loss of rights and

protections also causes substantial injury to students who cannot avail themselves of the Rule's

new streamlined process for obtaining loan discharges, and who will enroll in abusive

institutions without receiving the warnings and information necessary to make an informed

enrollment decision.

## CAUSES OF ACTION

### COUNT I

**Failure to Adhere to Procedures Required by Law
When Promulgating Regulations**

89.     The States incorporate by reference paragraphs 1 through 88 of this Complaint.

90.     The APA provides a general cause of action for parties adversely affected or

aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-

704.

91.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

92.     The APA requires an agency to give "(g)eneral notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

93.     The HEA requires the Department to obtain public involvement in the development of proposed regulations related to student financial assistance programs and to "submit such regulations to a negotiated rulemaking process."  20 U.S.C. § 1098a(a)(1), (b)(2).

94.     An agency's delay of the effective date of a final regulation for the purpose of reevaluating such regulation operates as an amendment or rescission of the final regulation and is subject to the APA's notice and comment requirement.

95.     The Delay Notice, which stays implementation of the Rule pending the reevaluation of the regulations, is a substantive rule requiring the Department to initiate notice and comment procedures and a new negotiated rulemaking.

96.     The Department did not engage in a notice and comment process or initiate a negotiated rulemaking regarding its delay of the Rule prior to issuing the Delay Notice.

97.     The Department promulgated the Delay Notice without adhering to the procedural requirements of 5 U.S.C. § 553 (b), (c) and 20 U.S.C. § 1098a. The Delay Notice should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(D).

## COUNT II

**Failure to Employ the Requisite Legal Standard**

98.     The States incorporate by reference paragraphs 1 through 97 of this Complaint.

99.     The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

100.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

101.    An agency seeking to justify a stay of its regulations on the basis of pending litigation challenging those regulations must employ the four-part preliminary injunction test, under which an agency must show that: (1) the plaintiff in the litigation is likely to prevail on the merits, (2) the absence of a delay will irreparably harm the plaintiff, (3) others will not be harmed by the delay, and (4) the public interest requires a delay. An agency's failure to do so renders the agency's action arbitrary and capricious. *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30-31 (D.D.C. 2012).

102.    Despite purporting to delay the Rule because of the CAPPS litigation, the Department failed to employ—or even acknowledge—the requisite four-prong test in the Delay Notice, which:

- does not refer to or address either party's probability of success on the merits;

- does not refer to or address irreparable harm or attempt to show that the plaintiff will suffer irreparable harm in the absence of a stay;

- without any discussion or analysis, conclusorily asserts that a delay "will not prevent student borrowers from obtaining relief because the Department will

continue to process borrower defense claims under existing regulations that will remain in effect during the postponement" 82 Fed. Reg. at 27,621; and

- does not discuss the public interest, except in its oblique and misleading statement that "the federal government and ultimately the federal taxpayer" will avoid incurring certain costs if the Rule is not implemented. 82 Fed. Reg. at 27,622.

103.    With respect to the effect of the stay on students, the Delay Notice ignores significant injuries that students will suffer due to the delay of the Rule. The Delay Notice does not mention or seek to address the harm caused to students by the postponement of provisions that provide for, *inter alia*: (1) the protection of students by streamlining the loan discharge process, including automatic loan discharge for groups of students victimized by widespread school misconduct; (2) the right to bring actions in court, both individually and collectively, against abusive schools; (3) the protection of enhanced disclosures from schools that have poor loan repayment outcomes; and (4) financial responsibility standards that protect students by deterring abusive conduct.

104.    Even if the Department had attempted to employ the proper legal test, the Department would have been unable to satisfy the test's requirements.

105.    The Delay Notice does not comply or attempt to comply with the legal test applicable to stays justified under 5 U.S.C. § 705. The Delay Notice is arbitrary and capricious and not in accordance with law, and should by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III

### Failure to Provide an Adequate Justification

106.    The States incorporate by reference paragraphs 1 through 105 of this Complaint.

107.    The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

108.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    Where an agency seeks to delay a regulation on the basis of pending litigation, the reasons used to justify the stay must be tied to the existence or consequences of the pending litigation.

