**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF MASSACHUSETTS,
et al.

               Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
EDUCATION,

      and

BETSY DEVOS, *in her official capacity as
Secretary of Education,*

          Defendants.

**Civil Action No. 1:17-CV-01331**

*AMICI CURIAE* **BRIEF OF THE NATIONAL CONSUMER LAW CENTER,
AMERICAN FEDERATION OF TEACHERS, AMERICANS FOR FINANCIAL
REFORM, BAY AREA LEGAL AID, CENTER FOR RESPONSIBLE LENDING,
COMMUNITY LEGAL SERVICES OF PHILADELPHIA, CONSUMER ACTION,
CONSUMERS UNION, HOUSING AND ECONOMIC RIGHTS ADVOCATES, LEGAL
AID FOUNDATION OF LOS ANGELES, LEGAL SERVICES NYC, NATIONAL
ASSOCIATION FOR COLLEGE ADMISSION COUNSELING, NEW YORK LEGAL
ASSISTANCE GROUP, PUBLIC COUNSEL, PUBLIC LAW CENTER, THE
INSTITUTE FOR COLLEGE ACCESS AND SUCCESS, UNITED STATES PUBLIC
INTEREST RESEARCH GROUP, AND YOUNG INVINCIBLES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Abigail Evans Shafroth
(D.C. Bar No. 1003646)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
(617) 542-8010
ashafroth@nclc.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF DISCLOSURE

Pursuant to LCvR 7(o) and 7.1 of the Local Rules of the United States District Court for the District of Columbia, and Fed. R. App. P. 29:

I, undersigned counsel of record for *amici curiae*, certify that to the best of my knowledge and belief, none of the *amici* organizations—American Federation of Teachers, Bay Area Legal Aid, Center for Responsible Lending, Community Legal Services of Philadelphia, Consumer Action, Consumers Union, Housing and Economic Rights Advocates, Legal Aid Foundation of Los Angeles, Legal Services NYC, National Association for College Admission Counseling, National Consumer Law Center, New York Legal Assistance Group, Public Counsel, Public Law Center, The Institute for College Access and Success, United States Public Interest Research Group, and Young Invincibles—has a parent corporation, no publicly held company holds 10% or more of stock of any of the *amici* organizations, and no parents, subsidiaries, or affiliates thereof have any outstanding securities in the hands of the public. *Amici* Americans for Financial Reform (AFR) operates as a project of the Leadership Conference on Civil and Human Rights, a 501(c)(4) organization, and The Leadership Conference Education Fund, Inc., a 501(c)(3) organization; neither organization has a parent company or stock.

## STATEMENT OF COUNSEL

Pursuant to LCvR 7(o) of the Local Rules of the U.S. District Court for the District of Columbia and Fed. R. App. P. 29, counsel for *amici curiae* states that none of the parties to the above-captioned dispute, and none of their counsel, authored this brief in whole or in part.  No person other than *amici* made a monetary contribution to preparation or submission of this brief.

Dated:  September 28, 2017                    Respectfully submitted,

                                              /s/ Abigail Evans Shafroth
                                              Attorney of record for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF DISCLOSURE ........... i

STATEMENT OF COUNSEL ....................................................................................... i

TABLE OF AUTHORITIES …………………………………………………………….iii

INTERESTS OF AMICI.................................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ...................................................................................................................... 4

I.  The Borrower Defense Rule was Promulgated in Response to Pervasive School Fraud and Closures........................................................................................................................... 4

    A.  Fraudulent Recruiting Tactics by Predatory Schools Have Robbed Students of Their Dreams and Loaded Them Down with Debt ............................................................... 4

    B.  Predatory School Conduct Disproportionately Harms Low-Income Students and Students of Color ..................................................................................................................... 7

II.  The Borrower Defense Rule Created a Long-Overdue Process for Defrauded Borrowers to Access Relief ................................................................................................................... 8

    A.  The Rule Establishes a Process for Borrower Defense Discharges ................................... 9

    B.  The Rule Expands Access to False Certification Discharges ........................................... 11

    C.  The Rule Expands Access to Closed School Discharges................................................. 12

    D.   The Rule Restores Access to Justice for Defrauded Student Borrowers ...................... 13

III.  Delaying the Rule Inescapably Harms Student Loan Borrowers ......................................... 15

    A.  Delaying the Rule Harms Borrowers Entitled to Automatic Closed School Discharges and to False Certification Discharges ........................................................................ 15

    B.  Delaying the Rule Harms Defrauded Students with Borrower Defenses ......................... 17

    C.  Delaying the Rule Leaves Defrauded Students Without Access to the Courts While the Statutes of Limitations on Their Claims Run...................................................... 21

    D.   Delaying the Rule Harms Students Who Will Enroll in Predatory and Financially Unstable Schools..................................................................................................... 21

IV.  The Rule Was Promulgated Following a Robust Public Process ......................................... 22

CONCLUSION................................................................................................................. 24

APPENDIX – LIST OF ADDITIONAL *AMICi*

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591, 617 (1997) ........................................................................................................ 14

*Commonwealth of Mass. v. Corinthian Colleges, Inc., et al.*,
  Case No. 14-1093L (Sup. Ct. Mass. Aug. 1, 2016) ............................................................. 4, 5

*Consumer Financial Protection Bureau v. Corinthian Colleges*,
  Case No. 1:14-cv-07194 (E.D. Ill. Oct 27, 2015) ..................................................................... 4

*Deposit Guar. Nat'l Bank v. Roper*,
  445 U.S. 326, 339 (1980) ........................................................................................................ 14

*Dieffenbacher v. DeVos*,
  Case No. 5:17-cv-00342-VAP-KK (C.D. Cal. June 9, 2017) ................................................... 18

*Hoffmann-La Roche v. Sperling*,
  493 U.S. 165, 170 (1989) ........................................................................................................ 14

*People of the State of Cal. v. Corinthian Schools, Inc., et al.*,
  Case No. BC374999 (Sup. Ct. Cal. July 31,2007) .................................................................... 4

*People of the State of Cal. v. Heald College et al.*,
  Case No. CGC-13-534793 (Sup. Ct. Cal. March 23, 2016) ...................................................... 4

*State of Wisconsin v. Corinthian Colleges, Inc.*,
  Case No. 2014 CX 00006 (Wis. Cir. Ct. Oct. 27, 2014) ............................................................ 4

*United States v. FastTrain II Corp.*,
  Case No. 12-CIV-21431, 2017 WL 606346 (S.D. Fla. 2017). ................................................. 12

**Statutes**

20 U.S.C. § 1087(c) ............................................................................................................. 11, 12

20 U.S.C. § 1087e(h). ................................................................................................................. 9

20 U.S.C. § 1091(d) ................................................................................................................... 11

Pub. L. No. 112-74, 125 Stat. 786 (Dec. 23, 2011) ................................................................... 11

**Regulations**

34 C.F.R. § 682.402 ............................................................................................................... 11

34 C.F.R. § 685.206 ................................................................................................................. 9

34 C.F.R. § 685.215. .............................................................................................................. 11

59 Fed. Reg. 61,664 (Dec. 1, 1994) ........................................................................................ 9

80 Fed. Reg. 50,588 (Aug. 20, 2015) .................................................................................... 23

81 Fed. Reg. 39,330 (June 16, 2016). .............................................................................. 11, 23

81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................................................. passim

82 Fed. Reg. 27,621 (June 16, 2017) . ....................................................... 2, 15, 16, 20

82 Fed. Reg. 6,253 (Jan. 19, 2017) ...................................................................................... 10

**Other Authorities**

Abby Shafroth, Student Loan Borrower Assistance Project Blog, *Department's Proposal to Help Defrauded Borrowers Misses the Mark* (Feb. 18, 2016) ......................................................... 24

Adam Looney & Constantine Yannelis, *A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributes to Rising Loan Defaults*, Brookings Papers (Fall 2015) .................................................................................... 7

Caren Arbelt & Laura Horn, National Center for Education Statistics, *A Profile of the Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions* (Feb. 2017) ........................................................................................................................................ 8

Coalition Comments to the U.S. Dep't of Educ. Re: Proposed Borrower Defense Rules, Docket ID ED-2015-OPE-0103 (Aug. 1, 2016) ................................................................................. 24

Coalition Comments to U.S. Dep't of Educ. re: Proposed Regulations on Use of Forced Arbitration, Docket ID ED-2015-OPE-0103 (Aug. 1, 2016) ................................................ 24

Coalition letter to Sec. King to Improve Proposed Borrower Defense Regulations (March 11, 2016) ....................................................................................................................................... 24

Coalition letter to Sec. King Urging Adoption of Student Borrower Protections Against Forced Arbitration (March 6, 2016) ..................................................................................................... 24

