**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* XAVIER BECERRA, Attorney General, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, PEOPLE OF THE STATE OF ILLINOIS, STATE OF IOWA, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA *ex rel.*  JOSH STEIN, Attorney General, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT COMMONWEALTH OF VIRGINIA, *ex rel.*  MARK R.  HERRING, and, STATE OF WASHINGTON, Office of the Washington Attorney General,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, and BETSY DEVOS, *in her official capacity as Secretary of Education,*<br><br>　　　　　　　Defendants. | Civil Action No. 17-1331<br>Judge Randolph D. Moss |

**AMICUS CURIAE MEMORANDUM OF POINTS AND AUTHORITIES OF THE
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF DISCLOSURE ...........1

INTEREST OF AMICUS .................................................................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................................3

ARGUMENT ...............................................................................................................5

I.  STUDENTS OF COLOR ARE DISPROPORTIONATELY HARMED BY FOR-
PROFIT SCHOOLS' ABUSIVE CONDUCT ...............................................................5

    **A.**  Due to Targeted Recruiting, Students of Color are Overrepresented in For-Profit
Institutions..................................................................................................6

    **B.**  For-Profit Institutions Overcharge For Degrees and Do Not Provide Students of
Color Meaningful Educational or Employment Opportunities.............................7

    **C.**  Students of Color Attending For-Profit Colleges are at a Disproportionate Risk of
Accruing Debt, Entering Delinquency, and Defaulting on Loans .........................9

II.  THE BORROWER DEFENSE RULE PROVIDES DEFRAUDED STUDENTS
OF COLOR MUCH NEEDED RELIEF. ...................................................................10

    **A.**  Student Relief Under Borrower Defense Rule.....................................................11

    **B.**  The Department's Indefinite Suspension of the Borrower Defense Rule..............13

III.  THE DEPARTMENT'S SUSPENSION OF THE IMPLEMENTATION OF THE
BORROWER DEFENSE RULE HURTS COMMUNITIES OF COLOR.....................15

    **A.**  Delaying the Rule Leaves Students of Color Unprotected from the Predatory
Practices of For-Profit Institutions.....................................................................16

    **B.**  Delaying the Rule Reinstates Procedural Hurdles that Disparately Impairs
Students of Color Ability to Access Courts, and Ultimately, Obtain Relief .........16

    **C.**  Delaying the Rule Prevents Defrauded Students of Color from Obtaining Relief
from Loans and Perpetuates the Racial Disparity in Student Debt.......................20

CONCLUSION...........................................................................................................22

WEIL 96299951V1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*University of Texas v. Fisher*,
    133 S.Ct. 2411 (2013).........................................................................................................2

*Consumer Fin. Prot. Bureau v. Corinthian Colls.*,
    No. 14-cv-7194, 2015 WL 10854380  (E.D. Ill. Oct. 27, 2015)............................................11

*People v. Heald College*,
    No. CGC-13-534793, 2016 WL 1130744 (Cal. Mar. 23, 2016).............................................11

*Cal. Assoc. of Private Postsecondary Sch. v. Devos*,
    No. 17-cv-999 (D.D.C. May 24, 2017).............................................................................14, 15

**Statutes**

20 U.S.C. § 1087(c)(1)..............................................................................................................21

**Legislative Materials**

Hearings on Abuses in Federal Student Aid Programs Before the Permanent Subcomm. on
    Investigations of Senate Comm. on Gov't Affairs, 101st Cong. 64 (1990) (statement of David
    B. Buckley, Chief Investigator, Permanent Subcomm. on Investigations) ..............................7

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher
    Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926
    (Nov. 1, 2016) ............................................................................................................. *passim*

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher
    Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 27,621
    (June 16, 2017)....................................................................................................................3, 19

U.S. Senate Health, Educ., Labor and Pensions Comm., 112th Cong., For-Profit Higher
    Education: The Failure to Safeguard the Federal Investment and Ensure Student Success
    (July 30, 2012) ..................................................................................................................8, 11

**Other Authorities**

Amy Myrick, et al., *Race and Representation: Racial Disparities in Legal Representation for
    Employment Civil Rights Plaintiffs*, 15 N.Y.U. J. LEGIS. & PUB. POL'Y 705 (2012) ...............19

WEIL 96299951V1

Annie E. Casey Found., *Race for Results:  Building a Path to Opportunity for All Children, Kids Count Policy Report* 3 (2014), http://www.aecf.org/m/resourcedoc/AECF-RaceforResults-2014.pdf ......................................................................................................................5

Clare McCann, *The Ins and Outs of the Borrower Defense Rule*, NEW AMERICA (July 10, 2017) https://www.newamerica.org/education-policy/edcentral /ins-and-outs-borrower-defense-rule/ ..................................................................................12

Danielle Douglas-Gabriel, *It's Almost Impossible for Students to Sue a For-Profit College. Here's Why.*, WASH. POST (Apr. 28, 2016)..............................................................................13

John H. Doyle et al., *Report of the Working Committees to the Second Circuit Task Force on Gender, Racial and Ethnic Fairness in the Courts*, 1997 ANN. SURV. AM. L. 117, 414 (1997) ..................................................................15, 18, 19

Leadership Conference on Civil & Human Rights, *Gainful Employment: A Civil Rights Perspective* 2 (Oct. 2014), http://www.protectstudentsandtaxpayers.org/wp-content/uploads/2014/10/Gainful-Employment-Civil-Rights-Perspective_WhitePaper_October2014.pdf.......................................................7, 8, 9, 14, 15

Letter from fourteen state Attorneys General to Sen. Richard J. Durbin & Rep. Elijah E. Cummings 2 (Sept. 9, 2014), http://ag.ky.gov/pdf_news/s2204-letter.pdf................................9

Linda Darling-Hammond, *Unequal Opportunity: Race and Education,* BROOKINGS (Mar. 1, 1998), https://www.brookings.edu/articles/unequal-opportunity-race-and-education ..............5

Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing,* DEMOS (May 19, 2015) ........................................................................20

National Consumer Law Center, Defend the Department of Education's Borrower Defense Rule: Protecting Students and Taxpayers Against Fraud and Abuse in Higher Education (Jan. 2017), https://www.nclc.org/images/pdf/special_projects/sl/defend-doe-borrower-def-rule.pdf.................................................................................................................................13

National Consumer Law Center, Student Loan Borrower Assistance, Consequences of Default (last visited Oct. 1, 2017), http://www.studentloanborrowerassistance.org/collections/federal-loans/consequences-of-default-federal ....................................................................................10

National Consumer Law Center,Ensuring Educational Integrity: 10 Steps To Improve State Oversight Of Schools 8 (June 2014), https://www.nclc.org/images/pdf/pr-reports/for-profit-report.pdf....................................................................................................................................10

Nina Ingwer Van Wormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 VAND. L. REV. 983, 1020 (2007)............................................................19

Patrick F. Linehan, *Dreams Protected: A New Approach to Policing Proprietary Schools' Misrepresentations*, 89 GEO. L.J. 753, 762 (2001) ..........................................................4, 6, 7

Peter Smith & Leslie Parrish, Center for Responsible Lending, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures,* CENTER FOR RESPONSIBLE LENDING 9 (Oct. 2014), http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf ...........................................7, 8, 9, 10

Rohit Chopra, *Student Debt Domino Effect?*, Consumer Financial Protection Bureau, (May 9, 2013), https://www.consumerfinance.gov/about-us/blog/student-debt-domino-effect/ ..........10

Sara Sternberg Greene, *Race, Class, and Access to Civil Justice*, 101 IOWA L. REV. 1263, 1322 (2016).....................................................................................................................................17, 18

*Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, U.S. DEP'T EDUC. (June 14, 2017), https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions...................................................................................................................................14

Tariq Habash & Robert Shireman, The Century Foundation Report: How College Enrollment College Contracts Limit Students' Rights (APR. 28, 2016), https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.................................................................13

Tressie McMillan Cottom, Lower Ed The Troubling Rise of For-Profit Colleges in the New Economy 256 (The New Press 2017) .....................................................................................4

U.S. Department of Education, *Information About Debt Relief for Corinthian Colleges Students*, FEDERAL STUDENT AID,  https://studentaid.ed.gov/sa/about/announcements/Corinthian (Oct. 2, 2017) ...............................................................................................................................11

U.S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, Demographic and Enrollment Characteristics of Nontraditional Undergraduates: 2011–12 1 (2015), https://nces.ed.gov/pubs2015/2015025.pdf..................................................6

U.S. Department of Education, Office of the Under Sec'y, Office of Planning, Evaluation and Policy Dev., Advancing Diversity and Inclusion in Higher Education:  Key Data Highlights Focusing on Race and Ethnicity and Promising Practices 5 (Nov. 2016), https://www2.ed.gov/rschstat/research/pubs/advancing-diversity-inclusion.pdf. .....................4

WEIL 96299951V1

## <u>CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF DISCLOSURE</u>

Pursuant to Local Rule 7(o) of the Local Rules of the United States District Court for the District of Columbia (the "Local Rules," and each rule therein, a "Local Rule"), and Federal Rule of Appellate Procedure 29:

I, undersigned counsel of record for *amicus curiae*, certify that to the best of my knowledge and belief, the Lawyers' Committee for Civil Rights Under Law (the "Lawyers' Committee") does not have a parent corporation, no publicly held company holds 10% or more of stock of the Lawyers' Committee, and no parents, subsidiaries, or affiliates thereof have any outstanding securities in the hands of the public.

## <u>STATEMENT OF COUNSEL</u>

Pursuant to Local Rule 7(o) and Federal Rule of Appellate Procedure 29, counsel for *amicus curiae* states that none of the parties to the above-captioned dispute, and none of their counsel, authored this brief in whole or in part. No persons other than *amicus* made a monetary contribution to preparation or submission of this brief.

Dated: October 3, 2017
      Washington, D.C.

Respectfully submitted,
/s/ Jon Greenbaum
Jon Greenbaum, Esq.

Attorney of Record for *Amicus Curiae*

## INTEREST OF AMICUS

The Lawyers' Committee for Civil Rights Under Law is a tax-exempt, non-profit civil rights organization founded in 1963 at the request of President John F. Kennedy in order to mobilize the private bar in vindicating the civil rights of African Americans and other racial and ethnic minorities.  The Lawyers' Committee is dedicated, among other goals, to eradicating all forms of racial discrimination in higher education opportunities affecting racial and ethnic minorities and other disadvantaged populations.

As a leading racial justice organization, the Lawyers' Committee has a vested interest in ensuring that equal educational opportunities are available to students of all racial and ethnic backgrounds.  In light of its mission to secure equal justice for all through the rule of law, the Lawyers' Committee challenges predatory and fraudulent practices that target racial and ethnic minorities and deny them educational and professional opportunities necessary to achieve economic security.  To that end, the Lawyers' Committee has litigated hundreds of impact cases that challenge racial discrimination in voting, housing, employment, and education and has served *amicus curiae* in cases promoting equity in higher education such as *University of Texas v. Fisher*, 133 S.Ct. 2411 (2013).

WEIL 96299951V1

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The Lawyers' Committee for Civil Rights Under Law respectfully submits this memorandum in support of Plaintiffs' motion for summary judgment to detail the disproportionate impact predatory for-profit schools' practices have on students of color, and the long-lasting harm that delayed implementation of the Borrower Defense Rule (the "Rule") may have on these students and their communities.