110.    Despite invoking the CAPPS litigation and stating obliquely that the litigation raises "serious questions" and that the plaintiffs identified "substantial injuries," the reasoning provided in the Delay Notice to justify the Department's delay of the Rule is not tied to the pending CAPPS litigation.

111.    Rather, the Delay Notice makes clear that the purpose of the stay is to allow the Department—independent of the litigation's outcome—to discard the Rule and replace it with new regulations. The Delay Notice explicitly states that "[t]he postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters."  82 Fed. Reg. at 27,6222.

112.    In addition to avoiding the imposition of costs on regulated parties pending the replacement of the Rule, the Delay Notice justifies the delayed implementation of the Rule on the basis that such a postponement will help avoid significant costs to the federal government. The Department's cost-saving goals are unrelated to the CAPPS litigation.

113.    Moreover, the Delay Notice delays implementation of multiple regulatory provisions that have not been explicitly challenged and which are not clearly at issue in the CAPPS litigation. The Department failed to provide any explanation or justification for delaying the particular provisions specified in the Delay Notice and has failed to base its delay of the specified provisions on the CAPPS litigation.

114.    The Department's failure to provide an adequate justification for the delayed implementation of the Rule renders the Delay Notice arbitrary and capricious and not in accordance with law. The Delay Notice should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT IV

### Failure to Offer Reasoned Analysis for Rescission of the Rule

115.    The States incorporate by reference paragraphs 1 through 114 of this Complaint.

116.    The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

117.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

118.    To satisfy the APA, an agency reversing or departing from a previous policy or rescinding a rule must acknowledge and offer a reasoned analysis for its reversal or rescission.

119.    By its own terms, the Delay Notice is intended to facilitate the Department's replacement of the Rule. The Delay Notice justifies staying implementation of the Rule on the basis that such a stay would "allow the Department to consider and conduct a rulemaking process to review and revise the final regulations." 82 Fed. Reg. at 27,622.

120.    In its official statement announcing the Delay Notice, the Department simultaneously announced that it would undertake a "regulatory reset" and initiate a new negotiated rulemaking process to develop "improved" borrower defense regulations. June 2017 Press Release.

121.    Although the Delay Notice operates as an amendment to or rescission of the Rule, the Department failed to supply a reasoned analysis for its change of position. The Department's failure to do so renders the Delay Notice arbitrary and capricious and not in accordance with law. The Delay Notice should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

## IV.    PRAYER FOR RELIEF

WHEREFORE, the States request that this Court enter judgment in their favor and grant the following relief after trial on the merits:

    a.   Declare the Delay Notice unlawful;

    b.   Vacate the Delay Notice;

    c.   Order that the Borrower Defense Rule be implemented promptly;

    d.   Award Plaintiffs reasonable costs, including attorneys' fees; and

    e.   Grant such other and further relief as the Court deems just and proper.

Dated: July 6, 2017

Respectfully Submitted,

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By: */s/ Yael Shavit*
Yael Shavit
Max Weinstein
Peter Leight
Assistant Attorneys General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197 (Shavit)
(617) 963-2499 (Weinstein)
(413) 523-7706 (Leight)
Yael.Shavit@state.ma.us
Max.Weinstein@state.ma.us
Peter.Leight@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By: */s/ Bernard A. Eskandari*
Bernard A. Eskandari
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

FOR THE STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

By: */s/ Joseph J. Chambers*
Perry Zin-Rowthorn
Deputy Attorney General
Joseph J. Chambers

Assistant Attorney General
Connecticut Office of Attorney General
PO Box 120
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

By: */s/Aaron Goldstein*
Aaron Goldstein
State Solicitor
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Aaron.goldstein@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By: */s/ Philip Ziperman*
Philip Ziperman
Assistant Attorney General
Attorney General for the District of Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 442-9886
Philip.Ziperman@dc.gov

FOR THE STATE OF HAWAII
DOUGLAS S. CHIN
ATTORNEY GENERAL OF HAWAII

By: */s/ Bryan C. Yee*
Bryan C. Yee
Deputy Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
bryan.c.yee@hawaii.gov