Comments from the Legal Aid Community to the Department of Education re: Proposed
    Regulations on Borrower Defenses and Use of Forced Arbitration by Schools in the Direct
    Loan Program, and Proposed Amendments to Closed School and False Certification Discharge
    Regulations, Docket ID ED-2015- OPE-0103 (August 1, 2016)................................. 13, 21, 24

Comments on Borrower Defenses Against Loan Repayment, Docket ID No. ED-2015-ICD-0076
    (Sep. 16, 2015)......................................................................................................... 24

Corinthian Colleges Inc., Form 424B1 (Feb. 5, 1999) .................................................. 4

Leadership Conference on Civil and Human Rights, *Gainful Employment: A Civil Rights
    Perspective* (Oct. 2014) .............................................................................. 8

Letter from James F. Manning, Acting Under Secretary of Education, to Sen. Dick Durbin (July
    7, 2017). ................................................................................................. 20

National Consumer Law Center et al., Petition to the U.S. Dep't of Educ. Demanding Student
    Loan Debt Relief for Corinthian Students (May 19, 2015) .................................... 23

National Consumer Law Center, Comments to U.S. Dep't of Educ. Re: Intent to Establish
    Negotiated Rulemaking Committee on Borrower Defense and Gainful Employment, Docket
    ID ED-2017-OPE-0076 (July 2017). ...................................................................... 6

National Consumer Law Center, Ensuring Educational Integrity: 10 Steps to Improve State
    Oversight of Schools, Appx. A (June 2014)........................................................... 5

National Consumer Law Center, *Student Loan Law* (5th ed. 2015 as updated in June 2017) ....... 9

Patrick F. Linehan, *Dreams Protected: A New Approach to Policing Proprietary Schools'
    Misrepresentations*, 89 Geo. L.J. 753 (2001). ........................................................... 7

Paul Fain, *Best of a Bad Situation?*, Inside Higher Ed, (Dec. 9, 2014) ........................ 13

Peter Smith & Leslie Parrish, Center for Responsible Lending, *Do Students of Color Profit from
    For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures* (Oct. 2014). 8

Press Release, Fed. Trade Comm'n, *FTC Action Halts Online High School Diploma Mill That
    Made $11 Million Selling Worthless Diploma to Students* (Sept. 19, 2014) ....................... 11

Press Release, U.S. Dep't of Educ., *U.S. Department of Education Takes Enforcement (sic)
    Against Two School Ownership Groups* (Feb. 1, 2016). ...................................... 12

Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the Employment and
    Earnings of For-Profit College Students Using Administrative Data*,  National Bureau of
    Economic Research Working Paper (May 2016) ..................................................... 7

Tariq Habash & Robert Shireman, *The Century Foundation Report:  How College Enrollment College Contracts Limit Students' Rights* ................................................................................ 14

U.S. Dep't of Educ., "Closed School Search File," available at https://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html ............................................... 6

U.S. Dep't of Educ., Borrower Defense to Repayment webpage, *available at* https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense ............. 19

U.S. Dep't of Educ., Federal Student Loan Portfolio, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio. ............................................ 19

U.S. Dep't of Educ., First Report of the Special Master for Borrower Defense (Sep. 3, 2015) ... 10

U.S. Dep't of Educ., Information about Debt Relief for Corinthian Colleges Students (2015) *at* https://studentaid.ed.gov/sa/about/announcements/Corinthian .................................................. 4

U.S. Dep't of Educ., Office of Inspector General, ED-OIG/A09Q0001, Final Report: Federal Student Aid's Processes for Identifying At-Risk Title IV Schools and Mitigating Potential Harm to Students and Taxpayers (Feb. 24, 2017). ................................................................. 22

U.S. Gov't Accountability Off., GAO-10-948T, For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010) ................................................................................................................................................ 5

U.S. Senate Health, Educ., Labor and Pensions Comm., "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," S. Rpt. No. 112-37 (2012) ................................................................................................................................. 4, 5, 6, 8

## INTERESTS OF AMICI

This brief is submitted by the National Consumer Law Center ("NCLC") on behalf of its low-income clients, and by 17 legal aid and other non-profit organizations that work on behalf of students and student loan borrowers, consumers, low-income individuals, teachers, college counselors, and the principles of college access and success and financial fairness. *Amici* participated in the 2016 negotiated rulemaking on borrower defense through rulemaking meetings, written comments, public letters, petitions, and other advocacy materials. Several *amici* organizations participated as representatives of the legal assistance and student communities on the rulemaking committee, and others participated as counselors and commenters. *Amici* educated the Department of Education about students' experiences with predatory schools and barriers to accessing relief under the existing regulatory regime.

NCLC is a nonprofit organization specializing in consumer issues on behalf of low-income people. NCLC has nationally recognized expertise in student loan law and publishes a widely-used treatise on student loan law, *Student Loan Law* (5th ed. 2015), *updated at* www.nclc.org/library. NCLC's Student Loan Borrower Assistance Project provides information about student borrowers' rights and seeks to increase public understanding of student lending issues and to identify policy solutions to promote access to education and lessen student debt burdens. The Project's attorneys provide direct representation to low-income student loan borrowers, many of whom enrolled in predatory schools that made false promises of guaranteed employment or used other unfair recruiting tactics to secure their enrollment.

NCLC also consults with civil legal services organizations across the country—including *amici* Legal Aid Foundation of Los Angeles, New York Legal Assistance Group, Bay Area Legal Aid, Community Legal Services of Philadelphia, Housing and Economic Rights

Advocates, Public Law Center, Public Counsel, and Legal Services NYC—that represent

borrowers in their local communities who have been harmed by predatory schools.  Through this

work, *amici* have seen the harm to students caused by predatory school abuses and abrupt closure

and have encountered the barriers to borrower relief under the existing regulatory regime.

Additional *amici* are described in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When the regulation known as the Borrower Defense Rule (the "Rule") was promulgated

on November 1, 2016 after an extensive rulemaking process, it created a much-needed—and 20-

years-overdue—process for borrowers harmed by illegal conduct at predatory schools to get the

relief they are entitled to under the Higher Education Act ("HEA").  It also, restored borrowers'

right to challenge school fraud in court, included deterrent measures to limit harm to future

students, and created mechanisms through which borrowers harmed by schools' abrupt closures

or false certification of their ability to benefit from federal loans could attain prompt relief.  On

June 14, 2017, however, the Department of Education ("Department") stated that it intended to

"delay" implementation of the Rule without any public deliberative process.[1]  Although the

Department asserted that delay "will not prevent student loan borrowers from obtaining relief,"[2]

delaying the Rule will cause significant harm to student loan borrowers—both to former students

who have already incurred significant debt as a result of school fraud and closures, and to future

students who will borrow to attend fraudulent programs that do not live up to their promises.

*Amici* write to explain the critical needs that gave rise to the promulgation of the Rule and

---

[1] Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621(June 16, 2017).  Although framed as a
"partial delay," nearly the entire rule is being delayed, including all provisions pertaining to: protecting student loan
borrowers from fraud; providing student loan discharges based on borrower defenses, school closures, and false
certification; restoring defrauded student borrowers' access to the courts; and holding schools to improved financial
responsibility standards.  The only portions of the rule not delayed deal will issues ancillary to the core student
protection purpose of the rule, including technical corrections and minor amendments to the Nurse loan
consolidation and death discharge documentation provisions.  *Id.* at 27,622.
[2] *Id.* at 27,621.

the harm to student loan borrowers that delay of the Rule will cause.  In particular, *amici* highlight the harm to borrowers caused by even a temporary delay of the Rule's provisions regarding closed school and false certification discharges, borrower defenses, and arbitration.

Delaying implementation of the Rule will prevent federal student loan borrowers from benefiting from the important rights conferred on them by the Rule and will mean that many borrowers who have a right to relief from their schools or to have their student debt wiped clean under the HEA will instead be burdened by invalid and often unaffordable debt and mounting interest.  Many of these defrauded borrowers are currently in default on their federal student loans.  While they await relief, debt collection actions cause cascading financial consequences for borrowers struggling to pay heating, electric, and housing bills.  Ruined credit increases the cost of credit and insurance, and is often a barrier to accessing employment and housing. Borrowers in default are also ineligible for additional federal student aid, preventing them from starting over at a quality school.  Thus, even if the borrowers who should receive discharges now under the Rule eventually receive their discharges when the Rule is finally implemented, many will suffer significant and irreparable damage during the delay.  Worse, because the Department has announced it intends to renegotiate the regulations during the delay, the provisions of the Rule that would provide relief to harmed borrowers may never be implemented at all.

Delaying implementation of the arbitration provisions will prevent borrowers with valid claims against their school from attaining timely relief.  Furthermore, because student loan borrowers' ability to attain relief either in court or through the borrower defense process may be time-limited by statutes of limitation, delaying the provisions that restore access to the courts and establish a borrower defense process with enforceable rights harms borrowers whose limitation periods fully or partially expire during the delay.