In November 2016, the Borrower Defense Rule was promulgated after serious concerns were raised as to the illegal conduct at predatory for-profit schools. The Rule allowed defrauded student borrowers to obtain their entitled relief and also bolstered many borrowers' right to challenge for-profits' fraudulent practices in court. Moreover, the Rule required disclosures by for-profits about prior judgments against them, as well as concerning other "triggering" events, to prevent future students from enrolling without understanding the fraudulent historical practices of these institutions. But on June 14, 2017, the Department of Education ("Department"), without any public deliberative process, announced that it would delay implementation of the Rule indefinitely. Although the Department asserted that delay "will not prevent student loan borrowers from obtaining relief,"[1] delaying the Rule will cause significant harm to student loan borrowers, and more specifically, student borrowers of color. *Amicus* submits this brief to provide background on the impact of predatory for-profit institutions' practices on students of color as well as to detail the lasting harm that delaying the Rule will have on students of color.

In her 2017 book analyzing for-profit institutions' role in, and impact on, American society, *Lower Ed*, Tressie McMillan Cottom aptly observed that these institutions help

---

[1] Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 27,621 (June 16, 2017).

3

"perpetuat[e] the inequalities resulting from intergenerational cumulative disadvantage."[2] Higher education has clear economic benefits, especially for students from traditionally underserved and underrepresented populations who rely on college degrees as catalysts for upward mobility. Where the unemployment rate for college graduates with a Bachelor's degree is about half of the national average, and the pay gap between college graduates and non-college graduates continues to grow,[3] it is critical that everyone, including people of color, have equal access to meaningful higher educational opportunities.

Unfortunately, predatory for-profit educational institutions exploit low-income people of color, who often are most vulnerable to fraudulent marketing techniques because they are "in need of employment or work an unskilled job and desire an increase in their earning capacity."[4] For-profits' misleading recruiting tactics take advantage of people who "tend to be of low educational attainment, and are not savvy enough to protect themselves from fraud."[5] For-profit institutions' goal to increase their enrollment numbers without regard to the actual educational services provided make it nearly impossible for students of color to achieve economic success.

The prior administration's Rule aimed to curb for-profits' abusive conduct by providing meaningful redress to defrauded students and seeking to deter students from attending fraudulent schools in the first place.  This administration's arbitrary delay of the Rule will disproportionately harm students of color that have already been defrauded by for-profit institutions, and will result in even more people of color being swindled by fraudulent institutions, which will have a further negative economic impact of families and communities of

---

[2] TRESSIE MCMILLAN COTTOM, LOWER ED THE TROUBLING RISE OF FOR-PROFIT COLLEGES IN THE NEW ECONOMY 256 (The New Press 2017)

[3] U.S. Dep't of Educ., Office of the Under Sec'y, Office of Planning, Evaluation and Policy Dev., *Advancing Diversity and Inclusion in Higher Education:  Key Data Highlights Focusing on Race and Ethnicity and Promising Practices* 5 (Nov. 2016), https://www2.ed.gov/rschstat/research/pubs/advancing-diversity-inclusion.pdf.

[4] Patrick F. Linehan, *Dreams Protected: A New Approach to Policing Proprietary Schools' Misrepresentations*, 89 GEO. L.J. 753, 762 (2001).

[5] *Id*. at 762, n.61.

4

color.

Section I of this brief discusses the harm that students of color suffer due to the fraudulent practices of for-profit institutions. Section II then provides an overview of the remedies and protections the Rule put in place. Lastly, Section III examines the disparate negative impact the delay in implementation of the Rule has on students of color and communities of color more broadly.

## ARGUMENT

## I.    STUDENTS OF COLOR ARE DISPROPORTIONATELY HARMED BY FOR-PROFIT SCHOOLS' ABUSIVE CONDUCT

Severe racial economic inequalities exist in this country, and this is, perhaps, nowhere more apparent than in the American educational system.  Starting from early childhood, students of color are more likely to be affected by exposure to high levels of poverty and violence at a young age, the effects of "toxic stress," and inadequate housing and transportation.[6]  Students of color are also more likely to attend schools that lack adequate funding, which means larger schools, larger class sizes, less challenging curriculums, and less qualified teachers.[7]  Add to this an increased likelihood that students of color will face disciplinary action, compared to white students,[8] and students of color are often stuck in a hole that is too deep to climb out alone without access to vital resources.  Not surprisingly, African-American and Latino students are less likely to be enrolled in college and less likely to graduate.  These setbacks, however, are not insurmountable if institutions of higher education promote equal access by providing the necessary resources to ensure long-term success for students of color.

---

[6] Annie E. Casey Found., *Race for Results:  Building a Path to Opportunity for All Children, Kids Count Policy Report* 3 (2014), http://www.aecf.org/m/resourcedoc/AECF-RaceforResults-2014.pdf.
[7] Linda Darling-Hammond, *Unequal Opportunity: Race and Education,* BROOKINGS (Mar. 1, 1998), https://www.brookings.edu/articles/unequal-opportunity-race-and-education/.
[8] Annie E. Casey Found., *supra* note 6, at 4.

While meaningful higher education provides disadvantaged students a pipeline to opportunity, many for-profit institutions do the opposite. Instead of investing in the educational development of their students, for-profit colleges divert the vast majority of their resources into targeted predatory recruiting of "non-traditional"[9] students, often times African Americans and Latinos. Students of color are thus often overrepresented at these institutions. To enroll, students are encouraged to take out large amounts of student debt, in amounts much greater than for their non-profit or public school counterparts, yet many students of color never complete the programs. And moreover, even those who do complete their degrees do not see educational benefits or increased employment prospects. At the end of the day, students of color who attend for-profits often end up where they started in terms of education and career outlook but are saddled with large amounts of student debt.