PEOPLE OF THE STATE OF

32

ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Susan Ellis*
    Susan Ellis
    Consumer Fraud Bureau, Chief
    Joseph Sanders
    Assistant Attorney General
    Consumer Fraud Bureau
    Office of the Illinois Attorney General
    100 W. Randolph St., 12th Fl.
    Chicago, IL 60601
    (312) 814-6796 (Joseph)
    sellis@atg.state.il.us
    jsanders@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By: */s/ Jessica Whitney*
    Jessica Whitney
    Director - Consumer Protection
    Office of the Attorney General of Iowa
    1305 E. Walnut St.
    Des Moines, Iowa 50319
    (515) 281-8772
    Jessica.Whitney@iowa.gov

FOR THE STATE OF MARYLAND
BRIAN E. FROSH
ATTORNEY GENERAL

By: */s/ Christopher J. Madaio*
    Christopher J. Madaio
    Assistant Attorney General
    Office of the Attorney General
    Consumer Protection Division
    200 St. Paul Place, 16th Floor
    Baltimore, MD 21202
    (410) 576-6585
    Cmadaio@oag.state.md.us

FOR THE STATE OF MINNESOTA
LORI SWANSON
ATTORNEY GENERAL

By:  */s/ Kathryn I. Landrum*
     Kathryn I. Landrum
     Assistant Attorney General
     445 Minnesota Street, Suite 1100
     St. Paul, Minnesota 55101-2130
     (651) 757-1189 (Voice)
     (651) 296-1410 (TTY)
     kathryn.landrum@ag.state.mn.us

     FOR THE STATE OF NEW MEXICO
     HECTOR BALDERAS
     ATTORNEY GENERAL

By:  */s/ Joseph Yar*
     Joseph Yar
     Assistant Attorney General
     New Mexico Office of the Attorney General
     408 Galisteo St.
     Santa Fe, NM 87501
     (505) 490-4060
     jyar@nmag.gov

     FOR THE STATE OF NEW YORK
     ERIC T. SCHNEIDERMAN
     ATTORNEY GENERAL OF NEW YORK

By:  */s/ Jane M. Azia*
     Jane M. Azia
     Chief, Bureau of Consumer Frauds and
     Protection
     120 Broadway, 3rd floor
     New York, NY 10271
     Tel.: (212) 416-8727
     Jane.azia@ag.ny.gov

     FOR THE STATE OF NORTH CAROLINA
     JOSH STEIN
     ATTORNEY GENERAL OF NORTH
     CAROLINA

By:  */s/ Sripriya Narasimhan*
     Sripriya Narasimhan (D.C. Bar No.: 1029549)
     Deputy General Counsel
     North Carolina Department of Justice
     114 W. Edenton St.

Raleigh, NC  27603
P.O. Box 629
Raleigh, NC  27602
(919) 716-6421
SNarasimhan@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By: */s/ Andrew Shull*
Andrew Shull
Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
(503) 934-4400
Andrew.shull@doj.state.or.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL

By: */s/ John M. Abel*
John M. Abel
Senior Deputy Attorney General
Office of the Pennsylvania Attorney General
Bureau of Consumer Protection
15th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 783-1439
jabel@attorneygeneral.gov

Jesse Harvey
Senior Deputy Attorney General
Office of the Pennsylvania Attorney General
Bureau of Consumer Protection
6th Floor Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219
(412) 565-2883
jharvey@attorneygeneral.gov

FOR THE STATE OF RHODE ISLAND
PETER F. KILMARTIN

ATTORNEY GENERAL

By: */s/ Edmund F. Murray, Jr.*
Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400
emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By: */s/ Christopher J. Curtis*
Christopher J. Curtis
State of Vermont
Office of the Attorney General
Chief, Public Protection Division
109 State St.
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By: */s/ Samuel T. Towell*
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Cynthia E. Hudson
Chief Deputy Attorney General
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By: */s/ Jeffrey T. Sprung*

Darwin P. Roberts
Deputy Attorney General
Jeffrey T. Sprung (D.C. Bar No.: 384880)
Benjamin J. Roesch
Cynthia Alexander
Assistant Attorneys General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
darwinr@atg.wa.gov
jeff.sprung@atg.wa.gov
benjaminr@atg.wa.gov
cynthiaa@atg.wa.gov