3

We ask that this Court find the delay unlawful and grant summary judgment to Plaintiffs.

## ARGUMENT

## I.   THE BORROWER DEFENSE RULE WAS PROMULGATED IN RESPONSE TO PERVASIVE SCHOOL FRAUD AND CLOSURES

### A.   Fraudulent Recruiting Tactics by Predatory Schools Have Robbed Students of Their Dreams and Loaded Them Down with Debt

The rulemaking that resulted in the Borrower Defense Rule was prompted by "the collapse of Corinthian Colleges ("Corinthian") and the flood of borrower defense claims submitted by Corinthian students stemming from the school's misconduct."[3]  After becoming a publicly-traded company in 1999, Corinthian pursued rapid growth, and by 2012 the company ran 105 colleges in 25 states.[4]  Corinthian's growth was attributable to an intense focus on recruitment—and the use of aggressive and deceptive tactics to sell enrollment.  After years of abuse, an array of state and federal enforcement actions pursued the school for systematically falsifying its graduates' job placement rates and misrepresenting the value of the school's programs to induce potential students to enroll.[5]  Subsequently, Corinthian abruptly sold or closed all of its schools[6] and was ordered to pay over $ 1.6 billion in default judgments.[7]

---

[3] Notice of Final Regulations, 81 Fed. Reg. 75,926 (Nov. 1, 2016).

[4] Corinthian Colleges Inc., Form 424B1 at 3 (Feb. 5, 1999) (hereinafter, "Prospectus"); U.S. Senate Health, Educ., Labor and Pensions Comm., "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," S. Rpt. No. 112-37 at 378-79 (2012) (hereinafter "Senate HELP Report").

[5] *See, e.g.,* Default Judgment, *Consumer Financial Protection Bureau v. Corinthian Colleges*, Case No. 1:14-cv-07194 (E.D. Ill. Oct. 27, 2015); Default Judgment, *People of the State of Cal. v. Heald College et al.*, Case No. CGC-13-534793 (Sup. Ct. Cal. March 23, 2016); Complaint and Final Judgment, *People of the State of Cal. v. Corinthian Schools, Inc., et al.*, Case No. BC374999 (Sup. Ct. Cal. July 31, 2007); Judgment, *Commonwealth of Mass. v. Corinthian Colleges, Inc., et al.*, Case No. 14-1093L (Sup. Ct. Mass. Aug. 1, 2016); Complaint, *State of Wisconsin v. Corinthian Colleges, Inc.*, Case No. 2014 CX 00006 (Wis. Cir. Ct. Oct. 27, 2014).

[6] *See* U.S. Dep't of Educ., Information about Debt Relief for Corinthian Colleges Students *at* https://studentaid.ed.gov/sa/about/announcements/Corinthian (last accessed Sep. 21, 2017).

[7] *See, e.g., Consumer Financial Protection Bureau v. Corinthian Colleges*, Case No. 1:14-cv-07194 (E.D. Ill. Oct. 27, 2015) (default judgment ordering that Corinthian was liable for more than $530 million and prohibiting the company from engaging in future misconduct); *People of the State of Cal. v. Heald College et al.*, Case No. CGC-13-534793 (Sup. Ct. Cal. March 23, 2016) , (default judgment finding Corinthian liable for $1.1 billion in restitution and penalties for misrepresenting job placement rates, transferability of credits, and programs offered, among other abuses) ; *Commonwealth of Mass. v. Corinthian Colleges, Inc., et al.*, Case No. 14-1093L (Sup. Ct. Mass. Aug. 1,

In the wake of Corinthian's fraud and collapse, hundreds of thousands of former students were left burdened by substantial student loan debt, with either no degree or a worthless one. Although the HEA and implementing regulations made clear that students' federal student loan debt was dischargeable when schools closed before students could complete their programs, as well as when such debt was incurred as a result of school fraud, processes to actually get these student borrowers the relief they were entitled to were lacking.

Though Corinthian served as a catalyst, it was hardly unique.  Recent investigations by state and federal authorities have exposed numerous schools that engaged in deceptive and abusive recruiting practices, many of which appear tied to the aggressive push for growth by large Wall Street-backed companies.[8]  A 2012 report by the Senate Health, Education, Labor and Pensions Committee found that admissions and recruiting staff at large for-profit school companies such as EDMC, Bridgepoint, and Kaplan were under enormous pressure to enroll as many students as possible.[9]  Recruiters were evaluated based on the number of students they enrolled, often rewarded for high numbers or fired for failing to hit their numbers.[10]

State and federal law enforcement actions, as well as the Government Accountability Office and the Senate HELP Report, have all uncovered widespread use of unfair and deceptive recruiting tactics by for-profit schools.[11]  For example, the Senate HELP report found that recruiters made false guarantees that students would be placed in a job, and misrepresented

---

2016) , (default judgment finding Corinthian liable for $67 million for unfair or deceptive acts including misrepresenting "the value and quality of the education provided to students, misrepresenting the placement rates and the probability of employment, promising students jobs they never received, and overstating the earnings students would receive in such jobs").

[8] *See* National Consumer Law Center, Ensuring Educational Integrity: 10 Steps to Improve State Oversight of Schools, Appx. A (June 2014), *available at* www.nclc.org (chart of state and federal law enforcement investigations of and actions against for-profit schools).

[9] Senate HELP Report, *supra* n. 4, at 50-53.

[10] *Id*. at 50-53.

[11] *See* National Consumer Law Center, Ensuring Educational Integrity, *supra* note 8. *See e.g.,* U.S. Gov't Accountability Off., GAO-10-948T, For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010); Senate HELP Report, *supra* n. 4, at 53.

material aspects of enrollment, including the "cost of the program, the availability and obligations of federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, and the reputation and accreditation of the school."[12]

Misrepresentations during recruitment lead individuals to enroll in—and take on debt for—programs they would not have agreed to pay for had they known the truth. For example, a group of Spanish-speaking clients of *amici* Legal Aid Foundation of Los Angeles sought help with debt for a medical assisting program in which they had enrolled because recruiters had told them that the program would be conducted entirely in Spanish. In fact, instruction and class materials were all in English, which they did not speak or read.[13]

Predatory schools are also likely to close abruptly when their scams are uncovered or when they lose accreditation. Over the past five years, thousands of schools across the country have closed.[14] As a result, students who took out federal student loans for their education suffer not just from wasted years, but from debt incurred for degrees they could not obtain.

These predatory school practices are a tremendous source of frustration, financial loss, and loss of opportunity for students. Many students who are convinced to enroll based on false information about the value of the credential or the cost of attendance wind up worse off than they were before enrolling. Students who attend for-profit certificate, associate, and bachelor's degree programs earn *less* on average in the 5 to 6 years after attendance than they did before attending.[15] And with no earnings boost to show for it, these former students now owe

---

[12] Senate HELP Report, *supra* n. 4, at 53.

[13] National Consumer Law Center, Comments to U.S. Dep't of Educ. Re: Intent to Establish Negotiated Rulemaking Committee on Borrower Defense and Gainful Employment at 5, Docket ID ED-2017-OPE-0076 (July 2017).

[14] *See* U.S. Dep't of Educ., "Closed School Search File," *at* https://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html.

[15] Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, National Bureau of Economic Research Working Paper at

significant federal student loan debt—averaging over $14,000 in 2014—and sometimes also private student loan debt.[16]  Given their low wages and high debt, many of these students are unable to keep up with their student loan bills, and default.  Indeed, nearly half of for-profit students default on their student loans within five years of entering repayment.[17]

## B.     Predatory School Conduct Disproportionately Harms Low-Income Students and Students of Color

According to testimony given by a former owner of a vocational training school:

> In the proprietary school business what you sell is dreams and so ninety-nine percent of the sales were made in poor, black areas, [at] welfare offices and unemployment lines, and in housing projects. My approach was that if [a prospect] could breathe, scribble his name, had a driver's license, and was over 18 years of age, he was qualified for North American's program.[18]

As this testimony reflects, predatory recruitment targets those who are most susceptible to misleading or false information about higher education.  This includes those who are the first in their family to pursue post-secondary education or who are unfamiliar with the intricacies of higher education and financial aid.  This population disproportionately includes low-income students and students of color.  Typical targets include so-called "non-traditional" students who may already be in the workforce, have children to support, and are hoping that their education will position them to earn more and break out of poverty.  Training materials from one for-profit college encouraged recruiters to target "Welfare Mom w/Kids. Pregnant Ladies. Recent Divorce. Low Self-Esteem. Low Income Jobs. Experienced a Recent Death. Physically/Mentally Abused.

---

3 (May 2016), *available at* http://www.nber.org/papers/w22287.