## A.    Due to Targeted Recruiting, Students of Color are Overrepresented in For-Profit Institutions

For-profit colleges successfully employ marketing and recruitment tactics that aggressively target vulnerable African-Americans and Latinos, including "non-traditional" students who work full time and/or have families, or delay their post-secondary education.[10] As one paper on for-profit institutions observed, for-profit schools "often target their predatory marketing efforts toward low-income and predominantly minority communities."[11] For example, below is an excerpt from a for-profit school's memorandum explaining how the admissions

---

[9] According to a 2015 U.S. Department of Education Report, "researchers generally consider nontraditional students to have the following characteristics: being independent for financial aid purposes, having one or more dependents, being a single caregiver, not having a traditional high school diploma, delaying postsecondary enrollment, attending school part time, and being employed full time." U.S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, *Demographic and Enrollment Characteristics of Nontraditional Undergraduates: 2011–12* 1 (2015), https://nces.ed.gov/pubs2015/2015025.pdf (internal citations omitted).

[10] In a study of post-secondary undergraduate students, both African-American and Hispanic students were less likely to claim dependent status for financial aid purposes, were more likely to delay enrollment in post-secondary education, and were less likely to attend school exclusively full-time. *See id.* at 9, 29, 38.

[11] Linehan, *supra* note 4, at 762.

6

officer could target low-income and minority communities:

> Drive through large housing projects SLOWLY with door sign on. Best times are Friday afternoons and Sunday afternoons.

> Meet the managers of low-income and Government housing apartment. Give group presentations.

> [Provide] [c]ollege career days on black campuses.

> Food stamp offices—leave referral cards.

> Welfare office—leave referral cards.[12]

Unsurprisingly, the results of these predatory recruitment tactics are reflected in the demographic composition of for-profit institutions' student bodies.

Twenty-eight percent of African-American students and fifteen percent of Latino students attending four year programs attend for-profit institutions compared to just ten percent of white students.[13] Similarly, a greater proportion of African-American and Latino students attend two-year for-profit institutions than white students as well.[14] Notably, in total, students of color constitute forty-one percent of students at for-profit colleges in general, but only twenty-one percent of all postsecondary enrollments.[15]

### B.    For-Profit Institutions Overcharge For Degrees and Do Not Provide Students of Color Meaningful Educational or Employment Opportunities

Predatory for-profit colleges, however, are hurting, not helping students of color who already have difficulty accessing educational opportunities.  For-profits charge high tuition

---

[12] Hearings on Abuses in Federal Student Aid Programs Before the Permanent Subcomm. on Investigations of Senate Comm. on Gov't Affairs, 101st Cong. 64 (1990) (statement of David B. Buckley, Chief Investigator, Permanent Subcomm. on Investigations), quoted in Linehan, *supra* note 4, at 762-63.

[13] Peter Smith & Leslie Parrish, Center for Responsible Lending, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures,* CENTER FOR RESPONSIBLE LENDING 9 (Oct. 2014), http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf.

[14] *Id.*

[15] Leadership Conference on Civil & Human Rights, *Gainful Employment: A Civil Rights Perspective* 2 (Oct. 2014), http://www.protectstudentsandtaxpayers.org/wp-content/uploads/2014/10/Gainful-Employment-Civil-Rights-Perspective_WhitePaper_October2014.pdf [hereinafter *Gainful Employment*].

prices without investing in critical educational and support services.  On average, the tuition

costs of for-profit colleges are higher than the tuition costs of in-state public and private-two-

year institutions.[16]  After taking grants and scholarships into consideration, four-year for-profit

colleges are also more expensive than attending private, non-profit four-year schools.[17]

But available data suggests that for-profit colleges divert more funds into marketing and

recruiting than to instruction.[18]  For example, in 2009, for-profit institutions spent a billion

dollars more on marketing than on instruction.[19]   Often, student support services at for-profit

institutions are lacking.  Compared to the amount invested in recruiting new students, for-profit

colleges invest relatively little in student support or career services,[20]  as evidenced by the low

number of career placement staff hired to help students find employment.[21]  A 2012 study found

that "[f]or-profit institutions spend nearly one-quarter (23%) of their revenue on marketing and

recruiting, while spending just 17% on actual instruction."[22] The overrepresentation of students

of color at these for-profit colleges means that students of color are disproportionately harmed by

for-profits' focus on enrollment and recruiting, rather than substantive educational and

employment advancement.

Despite the high costs of a for-profit education, students of color are not likely to

experience positive education and employment outcomes.  African Americans and Latinos

attending for-profit colleges are far less likely to graduate than their peers at other schools, with

nearly eight out of ten African-American and two out of three Latino students not completing

---

[16] *Id*. at 10.
[17] *Id*.
[18] U.S. Senate Health, Educ., Labor and Pensions Comm., 112th Cong., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* 81 (July 30, 2012) [hereinafter Senate HELP].
[19] *Id*. at 3, 6.
[20] Senate HELP, *supra* note 18, at 96-98.
[21] *Id*.
[22] Smith & Parrish, *supra* note 13, at 7.

WEIL 96299951V1

for-profit programs.[23]  In a study from 2012, only 20% of African-American students and 34% of Latino students at for-profit institutions obtained Bachelor's degrees within six years, compared to 40% of African-American students and 50% of Latino students at public universities.[24]  Even if students of color attending for-profit colleges graduate, they are more likely to face challenges obtaining gainful employment,[25] and experience slower wage growth if they find employment[26] because, in many cases, employers believe that for-profit schools do not provide adequate training and preparation.[27]

### C.  Students of Color Attending For-Profit Colleges are at a Disproportionate Risk of Accruing Debt, Entering Delinquency, and Defaulting on Loans

Given that African-American and Latino for-profit students are less likely to graduate, they are also more likely to experience delinquency and enter into default on their student loans.[28]  Students must borrow more to pay for their for-profits' higher tuition costs, as compared to non-profit tuition costs.  Students of color at all institutions are more likely to incur debt than their white peers—in part because students of color lack resources, which require them to take out more loans to finance their education.  Students of color attending for-profit colleges also borrow more than students of color attending public or private, non-profit colleges.  Even amongst students of color, students at for-profit schools are specifically at-risk of incurring student debt.  Research suggests that generally while students of color accrue more debt over

---

[23] *Id*. at 22.
[24] *Gainful Employment*, *supra* note 15, at 4.
[25] Smith & Parrish, *supra* note 13, at 20.
[26] *Id*.
[27] Letter from fourteen state Attorneys General to Sen. Richard J. Durbin & Rep. Elijah E. Cummings 2 (Sept. 9, 2014), http://ag.ky.gov/pdf_news/s2204-letter.pdf.
[28] Smith & Parrish, *supra* note 13, at 22.