[16] A recent report calculated that the median borrower at a for-profit schools owed $12,700 in 2013.  Adam Looney & Constantine Yannelis, Brookings Papers, *A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributes to Rising Loan Defaults* 41 Tbl. 6 (Fall 2015), *available at* https://www.brookings.edu/bpea-articles/a-crisis-in-student-loans-how-changes-in-the-characteristics-of-borrowers-and-in-the-institutions-they-attended-contributed-to-rising-loan-defaults/.

[17] *Id*. at 50.

[18] S. Rep. No. 102-58, at 12–13 (1991) (testimony), quoted in Patrick F. Linehan, *Dreams Protected: A New Approach to Policing Proprietary Schools' Misrepresentations*, 89 Geo. L.J. 753 (2001).

Recent Incarceration. Drug Rehabilitation. Dead-End Jobs-No Future."[19]  Training materials for other schools encouraged recruiters to identify sources of pain in prospective students' lives and "poke the pain" and insist that enrolling at the school is the solution.[20]

Demographic data on school enrollment supports the evidence that for-profit schools target low-income Americans and people of color for recruitment.  For example, the majority of students at for-profit programs receive Pell Grants, which are only available to low-income students; the percentages of Pell Grant recipients at public schools are significantly lower.[21]  The Leadership Conference has documented that African-American and Latino students are overrepresented in for-profit colleges, making up 41 percent of the student body.[22]

Because low-income students and students of color are overrepresented at for-profit colleges, abuses in this sector have a higher impact on poor students and students of color and cost these populations dearly.  Further, African Americans and Latinos at for-profit schools borrow more than their peers attending public or private, non-profit schools, even after controlling for income levels.[23]  And yet most gain no value from these schools—nearly 8 out of 10 African American and 2 out of 3 Latino for-profit students do not complete their programs.[24]

## II.     THE BORROWER DEFENSE RULE CREATED A LONG-OVERDUE PROCESS FOR DEFRAUDED BORROWERS TO ACCESS RELIEF

In promulgating the Borrower Defense Rule in 2016, the Department of Education

---

[19] Senate HELP Report, *supra* n. 4, at 58 (quoting Vatterott, March 2007, *DDC Training* (VAT-02-14-03904)).

[20] *Id*. at 60-63 (quoting materials from ITT, and Kaplan).

[21] Caren Arbelt & Laura Horn, National Center for Education Statistics, *A Profile of the Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions* at 21 and fig. 11, Stats in Brief (Feb. 2017), *available at* https://nces.ed.gov/pubs2017/2017416.pdf.

[22] Leadership Conference on Civil and Human Rights, *Gainful Employment: A Civil Rights Perspective* (Oct. 2014), *available at*  http://www.protectstudentsandtaxpayers.org/wp-content/uploads/2014/10/Gainful-Employment-Civil-Rights-Perspective_WhitePaper_October2014.pdf; *see also* Peter Smith & Leslie Parrish, Center for Responsible Lending, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures*, (Oct. 2014), *available at* http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf.

[23] Smith & Parrish, *supra* n. 22, at 21.

[24] *Id*. at  22.

created a much-needed—and long-overdue—process for borrowers harmed by misconduct at predatory schools to get the loan relief they are entitled to under the HEA. The Rule also closes several other critical loopholes in protections against school misconduct and, as described below, restores access to the courts for borrowers harmed by such misconduct and expands access to false certification and closed school discharges.

### A.   The Rule Establishes a Process for Borrower Defense Discharges

The HEA has long required that the Secretary of the Department of Education "shall specify in regulations when school misconduct may be asserted as a defense" to repayment of federal student loans.[25] In 1994, the Secretary promulgated regulations specifying that a borrower may assert as a defense to repayment any ''act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law.''[26] And since the early nineties, loan agreements signed by students have included similar language, guaranteeing federal student loan borrowers that "you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done . . . if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law."[27]

Despite the long-standing existence of this right to loan relief, the Department for over 20 years failed to provide any process through which student loan borrowers could exercise this right. As a result, the Department reports that prior to 2015, it was aware of only "a handful" of

---

[25] 20 U.S.C. § 1087e(h).

[26] 34 C.F.R. § 685.206(c)(1); 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).

[27] *See* National Consumer Law Center, *Student Loan Law* §13.8.2.2 (5th ed. 2015, as updated in June 2017), *available online at* https://library.nclc.org/. This language is from the current Direct Loan Master Promissory Note (expiring April 30, 2019) and is also used in the prior note versions that expired on February 29, 2016, and on July 31, 2014.

borrowers—out of hundreds of thousands likely eligible—who submitted borrower defenses.[28]

The Borrower Defense Rule promulgated in 2016 addresses this problem by setting forth a path for defrauded students to seek relief,[29] clarifying the authority of the Department to pursue automatic group-wide relief in cases of systemic fraud,[30] and providing transparency about the processes to all impacted parties. The Rule lays out processes for student loan borrowers to apply for relief,[31] evidence that will be considered and the evidentiary burden that will be applied,[32] how the Department may pursue group-wide relief to provide efficient and equitable treatment for groups of borrowers who were subject to the same school misconduct,[33] and how borrowers' eligibility for relief and the amount of relief warranted will be assessed.[34] Although the Rule leaves the Department considerable discretion in reviewing borrower defense applications and pursuing group relief, it answers the big questions left open by the sparse 1994 regulation and provides borrowers with much-needed clarity on how to seek relief and their rights in the process. Critically, along with a procedural rule,[35] the Rule establishes due process rights for students and schools, including rights related to evidentiary standards,[36] written decisions,[37] reconsideration,[38] and appeals,[39] as well as rights to forbearance and suspension of collection of defaulted loans while borrowers' applications are pending or being reconsidered.[40]

---

[28] U.S. Dep't of Educ., First Report of the Special Master for Borrower Defense 5 (Sep. 3, 2015).
[29] *See* 81 Fed. Reg. at 76,083-86.
[30] *Id.* at 76,084-85.
[31] *Id.* at 76,083-86.
[32] *Id.* at 76,083-84.
[33] *Id.* at 76,080, 76,084-85.
[34] *Id.* at 76,080, 76,085-86.
[35] 82 Fed. Reg. 6,253 (Jan. 19, 2017) (final rules amending "hearing procedures for actions to establish liability against an institution of higher education, and establish[ing] procedural rules governing recovery proceedings under the Department's borrower defense regulations).
[36] 81 Fed. Reg. at 76,080.
[37] *Id.* at 76,084-86.
[38] *Id.*
[39] *Id.* at 76,084 (specifying when a denial of an individual's application constitutes a final agency decision—and thus subject to appeal); *id.* at 76,085 (discussing appeals when sought in a group relief process).
[40] *Id.* at 76,084-86.

The Rule also alters the standard of relief applicable to new loans disbursed on or after July 1, 2017.  Whereas the loans disbursed earlier remain dischargeable under the prior regulatory standard—i.e., where school conduct would give rise to a cause of action under *state* law—loans disbursed after this date are dischargeable if: (a) the school made a substantial misrepresentation that the borrower reasonably relied on in deciding to enroll or remain enrolled or take out loans, (b) the school breached a contract with the borrower, or (c) the borrower is a beneficiary of a nondefault, favorable contested judgment against the school.[41]

### B.        The Rule Expands Access to False Certification Discharges

The HEA requires that the Department "shall discharge" a student's FFEL or Direct federal student loans disbursed after January 1, 1986 "if such student's eligibility to borrow . . . was falsely certified by the" school.[42]  The implementing regulations, however, failed to keep up with changes in the HEA regarding criteria for eligibility to borrow.  As a result, while the law now provides that after July 1, 2012, most students without high school diplomas or equivalencies are ineligible for federal aid, the implementing regulations failed to recognize that borrowers were entitled to false certification discharges if their schools falsely certified that they had a high school diploma or equivalent for purposes of loan eligibility.[43]

This type of false certification has become increasingly common: unscrupulous higher education companies either simply lie and say that students have high school diplomas, or direct students to online diploma mills that the school knows to be fraudulent but uses to certify the student for loans.[44]  For example, in 2016, the Department took enforcement actions against 23

---

[41] *Id*. at 76,083.
[42] 20 U.S.C. § 1087(c); *see also* 34 C.F.R. §§ 682.402(e)(3)(ii)(A); 685.215(c)(1)(i).
[43] Pub. L. No. 112-74, 125 Stat. 786 (Dec. 23, 2011); 20 U.S.C. § 1091(d).  *See also* 81 Fed. Reg. 39,330, 39,377 (June 16, 2016).
[44] *See* Press Release, Fed. Trade Comm'n, *FTC Action Halts Online High School Diploma Mill That Made $11 Million Selling Worthless Diploma to Students* (Sept. 19, 2014).