WEIL 96299951V1

time than other students, students of color at for-profits, in particular, are more likely to accrue debt over time than students of color attending public or private, non-profit colleges.[29]

Students of color burdened with debt and worthless degrees face an uphill battle. Difficulty paying student debt may lower credit scores and impact borrowers' abilities to further finance their education to obtain gainful employment.[30] Student debt can also impede the ability of recent college graduates to qualify for a mortgage and become homeowners.[31] Borrowers unable to make payments may have their tax refunds, federal benefits, or wages seized.[32] They may even face litigation.[33] In short, overwhelming student debt coupled with useless degrees makes it nearly impossible for students of color to accumulate wealth.[34]

## II.   THE BORROWER DEFENSE RULE PROVIDES DEFRAUDED STUDENTS OF COLOR MUCH NEEDED RELIEF.

In 2016, the Borrower Defense Rule, which provides essential relief to these student borrowers,[35] was promulgated in response to the rampant fraud by for-profit institutions.  From 2011 to 2014, fifty-four lawsuits and investigations into for-profit schools were commenced,[36] with Corinthian College being the most prominent.[37]  In 2016, the California Superior Court found that it had made false statements to students and investors regarding job placement rates, advertised for programs that it did not offer, made unlawful use of military seals in its

---

[29] Smith & Parrish, *supra* note 13, at 20.

[30] *Id.* at 18.

[31] Rohit Chopra, *Student Debt Domino Effect?*, CONSUMER FINANCIAL PROTECTION BUREAU, (May 9, 2013), https://www.consumerfinance.gov/about-us/blog/student-debt-domino-effect/.

[32] Smith & Parrish, *supra* note 13, at 18.

[33] National Consumer Law Center, Student Loan Borrower Assistance, *Consequences of Default* (last visited Oct. 1, 2017), http://www.studentloanborrowerassistance.org/collections/federal-loans/consequences-of-default-federal/.

[34] Chopra, *supra* note 31.

[35] Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program [hereinafter Student Assistance General Provisions], 81 Fed. Reg. 75,926 (Nov. 1, 2016).

[36] *See* NAT'L CONSUMER LAW CTR.,ENSURING EDUCATIONAL INTEGRITY: 10 STEPS TO IMPROVE STATE OVERSIGHT OF SCHOOLS 8 (June 2014), https://www.nclc.org/images/pdf/pr-reports/for-profit-report.pdf [hereinafter NAT'L CONSUMER LAW CTR.].

[37] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 75,926.

advertising, inserted unlawful clauses into enrollment agreements, and engaged in unlawful debt collection practices, among other fraudulent conduct.[38]  As a result of this action, and similar actions in other states, Corinthian was ordered to pay over $1.6 billion in default judgments,[39] and proceeded to close or sell all of its schools.[40]

Corinthian exemplifies abuses at for-profit institutions, but is by no means the only instance of abusive conduct; recent investigations have exposed many such cases.[41]  An investigation by the Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP") documented rampant misuse of federal funding within the for-profit sector and made specific recommendations to strengthen oversight of federal financial aid, enact regulations to create meaningful protections for students, and address the predatory recruitment of students.[42] The results of the Senate HELP investigation, in part, led to the promulgation of the Borrower Defense Rule.

### A.      Student Relief Under Borrower Defense Rule

The Rule ensures that federal student aid will not fund for-profit institutions engaged in predatory practices, and was promulgated after an extensive deliberative process.[43] The U.S. Department of Education considered the comments submitted by over 50,000 parties on the proposed regulations that addressed all aspects of the complex issues raised by the proposed rule.[44]

---

[38] People v. Heald College, No. CGC-13-534793, 2015 WL 10854380 (Cal. Mar. 23, 2016).

[39] *See, e.g.*, Consumer Fin. Prot. Bureau v. Corinthian Colls., No. 14-cv-7194, 2015 WL 10854380  (E.D. Ill. Oct. 27, 2015); People v. Heald College, No. CGC-13-534793, 2016 WL 1130744 (Cal. Mar. 23, 2016).

[40] *See* U.S. Dep't of Educ., *Information About Debt Relief for Corinthian Colleges Students*, FEDERAL STUDENT AID,  https://studentaid.ed.gov/sa/about/announcements/Corinthian (Oct. 2, 2017).

[41] NAT'L CONSUMER LAW CTR., *supra* note 36, at 8.

[42] Senate HELP, *supra* note 18.

[43] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 75,928-76,069.

[44] *Id*. at 75,928.

WEIL 96299951V1

The 2016 Rule strengthened existing regulations by establishing a new federal standard for all colleges receiving Title IV funding.  Student borrowers have a defense to repayment (i) when a school makes false, erroneous, or misleading statements that the borrower relied on and which had a negative effect on him; (ii) when a school breaches a contract with a student; or (iii) when a favorable non-default judgment is entered against the school.[45] In addition, the Rule establishes that no statute of limitations will limit a borrower's claim so long as the borrower still has an outstanding balance.[46] For amounts that have already been paid, borrowers have six years from the date when the misconduct was, or should have been, realized to bring their claim.[47]

Additionally, the Rule created a process for students victimized by for-profit colleges to have their loans discharged without filing an application.[48] Under the new regulations, the Secretary of Education can identify eligible groups of borrowers from individually filed applications *or* from any other source of information, and can include borrowers who may not have filed an application for relief, in the event that common facts and claims exist that apply to the group of borrowers.[49] In addition, the Rule allows the Department to assume there was reliance on misrepresentations by schools, if there are many borrowers with the same claims.[50]

The Rule also seeks to remedy a widespread predatory practice for-profits have used: forcing students to accept mandatory arbitration clauses that tend to insulate for-profit institutions from liability.  A majority of for-profits require mandatory arbitration which requires

---

[45] *Id*. at 76,083; *see* Clare McCann, *The Ins and Outs of the Borrower Defense Rule*, NEW AMERICA (July 10, 2017) https://www.newamerica.org/education-policy/edcentral/ins-and-outs-borrower-defense-rule/ [hereinafter McCann].
[46] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 75,926.
[47] *Id*. at 76,083. McCann, *supra* note 45.
[48] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,084.
[49] *Id*. at 76,084.
[50] *Id*. at 76,084-85.