Marinello Schools of Beauty campuses for precisely these sorts of violations,[45] and in 2017, a court entered a $20 million judgment against FastTrain College and its president for repeatedly knowingly submitting fake high school diploma and GED information to receive improper federal Title IV funds.[46]  The court described FastTrain fraud's impact on students, whom the school lied to about their eligibility for aid and validity of fake diplomas, as "abhorrent," observing that "[t]he student victims in this case were especially vulnerable . . . young people who, for whatever reasons, had not graduated high school," and whom "FastTrain aggressively recruited" and left with "debt that will be enormously difficult to pay off with what they can earn working the low-level jobs for which they are qualified."[47]  Under existing regulations, though the Department was able to recoup loan amounts it disbursed to FastTrain based on fraud, the Department would deny student victims relief from these same loans.

The Rule seeks to close this loophole and to bring the false certification discharge regulation in line with current statutory requirements for loan eligibility by clearly making borrowers eligible for discharges if their schools falsely certified that they had high school diplomas for purposes of loan eligibility.[48]  The Rule also provides relief in some circumstances when a school falsified loan eligibility by falsely reporting that a student had satisfactory academic progress—a measure of the value the student is getting from the loan investment.[49]

### C.     The Rule Expands Access to Closed School Discharges

The HEA requires the Department to discharge federal student loans if the borrower was unable to complete their program due to a school's closure.[50]  Existing rules allow students

---

[45] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Takes Enforcement Against Two School Ownership Groups* (Feb. 1, 2016).
[46] *United States v. FastTrain II Corp.*, Case No. 12-CIV-21431, 2017 WL 606346, at *9-10 (S.D. Fla. 2017).
[47] *Id.* at *10.
[48] 81 Fed. Reg. at 76,082.
[49] *Id.*
[50] 20 U.S.C. § 1087(c)(1).

whose school closed before they completed to apply for a discharge if they do not transfer credits and complete the program elsewhere.  But many students are unaware of this right and suffer unnecessarily. Legal aid offices frequently see clients whose schools closed as many as 30 years ago and who have no idea they are eligible for a discharge.[51]  The Department has estimated that it received closed school discharge applications from only 6 percent of eligible borrowers.[52]

The Rule strengthens existing closed school discharge regulations by requiring improved, prompt communications to eligible borrowers about their rights when their school is closing— helping to ensure that more students are informed of their options and can get their loans discharged quickly.[53]  Critically, the Rule also provides automatic discharges of federal student loans taken out to attend the closed school by borrowers whose schools closed on or after November 1, 2013, and who do not re-enroll at another school within three years of their school's closure.[54]  This amendment provides efficient and equitable relief to borrowers harmed by school closures, relieving both borrowers and the Department of the obligation to go through individual application processes, and ensuring that relief is not limited to those few harmed borrowers who happen to get good advice following a school closure.

### D.     The Rule Restores Access to Justice for Defrauded Student Borrowers

To insulate themselves from liability for wrongdoing, and to prevent the Department of Education, accreditors, and law enforcement agencies from learning about complaints and settlements, predatory schools have increasingly used forced arbitration clauses and class action

---

[51] *See* Comments from the Legal Aid Community to the U.S. Dep't of Educ. re: Proposed Regulations on Borrower Defenses and Use of Forced Arbitration by Schools in the Direct Loan Program, and Proposed Amendments to Closed School and False Certification Discharge Regulations at 53, Docket ID ED-2015- OPE-0103 (August 1, 2016), *available at* https://www.nclc.org/images/pdf/special_projects/sl/comments_legal_aid_docketid-ED-2015-OPE-0103.pdf [hereinafter, Comments of the Legal Aid Community on Borrower Defense NPRM].
[52] *See* Paul Fain, *Best of a Bad Situation?*, Inside Higher Ed, (Dec. 9, 2014), *available at* https://www.insidehighered.com/news/2014/12/09/feds-respond-criticism-bid-ecmc-buy-most-corinthian.
[53] 81 Fed. Reg. at 76,070.
[54] *Id*. at 76,078-82.

bans that require students to waive their rights to bring claims in court or to join together with other aggrieved students in class actions challenging systemic fraud.  These schools require students to waive these rights as part of the fine print of their enrollment agreements, long before students know what disputes they might have with the school.  A recent analysis revealed that the majority of for-profit schools now include arbitration clauses in their student enrollment agreements, though almost no public and very few non-profit schools do.[55]

These clauses cause enormous harm to student loan borrowers.  Requiring defrauded students to pursue their claims individually against their schools significantly limits access to justice.  Most defrauded students are unaware of their rights and lack the time and money necessary to pursue their claims individually against school that has far more financial and legal resources.  Indeed, the Supreme Court has repeatedly recognized the importance of class actions in providing legal redress for violations of the law that may be too time- and resource-intensive to realistically challenge through individual claims.[56]  Arbitration provisions make proving claims against schools all the more difficult because discovery is often limited, and borrowers and their advocates typically do not have access to prior arbitration decisions or evidence developed in those cases.  Even when such decisions and evidence do exist, they are typically shielded by confidentiality requirements.  Additionally, arbitration clauses and class bans prevent information about valid disputes from reaching the Department, accreditors, and other law enforcement agencies, meaning indicators of a failing or predatory school are suppressed.

The Rule restores federal student borrowers' rights to challenge school fraud claims in court and to do so on a collective basis through class actions.  It does so by prohibiting schools

---

[55] *See, e.g.,* Tariq Habash & Robert Shireman, *The Century Foundation Report:  How College Enrollment Contracts Limit Students' Rights*, *available at* https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.

[56] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

that participate in the Direct Loan Program from relying on or imposing new forced arbitration provisions or provisions waiving students' rights to participate in class actions for resolution of school misconduct claims that could form the basis of a borrower defense.[57]   The Rule thus benefits borrowers who have already been defrauded by ensuring that their opportunity to obtain relief through the courts is not unfairly suppressed.   It also protects future students by improving the odds that school misconduct will be brought to light and by restoring the risk of liability for wrongdoing—and thus law's deterrent effect.

## III.   DELAYING THE RULE INESCAPABLY HARMS STUDENT LOAN BORROWERS

The Department's plan to delay and replace the Rule through a new rulemaking process[58] creates significant confusion as to borrowers' rights in the interim, as well as a very real risk that borrowers' rights under the Rule will not only be delayed but denied.   Further, as detailed below, the delay ensures that at minimum many borrowers who have a right to discharge of their student loan debt under the HEA now will instead be burdened by such debt unless and until the provisions of the Rule implementing their HEA discharge rights go into effect.

### A.   Delaying the Rule Harms Borrowers Entitled to Automatic Closed School Discharges and to False Certification Discharges

Delaying implementation of the automatic closed school and false certification discharge provisions means that borrowers who have a right to have their student debt wiped clean under the HEA will instead be burdened by hundreds of millions of dollars in invalid and often unaffordable debt and mounting interest.

As discussed *supra* Part II.C, while the HEA requires the Department to discharge the loans of borrowers unable to complete their program due to a school closure, the vast majority of

---

[57] 81 Fed. Reg. at 76,021-31.
[58] 82 Fed. Reg. at 27,622 (announcing that the delay is intended to allow the Department to conduct a new rulemaking prior to implementation of the Rule).

eligible borrowers are unaware of this right and suffer unnecessarily with debt.  The Rule addresses this by , among other things, providing automatic closed school discharges to eligible borrowers whose schools closed on or after November 1, 2013 and who do not re-enroll in another school within three years of their school's closure.  Delaying this provision means that borrowers whose loans would have been automatically discharged when the Rule was scheduled to be implemented—as well as those whose loans would be discharged later during the delay— will instead continue to be burdened with debt for  programs they could not complete.

The Department estimates if the Rule is not delayed, between July 1, 2017 and July 1, 2019—the earliest a replacement rule could be implemented—borrowers whose schools shut down before they could complete their studies will have an estimated $381 million of loans cancelled as a result of the automatic closed school discharge provision.[59]  While the Department celebrates that the federal government will save this amount by delaying,[60] it will be at the cost of the borrowers who were the intended beneficiaries of the Rule.  In short, if the Department is permitted to delay closed school provisions of the Rule, borrowers whose schools closed suddenly will be left owing $381 million in debt for which Congress has decided they should not be legally responsible, and that would be discharged absent the delay.

Similarly, as discussed *supra* Part II.B, while the HEA requires the Department to discharge the loans of borrowers whose eligibility for federal student loans was falsified by their schools, false certification regulations had not kept pace with changes to eligibility criteria for federal student loans.  The Rule updated the regulations to ensure that students are eligible for discharges if their school falsely certified their eligibility by untruthfully reporting that the

---

[59] *See* 82 Fed. Reg. at 27,621 (citing estimate of "$381 million for cohorts 2014-2016 attributable to the regulations providing for a three-year automatic closed school discharge").
[60] *See id.* ("Postponing the effectiveness of the final regulations will help to avoid these significant costs to the Federal government . . . .").

student had a high school diploma or achieved satisfactory academic progress. While the Rule is delayed, these borrowers will not be able to obtain discharges that they should be eligible for under the HEA. *Amici* Legal Aid Foundation of Los Angeles has clients in precisely this situation: their eligibility for federal loans was falsely certified by Marinello Schools, which the Department determined arranged sham diplomas to access federal aid, but their applications for discharges were recently denied under the existing, outdated regulations.