WEIL 96299951V1

students to waive their rights to bring individual or class actions against the school.[51] By contrast, few public and non-profit colleges require mandatory arbitration.[52] The Rule bans forced arbitration or class action waiver provisions for any school that receives Title IV funding from the federal government.[53]

Finally, the Rule created "triggers" which require schools to insure against future borrower claims.[54] This protects taxpayers by requiring that a school provide financial protections, such as a letter of credit, in the event that the school becomes ineligible for federal aid in the future.[55] When a school closes, the Rule ensures that the schools have sufficient available funds to pay such costs.  More importantly, the Rule requires schools to disclose to prospective students, and on their websites generally, if a trigger event has occurred at that school rendering it ineligible for federal aid.[56] The Rule also requires that for-profit schools with poor loan repayment outcomes include a plain-language warning about this in their advertising and promotional materials.[57]

### B.   The Department's Indefinite Suspension of the Borrower Defense Rule

The Department's June 2017 announcement that implementation of the Rule would be indefinitely "delayed" failed to follow the requisite public deliberative process. Moreover, the Department's assertion that delay "will not prevent student loan borrowers from obtaining

---

[51] Danielle Douglas-Gabriel, *It's Almost Impossible for Students to Sue a For-Profit College. Here's Why.*, WASH. POST (Apr. 28, 2016), https://www.washingtonpost.com/news/grade-point/wp/2016/04/28/its-almost-impossible-for-students-to-sue-a-for-profit-college-heres-why/?utm_term=.06601fd1153a.

[52] *See, e.g.*, TARIQ HABASH & ROBERT SHIREMAN, THE CENTURY FOUNDATION REPORT: HOW COLLEGE ENROLLMENT COLLEGE CONTRACTS LIMIT STUDENTS' RIGHTS (APR. 28, 2016), https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.

[53] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,087-88.

[54] *Id*. at 76,064.

[55] *Id*.

[56] *Id*. at 76,071.

[57] *Id*. at 76,070; NAT'L CONSUMER LAW CTR., DEFEND THE DEPARTMENT OF EDUCATION'S BORROWER DEFENSE RULE: PROTECTING STUDENTS AND TAXPAYERS AGAINST FRAUD AND ABUSE IN HIGHER EDUCATION (Jan. 2017), https://www.nclc.org/images/pdf/special_projects/sl/defend-doe-borrower-def-rule.pdf.

relief," is not founded in any factual basis. Instead, the Department blindly relied on the instigation of one lawsuit to justify its indefinite delay of the Rule. But this too, lacks any merit.

On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a complaint against the Department of Education seeking a declaratory judgment that the Rule is arbitrary and capricious, and that any action previously taken by the Department pursuant to the Rule is null and void, as well as to enjoin the implementation of the Rule.[58] The Department cites the complaint to justify postponing enforcement of the Rule;[59] however, the CAPPS complaint contains unfounded assertions against the Rule and cannot be the basis of the Department's decision to rollback a rule that was promulgated through an extensive deliberative process when delayed implementation affects thousands of borrowers.

The complaint alleges that students would be acutely harmed if for-profit schools began to close in large numbers as a result of the rule.[60] But, students of for-profit institutions are already being harmed by their mere enrollment in such schools.[61] The lack of potential (and actual) gainful employment, the high amount of student loan debt acquired from attending a for-profit institution, and the lack of any true market value of a for-profit degree all pose greater dangers to students, and in particular students of color who are disproportionately represented at for-profit schools, than their closure.

The complaint also disingenuously alleges that for-profit member institutions of CAPPS serve a student population comprised mostly of low-income minorities who are not well-served by traditional higher education institutions.[62] But, the facts paint a different picture.  African-

---

[58] Complaint, Cal. Assoc. of Private Postsecondary Sch. v. Devos, No. 17-cv-999 (D.D.C. May 24, 2017).
[59] *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, U.S. DEP'T EDUC. (June 14, 2017), https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions [hereinafter Complaint].
[60] Complaint, *supra* note 58, at 12.
[61] *Gainful Employment*, *supra* note 15.
[62] Complaint, *supra* note 58, at 12.

14

American and Latino students have higher graduation rates, higher household incomes, and much lower student loan debt when having attended a public or non-profit college.[63] These statistics clearly show that these minority students are better served in non-profit colleges than at for-profit schools.

Finally, the complaint asserts that if the Rule is implemented, many minority students may be unable to access postsecondary education.[64]  The ultimate goal should not be equal access to *any* higher education institution, but to meaningful, legitimate higher education programs that equip students with valuable, marketable skills that will translate into long-term wealth and financial success.  The Borrower Defense Rule's objections do not conflict with providing students access to higher education—quite the opposite, it holds predatory for-profit institutions accountable for harmful practices that sink vulnerable students further into debt.