Even if the Rule is only temporarily delayed and borrowers who would receive these automatic closed school or false certification discharges under the Rule obtain them following the delay, in the meantime borrowers will be subject to the wholly unnecessary financial stress of responsibility for debt that Congress has decided they are not and should not be legally responsible for. As long as the delay lasts, these borrowers will continue to be subject to monthly bills and mounting interest. For many low-income borrowers struggling to pay for basic necessities, including heating and housing bills, continued student loan bills and collections will cause cascading financial consequences. Additionally, the many harmed borrowers who cannot afford the debt and are in default face potentially devastating consequences. Defaulted borrowers are subject snowballing collection fees and aggressive debt collection practices that can trap them in poverty, including garnishment of their wages and seizure of Social Security and Earned Income Tax Credit payments. Defaults also tarnish borrowers' credit histories— which often drives up insurance and borrowing costs and creates barriers to employment and housing. Borrowers who default are also ineligible for further federal student aid, preventing them from getting a second chance at an education. Thus even for borrowers who are later approved for discharges, irreparable damage may already be done by the delay.

### B.    Delaying the Rule Harms Defrauded Students with Borrower Defenses

Delaying the Rule deprives defrauded students with borrower defenses of enforceable

17

procedural rights established by the Rule, as well as of valuable rights to forbearance and stopped collections while their applications are pending.  The delay also leaves borrowers in the dark about the standard for relief and the process for adjudication of their claims, and may limit relief available to defrauded borrowers due to statutes of limitation on borrower defense relief.

Borrowers have an interest in the fair adjudication of their applications under the process set out by the Rule; this interest is plainly impaired by the delay.  Valuable due process rights established by the Rule include those related to: (i) a fact-finding process that includes consideration of Department records; (ii) use of a preponderance of the evidence standard; (iii) access to records the Department considers relevant to the borrower defense; (iv) written decisions that for denials include "the reasons for the denial" and "evidence that was relied upon"; (v) reconsideration; (vi) appeals; and (vii) forbearance and suspension of collection of defaulted loans while borrowers' applications are pending or being reconsidered.[61]

These rights are especially critical given that under the old regulations borrowers' requests for relief have often sat pending for years and been ignored or "resolved" without acknowledging the borrower's evidence or arguments regarding school fraud.  For example, a district court recently observed that the Department appeared to be attempting to evade a conclusive ruling on plaintiff's borrower defense  that had been raised over two years prior, while continuing to garnish plaintiff's wages.[62]  The Department also summarily denied the borrower's objection to garnishment premised on the borrower defense and supported with a 29-page letter brief and 254 pages of exhibits, without even acknowledging the defense or evidence.[63]  In contrast, under the new Rule, a borrower would be entitled to stopped collections—and thus prevention of wage garnishment—while her borrower defense application

---

[61] 81 Fed. Reg. at 76,080-86.
[62] *Dieffenbacher v. DeVos*, Case 5:17-cv-00342-VAP-KK at 6-7 (C.D. Cal. June 9, 2017).
[63] *See id.* at 2-4.

is pending, and would have enforceable procedural rights to have the Department apply a

preponderance of the evidence standard and state the evidence relied upon in adjudicating

borrower defenses, as well as clear rights to seek reconsideration and appeal.

In addition to loss of procedural rights, borrowers also suffer uncertainty as to the

standard for eligibility for relief so long as the Rule is delayed.  As discussed above, the Rule

changes the standard for eligibility for borrower defense relief for Direct Loans—including

Direct Consolidation loans—issued after July 1, 2017.  Some borrowers will be able to meet one

standard but not the other, and without an end date for the delay, it is unclear what standard they

will be held to.  This is especially significant because there are over 17 million borrowers with

outstanding FFEL loans,[64] which the Department has stated will need to be consolidated into

new Direct Consolidation Loans to access borrower defense discharges from the Department;[65] it

is now unclear what standard these borrowers have to satisfy to have their loans discharged.

The uncertainty regarding which process and standards the Department will apply means

borrowers are once again left in the dark about how to discharge their debt.  They could wait it

out—awaiting further guidance, potential restoration of their procedural rights and the new

federal standard for eligibility, or yet another rulemaking and new set of rules—to provide clarity

and potentially restore procedural protections that could enable them to effectively vindicate

their rights.  But waiting would itself cause many borrowers injury.  Because the Department has

stated that it will apply statutes of limitation to limit refunds of amounts already paid or collected

---

[64] *See* U.S. Dep't of Educ., Federal Student Loan Portfolio, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

[65] *See* 81 Fed. Reg. at 76,081 (amending § 682.212(k)(2)(i)(A)); *see also* U.S. Dep't of Educ., Borrower Defense to Repayment webpage, *available at* https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense (last checked, Sep. 22, 2017) ("For the purposes of borrower defense discharge only, we interpret the term "Direct Loan" in 34 CFR 685.206(c) to include Direct Consolidation loans. This interpretation enables borrowers with loans eligible for Direct Loan consolidation, including Federal Family Education Loan (FFEL) Program loans, to avail themselves of the borrower discharge process provided here by consolidating such loans into the Direct Loan Program.").

on loans later found to be unenforceable,[66] waiting would keep many defrauded borrowers with valid defenses from recovering amounts paid or collected from them on their loans during the delay.  More generally, if defrauded borrowers delay relief applications pending implementation of the 2016 Rule or a replacement, they will in the meantime be left on the hook for debt that is legally unenforceable.  As with borrowers forced to await closed school and false certification discharges due to the delay, these borrowers will suffer negative financial consequences as a result of continued liability for a debt that would be dischargeable under the Rule.

Despite this clear harm to student borrowers, the Department has claimed that individuals with borrower defense claims will not be harmed by delaying implementation of the Rule because "the Department will continue to process borrower defense claims under existing regulations" and the delay will merely "preserve the regulatory status quo."[67]  There are several problems with this argument.  First, borrowers may take little comfort from this claim that the "status quo" will be preserved in light of the Department's recent acknowledgment that there are at least 64,301 outstanding borrower defense applications and the Department has failed to approve a single application since January 20, 2017.[68]  Second, the Department's statement that the delay would help to "avoid the[] significant costs" of borrower defense and closed school discharges to the government[69] indicates that the Department expects and intends the delay of the Rule to reduce the amount of student loan debts discharged through the borrower defense process.  Third, the 2016 rulemaking was conducted precisely because the existing regulations did not provide for a process; thus, the promise to continue processing under the existing regulations provides no assurance or clarity to borrowers about when, whether, or how they can

---

[66] 81 Fed. Reg. at 75,956 ("[T]he Department will continue to apply the applicable State statute of limitations to claims relating to loans disbursed prior to July 1, 2017.")
[67] 82 Fed. Reg. at 27,621.
[68] Letter from James F. Manning, Acting Under Secretary of Education, to Sen. Dick Durbin (July 7, 2017).
[69] 82 Fed. Reg. at 27,621-22.

vindicate their rights and finally resolve their student loan liability.

### C.   Delaying the Rule Leaves Defrauded Students Without Access to the Courts While the Statutes of Limitations on Their Claims Run

Delaying the arbitration provisions in the Rule leaves millions of students without the opportunity to hold lawbreaking schools accountable in court or to realistically access full relief for their injuries.  As discussed *supra* Part II.D, forced arbitration provisions and class action bans in predatory schools' enrollment agreements have the practical effect of preventing low-income student loan borrowers from vindicating their rights against fraudulent schools and attaining the full relief they are entitled to under the law.  While the borrower defense discharge process—if implemented—would provide an administrative means for borrowers to achieve *partial relief* for their injuries caused by illegal school conduct through discharge of their federal student loans, access to the courts would still be necessary for students to attain full relief.  Full relief may include compensation for their out-of-pocket educational expenses and private student loan debts incurred, loss of Pell Grant eligibility, lost time and other consequential economic damages, as well as punitive damages and emotional distress.[70]

Delaying implementation of the arbitration provisions will not only prevent borrowers with valid claims against their school from attaining *timely* relief, but for many borrowers the delay will prevent them from accessing the courts and attaining relief *at all* due to statutes of limitations.  For borrowers whose valid claims are subject to limitations periods that expire during the delay, the delay will extinguish their opportunity to bring their claim in court.