## III.    THE DEPARTMENT'S SUSPENSION OF THE IMPLEMENTATION OF THE BORROWER DEFENSE RULE HURTS COMMUNITIES OF COLOR

Delayed implementation of the Rule undoubtedly disadvantages all students who have incurred debt to attend for-profit institutions, but especially harms students and communities of color and presents significant civil rights concerns.  Not only are students of color often intentionally targeted by predatory for-profit institutions, which leads to an overrepresentation of those students, but students of color at for-profit institutions also face substantial obstacles discharging improper loans that other borrowers do not face.  Students of color are less likely to bring claims against for-profit institutions, and when they do, often bring claims as pro se litigants.[65]  The delay of the Rule allows for-profit institutions to continue encumbering racial

---

[63] *Gainful Employment*, *supra* note 15.

[64] Complaint, *supra* note 58, at 13.

[65] *See* John H. Doyle et al., Report of the Working Committees to the Second Circuit Task Force on Gender, Racial and Ethnic Fairness in the Courts, 1997 ANN. SURV. AM. L. 117, 298 (1997) (finding that in the Second Circuit, "the majority of non-prisoner pro se cases are likely to be brought by women and minorities because they are disproportionately poor.")

15

minorities with substantial student loan debt without providing adequate educational or employment returns, thus widening the wealth gap between racial minorities and whites.

### A.    Delaying the Rule Leaves Students of Color Unprotected from the Predatory Practices of For-Profit Institutions

The indefinite suspension of the Rule leaves students of color vulnerable by not holding for-profit institutions accountable for fraudulent conduct.  For-profit institutions will not be deterred from misleading and deceptive recruiting tactics.  Currently, prospective students are left without a federal standard that offers relief when a for-profit college breaches a contract with its students, misrepresents its program, or has a court judgment against it related to a loan or educational services for which a loan was obtained.  As discussed above, under the Rule, these events require for-profit colleges to disclose that they were obligated to provide financial protections and include warnings in their advertising and promotional materials.[66]  The misleading and deceptive recruitment practices of for-profit institutions place prospective students of color in harm's way of attending for-profit institutions that are not worth the debt incurred to attend.  This risk is underscored by for-profits' lack of investment into their educational programs and the resulting graduation and employment outcomes for students of color.

### B.    Delaying the Rule Reinstates Procedural Hurdles that Disparately Impairs Students of Color Ability to Access Courts, and Ultimately, Obtain Relief

In addition to tolerating predatory practices, delayed implementation of the Rule deprives defrauded students the specific relief and procedural protections it established.  As discussed above, the Rule provides defrauded borrowers several protections in court.  First, the Rule established a new standard for borrowers who attend colleges that receive Title IV funding to

---

[66] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,070.

WEIL 96299951V1

defend against repayment of their loans.  The borrower can avoid repayment if he shows: (i) a substantial misrepresentation—including a false or misleading statement that the borrower relied on, (ii) a breach of contract; or (iii) a favorable non-default judgment against the institution.[67] Second, the Rule also eliminated a statute of limitations that could run on a borrower's claim against the institution.[68] Instead, under the Rule, a borrower could bring a claim so long as at least a portion of her debt remained outstanding.[69] Third, the Rule barred institutions that participated in the federal student loan programs from using forced arbitration clauses and class action bans to prevent any future liability.[70]  The Rule also created a process through which borrowers could have their loans discharged without filing an application.[71] These procedural protections, merely some of the many protections promulgated in the Rule, were meant to help identify and preserve valid claims of defrauded borrowers,[72] but the Department's delay in implementing the Rule has eliminated these safeguards.

These safeguards are particularly important to students of color who are less likely to bring civil litigation and lack access to courts.  A 2016 study on the racial differences in access to civil justice[73] concluded that "black respondents . . . were less likely than white respondents to have sought, or considered seeking, legal help for their civil legal problems."[74] The study attributed this difference in part to racial differences in trust in institutions—of the respondents polled in the study, 75% of white respondents answered that they trusted the court system while

---

[67] *Id.* at 76,083.

[68] *Id*.

[69] *Id.*

[70] *Id*. at 75,926.

[71] *See* Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. 75, 926.

[72] *See id.* at 76,080, 76,083-86.

[73] Sara Sternberg Greene, *Race, Class, and Access to Civil Justice*, 101 Iowa L. Rev. 1263, 1322 (2016). The study was analyzed a sample data set obtained by interviewing 97 individuals who lived in a public housing complex in Cambridge, Massachusetts. The sample data set was controlled for socioeconomic background —all those interviewed lived below 80% of the area median income and also removed any convicted felons from the data set, in other words, removing those who had serious encounters with the criminal justice system. *Id.* at 1283.

[74] *Id.* at 1268.

only 22% of African Americans answered the same.[75] According to the study, African-American distrust of the judicial system stems from experiencing discriminatory treatment not only in the judicial system or law enforcement contexts, but in broader institutional discrimination.[76] Accordingly, African-American students likely face significant societal obstacles to bringing any civil claim in court.

This tendency to distrust the judicial system certainly affects the likelihood that African-American students will bring a borrower defense claim against for-profit institutions. While the implementation of the Rule sought, in part, to pave the road for defrauded borrowers to discharge their debt more easily,[77] the indefinite postponement of the Rule leaves borrowers at a disadvantage in their claims against predatory for-profit institutions. Defrauded students continue to face mandatory arbitration clauses that put for-profit institutions in a favorable forum and statutes of limitations that limit the amount of time a borrower has to bring her claim. These barriers are higher for students of color who distrust the court system and are less willing to initiate civil litigation. Similarly, delaying the creation of an application-free process perpetuates another barrier to students of color seeking relief from fraudulent loans.

Even in the cases where students of color have initiated litigation against for-profit institution, students of color are often at a disadvantage because they are more likely to bring the claim as a pro se litigant. Though there has been sparse research on the issue,[78] it is generally understood that "a substantial number of pro se litigants are minorities and women."[79]

---

[75] *Id.* at 1301-02.
[76] *Id.* at 1266-67, 1278.
[77] *See* Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,080, 76,083-86.
[78] *See, e.g.* Amy Myrick, et al., *Race and Representation: Racial Disparities in Legal Representation for Employment Civil Rights Plaintiffs*, 15 N.Y.U. J. LEGIS. & PUB. POL'Y 705, 758 (2012); John Doyle et al., *supra* note 65, at 297-98 ("Although no clear statistical profile on the gender, race or ethnicity of the civil pro se litigants in the Second Circuit exists, it is highly probable that many of these litigants are minorities and/or women and that women and minorities are more prevalent litigants bringing pro se cases than in represented matters.").
[79] John Doyle et al., *supra* note 65, at 343.