### D.   Delaying the Rule Harms Students Who Will Enroll in Predatory and Financially Unstable Schools

The Rule also protects current and future student loan borrowers by deterring abusive conduct by schools, reducing the risk to students of abrupt school closures, and requiring schools

---

[70] *See* Comments of the Legal Aid Community on Borrower Defense NPRM, *supra* n. 51, at 34-36.

to warn prospective students of poor student outcomes.  School misconduct is deterred through provisions that restore school accountability for such misconduct, including limits on forced arbitration and class action bans and provisions specifying how the Department can recoup the cost of borrower defense discharges from schools that engage in misconduct.  Financial responsibility standards reduce the risk to students of abrupt school closures by providing information that will help the Department to identify schools at risk of abrupt closure and take action to protect students, and by deterring irresponsible school conduct that makes abrupt closures more likely.[71]  Future students are protected by new requirements to "warn students in advertising and promotional materials if the typical student experiences poor loan repayment outcomes" so that students can make more informed enrollment and financing decisions.[72]

Without these provisions, financially unstable schools can continue to recruit new students and load them up with loans without adequate protections in place to alert students to the risk that their school may close, or to ensure that any closure will be adequately managed. In short, delaying these provisions allows the widespread predatory school conduct and abrupt school closures that prompted the rulemaking to continue unabated, harming more students, particularly those students who are already most financially vulnerable.

## IV.    THE RULE WAS PROMULGATED FOLLOWING A ROBUST PUBLIC PROCESS

The borrower defense rules were promulgated on November 1, 2016 following a lengthy and robust public process in which many of the *amici* on this brief participated extensively.

The rulemaking process formally began in August 2015, when the Department of Education published a notice announcing its intent to establish a negotiated rulemaking

---

[71] *See, e.g.,* U.S. Dep't of Educ., Office of Inspector General, ED-OIG/A09Q0001, Final Report: Federal Student Aid's Processes for Identifying At-Risk Title IV Schools and Mitigating Potential Harm to Students and Taxpayers at 15 (Feb. 24, 2017).
[72] 81 Fed. Reg. at 75,926.

committee.[73]   The Department announced that it would hold two public hearings and that it

would accept written comments.[74]   Hundreds of comments were submitted in response to the

notice.  A negotiated rulemaking committee was subsequently established that included

representatives from various interested parties.[75]   The committee participated in nine full days of

meetings held in early 2016, and exchanged, reviewed, and commented on many drafts during

that time.[76]   Robust discussions in the meetings resulted in significant changes to the proposed

text of the rules.  The Department subsequently solicited public comment on proposed

regulations similar to those discussed at the final committee meeting in June 2016.[77]   Over

50,000 parties submitted comments.[78]   The final rules included changes responsive to the

comments, and the Department provided responses to the comments in an extensive, 118-page

"Analysis of Comments and Changes."[79]

Many of the *amici* on this brief participated (both formally and informally) in this multi-

year rulemaking process.  Even prior to the initial call for comments in 2015, NCLC submitted a

petition signed by 50 organizations and supported by over 78,000 individuals calling on the

Department to act on its obligation under the HEA to discharge the federal student loan debts of

former Corinthian students, and setting forth the basis for such obligation.[80]   Subsequently, in

response to the initial 2015 call for comments and testimony on the intent to engage in

rulemaking, *amici* provided significant information regarding the fraud and abuse low-income

students had been subjected to and the barriers to accessing relief these students faced under the

---

[73] 80 Fed. Reg. 50,588 (Aug. 20, 2015).
[74] *Id.*
[75] 81 Fed. Reg. at 39,333-34.
[76] *Id*.
[77] *Id*. at 39,329.
[78] 81 Fed. Reg. at 75,928.
[79] *Id*. at 75,928-76,046.
[80] National Consumer Law Center et al., Petition to the U.S. Dep't of Educ. Demanding Student Loan Debt Relief
for Corinthian Students (May 19, 2015), *available at* http://www.studentloanborrowerassistance.org/wp-
content/uploads/2015/04/corinthian-petition.pdf.

existing regulatory framework.[81]  *Amici* also participated extensively in the committee meetings as both negotiators and members of the public attending the meetings and commenting in writing on the drafts.[82]  NCLC and many *amici* criticized portions of the drafts for not going far enough to protect student loan borrowers.[83]  And following the Department's publication of its proposed rule, NCLC and other *amici* submitted extensive comments regarding the impact of the proposed rule on student loan borrowers—commending aspects of the rule that would better protect and empower borrowers, identifying shortcomings and potential barriers to student relief, and proposing ways to strengthen the rule to better protect students and borrowers.[84]

Like other stakeholders, *amici* invested significant time and thinking into the negotiated rulemaking process with the understanding that the rulemaking was being undertaken in good faith and that the resulting rule would be implemented as stated.  There is no justification for redoing this extensive process less than one year after it ended, particularly given that there has been no change in the underlying factual circumstances, and there is no justification for delaying or rescinding the Rule developed through this extensive public process.

## CONCLUSION

For the foregoing reasons, we respectfully ask that this Court grant summary judgment in

---

[81] *See, e.g.*, Comments on Borrower Defenses Against Loan Repayment, Docket ID No. ED-2015-ICD-0076 (Sep. 16, 2015) (submitted by Bay Area Legal Aid, East Bay Community Law Center, Housing and Economic Rights Advocates, Legal Aid Foundation of Los Angeles, NCLC (on behalf of its low-income clients), New York Legal Assistance Group, Project on Predatory Student Lending at the Legal Services Center of Harvard Law School).
[82] *See, e.g.,* Coalition letter to Sec. King to Improve Proposed Borrower Defense Regulations (March 11, 2016); Coalition letter to Sec. King Urging Adoption of Student Borrower Protections Against Forced Arbitration (March 6, 2016); Abby Shafroth, Student Loan Borrower Assistance Project Blog, *Department's Proposal to Help Defrauded Borrowers Misses the Mark* (Feb. 18, 2016), www.studentloanborrowerassistance.org/departments-proposal-to-help-defrauded-borrowers-misses-the-mark/.
[83] *See supra* n.82.
[84] *See, e.g.*, Comments of the Legal Aid Community on Borrower Defense NPRM, *supra* n. 51; Coalition Comments to U.S. Dep't of Educ. re: Proposed Borrower Defense Rules, Docket ID ED-2015-OPE-0103 (Aug. 1, 2016), *available at* http://www.nclc.org/images/pdf/special_projects/sl/BD-NPRM-Coalition-Comment_FINAL_August1_2016.pdf; Coalition Comments to U.S. Dep't of Educ. re: Proposed Regulations on Use of Forced Arbitration, Docket ID ED-2015-OPE-0103 (Aug. 1, 2016), *available at* https://www.nclc.org/images/pdf/special_projects/sl/ Public-Citizen-Arbitration-Proposed-Rule-Coalition-Comment-Letter-to-ED-080116.pdf .

favor of Plaintiffs and enjoin the Department of Education from delaying the implementation of the Borrower Defense Rule.

Dated:  September 28, 2017

Respectfully submitted,

*/s/ Abigail Evans Shafroth*
Abigail Evans Shafroth
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
(617) 542-8010
ashafroth@nclc.org

*Counsel for Amici Curiae*

25

## APPENDIX – LIST OF ADDITIONAL *AMICI*

The **American Federation of Teachers** is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for our students, their families and our communities.  We are committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work our members do.

**Americans for Financial Reform** ("AFR") is a nonpartisan, nonprofit coalition of more than 200 consumer, investor, labor, civil rights, business, faith-based, and community groups, with membership list available at http://ourfinancialsecurity.org/about/our-coalition/.  AFR works to lay the foundation for a strong, stable, and ethical financial system—one that serves the economy and the nation as a whole.  Through policy analysis, education, and outreach to our members and others, AFR seeks to build public will for substantial reform of the American financial system.  AFR engages actively in policy issues relating to student loans and civil access to justice, including participating in Department of Education rulemaking proceedings related to borrower defense.

**Bay Area Legal Aid** ("BayLegal") provides free legal representation to low-income clients on a broad range of issues, including domestic violence prevention, consumer rights, housing preservation and homelessness prevention, improving income security, removing barriers to employment, and providing holistic support and legal representation for formerly incarcerated individuals and homeless or at-risk youth.  Across all practice areas, BayLegal has seen a recent increase in individuals impacted by student loans incurred to attend predatory, for-profit schools that misled borrowers with false information about the value of their degrees.  Without access to relief from student loan debt, low-income borrowers are at risk for negative

credit reporting, wage garnishment, income tax refund offset, and administrative levies for defaulted federal student loans.  A delay in the implementation of the Borrower Defense Rule impacts our vulnerable clients' ability to maintain safe housing, care for their families, and work toward economic stability.

The **Center for Responsible Lending** ("CRL") is working to ensure a fair, inclusive financial marketplace that creates opportunities for all responsible borrowers, regardless of their income.  CRL is a nonprofit, non-partisan organization that works to protect homeownership and family wealth by fighting predatory lending practices. Our focus is on consumer lending: primarily mortgages, payday loans, credit cards, bank overdrafts, student loans and auto loans.