Importantly, a Second Circuit Task Force Report observed that "the majority of non-prisoner pro se cases are likely to be brought by women and minorities because they are disproportionately poor."[80] Similarly, a statistical analysis of employment discrimination actions in 2012 explained "that African Americans are 2.5 times more likely to file pro se than whites."[81] Without representation, pro se litigants face significant hurdles including being "more likely to neglect time limits, miss court deadlines, and have problems understanding and applying the procedural and substantive law pertaining to their claim."[82] Students of color bringing pro se claims will likely grapple with these hurdles as well and moreover, may struggle with the procedural and substantive laws that govern borrower defense cases.

The Rule delay creates uncertainty as to what standard applies when determining eligibility for relief from student debt.  As discussed above, the Rule changed the standard for eligibility for borrower defense relief to a clear three-pronged method of prevailing on a claim: (i) a substantial misrepresentation—including a false or misleading statement that the borrower relied on, (ii) a breach of contract; or (iii) a favorable non-default judgment against the institution. Under existing state regulations,[83] the standard for relief is not only unclear, but varies state-by-state.  Pro se litigants of color may meet some state standards but not others and may struggle to understand what standard applies to their case.  This uncertainty creates confusion for all borrowers, but students of color seeking redress may be less likely to attempt to untangle complex federal and state law standards without the help of counsel.  The added confusion may decrease the ability of students of color, who are more likely to bring claims as

---

[80] *Id.* at 298.
[81] Amy Myrick, et al., *supra* note 78,  at 758.
[82] Nina Ingwer Van Wormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 VAND. L. REV. 983, 1020 (2007).
[83] Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 27,621 (June 16, 2017).

19

pro se litigants, to succeed in court.

The Department's unilateral decision to delay the implementation of the Rule will limit the ability of students of color to not only have their day in court, but also to ultimately prevail on claims that they have been defrauded by predatory for-profit institutions.

### C. Delaying the Rule Prevents Defrauded Students of Color from Obtaining Relief from Loans and Perpetuates the Racial Disparity in Student Debt

The delay in implementation prevents students of color, who are overrepresented in for-profit institutions, from discharging their fraudulently incurred loans by eliminating processes for students to discharge their loans.  The Rule provides several direct ways that borrowers can obtain full or partial discharge of their loans, which are particularly difficult to discharge.[84]

The Rule provides specific processes for relief.[85] For example, under the Rule, the Department could pursue group-wide relief to provide equitable treatment for groups of borrowers who were subject to similar mistreatment and take advantage of the efficiencies of class actions.[86] The Rule also permits borrowers to discharge their loans if the institution they attended falsified records or certifications to make the borrower eligible for certain loans. [87] Similarly, the Rule provides relief in some circumstances when a school falsified loan eligibility by falsely reporting that a student had satisfactory academic progress—a measure of the value the student is getting from the loan investment.[88] Lastly, while existing legislation already required the Department to discharge federal student loans if the borrower was unable to

---

[84] Student loan debt is particularly hard to escape—for example, it is nearly impossible to discharge it in bankruptcy. *See* Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing,* DEMOS (May 19, 2015).
[85] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,080, 76,083-86.
[86] *Id.* at 76,080, 76,084-85.
[87] *Id*. at 76,082.
[88] *Id*. at 76,082.

complete his program due to an institution's closure,[89] the Rule requires timely communication to borrowers who are eligible for this form of relief so they can discharge their loans quickly and avoid any unnecessary repayment.[90] These mechanisms were meant to provide swift and efficient means through which defrauded borrowers could discharge their loans. Because students of color are overrepresented in for-profit institution enrollment, the inability to discharge loans will disproportionately impact students of color.

The indefinite delay on implementing the Borrower Defense Rule prevents students of color from absolving themselves of significant amounts of fraudulently incurred student debt. As evident by the disparity between the outstanding debt of African-American and white borrowers, the delay of the Rule poses particular harm to students of color because they cannot discharge their larger amounts of debt with the devices provided by the Rule.

*               *               *

The Rule represents a step in the right direction by providing the neediest students of color defrauded by for-profit institutions with long-term economic relief. The Rule's suspension will further exacerbate racial economic gaps and hinder minorities' ability to obtain wealth and security.

---

[89] 20 U.S.C. § 1087(c)(1)
[90] Student Assistance General Provisions, *supra* note 35, 81 Fed. Reg. at 76,070.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully ask that this Court grant summary judgment in favor of Plaintiffs and enjoin the Department of Education from delaying the implementation of the Borrower Defense Rule.


Dated:  October 3, 2017
       Washington D.C.


                       Respectfully submitted,

                         /s/ Jon Greenbaum
                       Kristen Clarke
                       Jon Greenbaum
                       LAWYERS' COMMITTEE FOR
                       CIVIL RIGHTS UNDER LAW
                       1401 New York Avenue, NW
                       Suite 400
                       Washington, DC 20005
                       (202) 662-8600

                       Anish Desai
                       Irisa Chen
                       Natalie Kennedy
                       WEIL, GOTSHAL & MANGES LLP
                       767 Fifth Ave.
                       New York, NY 10153
                       (212) 310-8000

22

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of October, 2017, Amicus Curiae Memorandum of Points and Authorities of the Lawyers' Committee for Civil Rights Under Law in Support of Plaintiffs' Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system, which shall send notice to all counsel of record.


/s/ Jon Greenbaum
Jon Greenbaum, Esq.