For over 50 years, **Community Legal Services of Philadelphia** ("CLS") has served the legal needs of low-income Philadelphians by providing advice and representation in civil matters, advocating for legal rights, and conducting community education. CLS' Homeownership and Consumer Rights Unit represents consumers in a range of matters, including mortgage foreclosure, tax foreclosure, debt collection, payday lending, student loans, and predatory lending schemes. CLS also provides advice and referral services to low-income consumers, and advocates for laws and programs to protect consumers from unfair and predatory practices.  CLS provides direct representation to borrowers with student loans who are eligible for discharge of their loans based on school closure and other remedies provided by the Department of Education.

**Consumer Action** has been a champion of underrepresented consumers nationwide since 1971.  A non-profit 501(c)(3) organization, Consumer Action focuses on consumer education that empowers low- and moderate-income and limited-English-speaking consumers to financially prosper.  Consumer Action has long supported consumer protections and Consumer

Financial Protection Bureau rules and agency actions designed to assist student loan borrowers in exercising their rights to access relief when defrauded by schools, lenders and loan servicers. By providing consumer education materials in multiple languages, a free national hotline, a comprehensive website (www.consumer-action.org) and annual surveys of financial and consumer services, Consumer Action helps consumers assert their rights in the marketplace and make financially savvy choices.  Nearly 8,000 community based organizations benefit annually from its extensive outreach programs, training materials and advocacy before lawmakers, regulators and the media to advance consumer rights and promote industry-wide change, particularly in the fields of credit, banking, student lending, housing, privacy, insurance and utilities.

**Consumers Union** is the policy and mobilization division of Consumer Reports, an independent, nonprofit organization that works side by side with consumers to create a fairer, safer, and healthier world.  As the world's largest independent product-testing organization, Consumer Reports uses its more than 50 labs, auto test center, and survey research center to rate thousands of products and services annually.  Founded in 1936, Consumer Reports has over 7 million subscribers to its magazine, website, and other publications.  Consumers Union has been active over the years in numerous policy issues affecting consumers, including fair treatment of student borrowers.

**Housing and Economic Rights Advocates** ("HERA") is a California state-wide, non-profit law office with a broad economic justice and asset building and preservation mission.  We are dedicated to helping Californians — particularly those most vulnerable — build a safe, sound financial future, free of discrimination and economic abuses. From HERA's direct services work to thousands of California consumers each year on a wide-range of economic issues, we have

extensive first-hand experience with the impact of predatory financial practices on our vulnerable communities. Predatory schools and predatory student loan lenders provide clear example of these predatory practices. We strongly support the implementation of borrower protections from these predatory practices, including the enforcement of Borrower Defense regulations.

**Legal Aid Foundation of Los Angeles** ("LAFLA") is the first place thousands of poor and low income people turn to when they need legal assistance for a crisis that threatens their safety, security or shelter. It provides free legal services to the most vulnerable people in Southern California: the homeless, unemployed, working poor, domestic abuse survivors, victims of torture and human trafficking, elderly, disabled, and veterans. LAFLA also provides free legal education, outreach, and self-help assistance to litigants and community members, allowing for additional access to justice. For over thirty years, LAFLA has consistently fought for-profit school fraud, sought redress for students, and worked to change a higher education system that is increasingly deaf to the needs and experiences of low-income students. In the past two years, LAFLA has obtained more than $200,000 in federal student loan relief for clients who attended schools that preyed upon non-English speaking, immigrant populations. It also submitted over 70 student loan discharge applications seeking more than $800,000 in debt relief for former Corinthian Colleges and Marinello Schools of Beauty students.

**Legal Services NYC** ("LS NYC") is the largest civil legal services provider in the country with offices in the Bronx, Brooklyn, Queens, Staten Island and Manhattan. For nearly 40 years, Legal Services NYC has provided critical legal help to low-income residents of New York City. In the student loan context, Legal Services NYC provides full representation to low-income New Yorkers who have defaulted upon or are having trouble repaying their student loans. Many of our clients are victims of predatory schools that promised lucrative careers yet

delivered nothing but large student loan debts.  Enforcement of the Borrower Defense Rule is needed to protect such borrowers from predatory schools.

Founded in 1937, the **National Association for College Admission Counseling** ("NACAC") is an association of more than 15,000 members, including school counselors and college admission staff, who work with students making the transition from high school to postsecondary education.  NACAC is committed to maintaining professional standards that foster ethical and social responsibility among those involved in the college application and enrollment process, as outlined in the NACAC Statement of Principles of Good Practice, which may be accessed on our website (www.nacacnet.org).

**New York Legal Assistance Group** ("NYLAG") is a not-for-profit law office that provides free civil legal services to low-income New Yorkers who cannot afford private attorneys.  NYLAG provides legal assistance to New York City's poor and near poor in the areas of consumer debt, government benefits, family law, immigration, disability rights, housing law, and special education, among others.  NYLAG's Consumer Protection Project (CPP) represents and advises individuals with student loan debt, among other issues.  NYLAG's Special Litigation Unit represents classes of low-income individuals, including those subject to fraudulent practices by for-profit schools, and failures by oversight agencies to protect students at those schools.

Founded in 1970, **Public Counsel** is the nation's largest pro bono law firm and one of our main goals is to foster economic justice by providing individuals and institutions in underserved communities with access to quality legal representation.  In 2015, Public Counsel staff and over 4,500 volunteers provided legal services to more than 22,000 individuals, benefiting over 330,000 underserved people and more than 350 nonprofit organizations and small businesses.  We regularly assist low income consumers with both unfair debt collection

and predatory lending claims.  Over the past few years, Public Counsel has assisted over 100 former college students seeking relief from student loans used to pay for education and career opportunities never received due to fraud and/or school closures.  We join this amicus to express our concerns over the impact that delaying implementation of the Borrower Defense Rule will have on our current and future clients.

The **Public Law Center** ("PLC") provides free legal services to low-income residents of Orange County. Annually, over 8,000 of the most vulnerable residents of the county, including immigrants, minorities, veterans, seniors, and children, receive services from PLC's staff and volunteers. PLC's work includes counseling, individual representation, community education and strategic policy advocacy and impact litigation to challenge societal injustices, in the areas of domestic violence, human trafficking, guardianship, housing, health, bankruptcy, asylum, family law, consumer fraud, immigration, and discrimination.  PLC's Consumer Law Unit works on a variety of issues, including assisting low-income individuals who have been preyed on and victimized by for-profit schools with identifying solutions to make them whole again, including student loan discharges, accessing California's Student Tuition Recovery Fund, and other solutions. These students regularly tell PLC that they were convinced to enroll as a result of misrepresentations made and fraud committed by their schools.  The Borrower Defense Rule is often the primary way these students could attain relief, and without it, thousands of students will have paid for education that they are unable to use.

**The Institute for College Access & Success** (TICAS) is an independent, nonprofit research and policy organization dedicated to increasing college access, affordability and success through improvements in student financial aid policies, both nationally and in California.  Since 2005, our Project on Student Debt has worked to reduce the burden of student loan debt and

increase public understanding of rising debt and its implications for families, the economy, and society.  We work with a broad range of partners to advance practical, evidence-based solutions, and we serve as an expert resource to the media, policymakers, and the public on issues ranging from the financial aid application process to student loan repayment.  Our accomplishments include leading a national coalition that secured greater regulation of federally funded career education programs.

**United States Public Interest Research Group Education Fund, Inc.** ("U.S. PIRG Education Fund") is an independent, non-partisan 501(c)(3) organization that works for consumers and the public interest.  Through its Higher Education Project, U.S. PIRG Education Fund works to make higher education more affordable and find solutions to the problem of skyrocketing student debt.  Heavy student loan debt carries severe negative consequences for borrowers, who must make monthly payments with their hard-earned dollars rather than save up and get ahead.  High debt can affect where graduates live, the kind of careers they pursue, when they start a family or purchase a home, and whether they can save for retirement.  The combination of high student debt and low earnings can lead to default, ruined credit, and wage garnishment.  Such distress runs counter to the goal of higher education. U.S. PIRG Education Fund supports the Borrower Defense Rule and is working to ensure that these necessary protections remain in place for student loan borrowers.

**Young Invincibles** ("YI") is a national non-profit organization working to expand opportunity for young adults ages 18 to 34 and amplify the voice of our generation in the national political conversation.  Founded by and for young adults in the summer of 2009 during the debate over health care reform, YI has quickly grown into a leading voice for young people on the issues of health care, higher education and financial security.  The organization has

successfully engaged hundreds of thousands of young adults online, through a network of over 100 partner organizations. Young Invincibles has spoken publicly and submitted regulatory comments in support of the Borrower Defense Rule.