# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF
MASSACHUSETTS, et al.

               Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION,

    and

BETSY DEVOS, *in her official capacity as
Secretary of Education,*

               Defendants.

Civil Action No. 1: 17-CV-01331

---

### *AMICUS CURIAE* BRIEF OF CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036

GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N Upper Wacker Dr. #2700
Chicago, IL 60606

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004

CLIFFORD M. SLOAN, DC Bar No. 417339
CAROLINE S. VAN ZILE, DC Bar No. 1017942
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com
Email: caroline.vanzile@skadden.com

*Attorneys for CAPPS*

## CORPORATE DISCLOSURE STATEMENT
## AND CERTIFICATE OF DISCLOSURE

Pursuant to Local Rule 7(o) of the Local Rules of the United States District Court for the

District of Columbia (the "Local Rules"), and Federal Rule of Appellate Procedure 29:

I, undersigned counsel of record for *amicus curiae*, certify that to the best of my

knowledge and belief, the California Association of Private Postsecondary Schools ("CAPPS")

does not have a parent corporation, no publicly held company holds 10% or more of stock of

CAPPS, and no parents, subsidiaries, or affiliates thereof have any outstanding securities in the

hands of the public.

## STATEMENT OF COUNSEL

Pursuant to Local Rule 7(o) and Federal Rule of Appellate Procedure 29, counsel for

*amicus curiae* states that none of the parties to the above-captioned dispute, and none of their

counsel, authored this brief in whole or in part.  No persons other than *amicus*, its members, or

its counsel made a monetary contribution to preparation or submission of this brief.

Dated: December 15, 2017

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036

GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N Upper Wacker Dr. #2700
Chicago, IL 60606

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004

Respectfully submitted,

/s/ Clifford M. Sloan
CLIFFORD M. SLOAN, DC Bar No. 417339
CAROLINE S. VAN ZILE, DC Bar No. 1017942
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com
Email: caroline.vanzile@skadden.com

*Attorneys for CAPPS*

ii

## TABLE OF CONTENTS

Page

INTEREST OF AMICUS CURIAE ...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................2

ARGUMENT .....................................................................................................................6

I.      THE DEPARTMENT SATISFIED THE REQUIREMENTS OF § 705. ..........................6

        A.      The Department Reasonably Concluded That Justice Required Issuing the
                § 705 Stay. .........................................................................................................7

                1.      Whether "Justice So Requires" Is a Broad Standard that Gives the
                        Department Considerable Discretion. ...........................................................7

                2.      The Conclusion that the Regulation Would Cause Substantial
                        Harm to Schools and Students Is Amply Justified by the Record. ..............8

                        (a)     The Borrower Defense Provisions Would Cause Substantial
                                Harm. ......................................................................................11

                        (b)     The Financial Responsibility Provisions Would Cause
                                Substantial Harm.....................................................................12

                        (c)     The Repayment Rate Provisions Would Cause Substantial
                                Harm. ......................................................................................13

                        (d)     The Arbitration and Class Action Provisions Would Cause
                                Substantial Harm.....................................................................14

                3.      The Department Permissibly Balanced the Equities.................................16

        B.      The Department Issued the § 705 Stay "Pending Judicial Review" of the
                Borrower Defense Regulations. .........................................................................16

        C.      The Department Was Not Required to Engage in Notice and Comment
                Rulemaking Before Issuing the § 705 Stay.........................................................18

i

II.     THE DEPARTMENT LAWFULLY PROMULGATED THE 2018 DELAY. ................20

III.    IF THE COURT CONCLUDES OTHERWISE, THE COURT SHOULD REMAND WITHOUT VACATUR. ................................................................................23

CONCLUSION..........................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,*
    988 F.2d 146 (D.C. Cir. 1993) ...................................................................... 23, 24

*American Lung Ass'n v. EPA,*
    134 F.3d 388 (D.C. Cir. 1998) ............................................................................. 24

*Black Oak Energy, LLC v. FERC,*
    725 F.3d 230 (D.C. Cir. 2013) ............................................................................. 24

*Cytori Therapeutics, Inc. v. FDA,*
    715 F.3d 922 (D.C. Cir. 2013) .................................................................... *passim*

*Dean v. United States,*
    556 U.S. 568 (2009) ............................................................................................. 19

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................. 6, 16, 18

*Hibbs v. Winn,*
    542 U.S. 88 (2004) .............................................................................................. 20

*Marmet Health Care Center, Inc. v. Brown,*
    132 S. Ct. 1201 (2012) ........................................................................................ 14

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,*
    460 U.S. 1 (1983) ................................................................................................ 14

*Motor Vehicle Manufacturers Ass'n of United States.S., Inc. v. State Farm Mutual Auto,*
    *Insurance Co.,*
    463 U.S. 29 (1983) .............................................................................................. 18

*National Telephone Co-op. Ass'n v. FCC,*
    563 F.3d 536 (D.C. Cir. 2009) ............................................................................. 16

*POM Wonderful LLC v. Coca-Cola Co.,*
    134 S. Ct. 2228 (2014) ........................................................................................ 19

*United States Telecom Ass'n v. FBI,*
    276 F.3d 620 (D.C. Cir. 2002) ............................................................................. 24

# STATUTES

5 U.S.C. § 553 ................................................................................................ 19, 20

5 U.S.C. § 553(b)(3)(B), (d)(3) ............................................................................ 23

5 U.S.C. § 705 ......................................................................................... *passim*

5 U.S.C. § 706(2)(A), (D) .................................................................................... 6

20 U.S.C. § 1088(a)(1) ........................................................................................ 20

20 U.S.C. § 1089 ................................................................................................ 4

20 U.S.C. § 1089(a) ............................................................................................ 20

20 U.S.C. § 1089(c) ............................................................................................ 20

20 U.S.C. § 1089(e) ............................................................................................ 20

20 U.S.C. § 1098a(b)(2) ...................................................................................... 23

# RULES

Federal Rule of Appellate Procedure 29 ............................................................... ii

# REGULATIONS

34 C.F.R. § 685.222 (2017) ............................................................................ 3, 11

34 C.F.R. § 685.300(e)-(f) (2017) ......................................................................... 4

34 C.F.R. § 685.300(e)(3)(ii) (2017) .................................................................... 15

34 C.F.R. § 685.300(f)(3)(ii) (2017) .................................................................... 15

Exchange Act Rule 13p-1 and Form SD,
Exchange Act Release No. 72079, 79 Fed. Reg. 26,297-01 (May 27, 1992)
(amending 40 C.F.R. pt. 41) (EPA) ................................................................ 17

National Primary Drinking Water Regulations,
57 Fed. Reg. 22,178 ..................................................................................... 17

S. Rep. No. 79-752 (1945) ................................................................................. 19

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    81 Fed. Reg. 75,926 ................................................................................................... 1

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    82 Fed. Reg. 27,621 ................................................................................................... 2

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    82 Fed. Reg. 49,114 ................................................................................................... 2

## OTHER AUTHORITIES

Judah Bellin, *A Gateway to the Working World*, City J. (Spring 2015), https://www.city-
    journal.org/html/gateway-working-world-13724.htm ......................................................10

Bill Bennett, *Taxpayers Shouldn't Have to Pay for Unhappy College Students*, Time
    (July 27, 2016), http://time.com/4426095/college-loan-fraud/ ...........................................9

Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010),
    https://www.wsj.com/articles/SB1000142405274870372410457537893395426730
    8.......................................................................................................................................10

CAPPS Comment on Borrower Defense Regulations, No. ED-2015-OPE-0103 (Aug. 1,
    2016) .........................................................................................................................10, 13

CAPPS's Opposition to the Motions to Intervene by States and Borrowers, *CAPPS v.
    DeVos*, 1:17-cv-00999-RDM (D.D.C. July 12, 2017), ECF No. 39 ...................................5

Career Education Colleges and Universities, Comment Letter on Borrower Defense
    Regulations 4-5, No. ED-2015-OPE-0103 (Aug. 1, 2016)................................................13

Anthony T. Caso, No Good Reason For New Student Loan Forgiveness Rules, Law360
    (July 22, 2016), https://www.law360.com/articles/817923/no-good-reason-for-
    new-student-loan-forgiveness-rules.....................................................................................9

Declaration of Robert Johnson, *CAPPS v. DeVos*, 1:17-cv-00999-RDM (D.D.C. June 2,
    2017), ECF No. 6 ......................................................................................................1, 15

National Association of College and University Business Officers (NACUBO), Comment
    Letter on Borrower Defense Regulations, No. ED-2015-OPE-0103 (Aug. 1, 2016)........14

Jonathan Oosting, *DeVos on Mackinac: 'Washington Knows Best' is Over*, Detroit News
(Sept. 22, 2017),
http://www.detroitnews.com/story/news/politics/2017/09/22/mackinac-devos-
romney-mcdaniel/105897636/ ........................................................................................12

Spelman College, Comment Letter on Borrower Defense Regulations, No. ED-2015-
OPE-0103 (July, 28, 2016) .............................................................................................9

United Negro College Fund, the Thurgood Marshall College Fund, and the National
Association for Equal Opportunity in Higher Education, Comment Letter on
Borrower Defense Regulations, No. ED-2015-OPE-0103 (July 29, 2016)..................9, 11

## INTEREST OF AMICUS CURIAE

*Amicus* California Association of Private Postsecondary Schools ("CAPPS"), is a non-profit association of California private postsecondary educational institutions.  CAPPS has a membership of approximately 150 institutions, including proprietary, or for-profit, and non-profit schools.  Many CAPPS schools are relatively small institutions, with an average of fewer than 400 students and one or two locations.  In a related case pending before this Court, *CAPPS v. DeVos*, 1:17-cv-00999-RDM (D.D.C. 2017) ("Borrower Defense litigation"), CAPPS is challenging the Final Borrower Defense to Repayment Rule adopted by the Department of Education ("Department").  *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Borrower Defense Regulations" or the "Final Rule").

Many CAPPS schools are technical or vocational colleges that prepare students for occupations that are instrumental to a thriving economy.  Declaration of Robert Johnson ¶ 7, *CAPPS v. DeVos*, 1:17-cv-00999-RDM (D.D.C. June 2, 2017), ECF No. 6-2 [hereinafter Johnson Decl.].  Among the individuals that CAPPS schools train are future nurses, medical equipment technicians, information technology specialists, electricians, paralegals, chefs, and cosmetologists. *Id.* ¶ 8.  Businesses rely on the availability of well-trained workers, and students rely on CAPPS for access to industries requiring skilled work.

CAPPS has a pressing interest in this case.  The Plaintiffs in this litigation seek to invalidate the Department's decisions (i) to postpone the effective date of the Borrower Defense Regulations pending the resolution of the Borrower Defense litigation (the "§ 705 Stay") and (ii) to issue an interim final rule delaying the effective date of the Regulations until July 1, 2018 (the

1

"2018 Delay").  *See* Student Assistance General Provisions, Federal Loan and Grant Programs,

82 Fed. Reg. 27,621 (June 16, 2017) [hereinafter § 705 Stay]; Student Assistance General

Provisions, Federal Loan and Grant Programs, 82 Fed. Reg. 49,114 (Oct. 24, 2017) [hereinafter

2018 Delay].  If the Court invalidates and vacates these temporary delays, the Regulations could,

in Plaintiffs' view, take effect immediately.  Vacatur of the § 705 Stay and the 2018 Delay would

cause chaos and disruption for CAPPS schools and other postsecondary institutions.  Schools and

students alike would be injured by the implementation of the Regulations' onerous and unlawful

requirements.

### INTRODUCTION AND SUMMARY OF ARGUMENT

CAPPS supports the Department's considered and lawful actions in delaying the effective

date of the Regulations.  CAPPS respectfully urges this Court to deny the Plaintiffs' Motion for

Summary Judgment and to grant the Department's cross-motion.  As explained further below,

CAPPS schools and students would sustain significant harm if the Borrower Defense

Regulations were implemented.  The Department's temporary delays of the Regulations were

necessary, legally sound, and entirely reasonable.  They prevent the irreparable injuries that

schools would suffer if they were subjected to this unlawful and unjustified regulatory regime,

with inadequate notice to institutions and while legal challenges regarding the Regulations

remain unresolved.

By way of background, on November 1, 2016, the Department promulgated the Borrower

Defense Regulations with an effective date of July 1, 2017, pursuant to Title IV of the Higher

Education Act, 20 U.S.C. §§ 1070-1099 ("HEA").  *See* Final Rule, *supra*, at 75,926.  As CAPPS

explained in its Complaint in the Borrower Defense litigation, *see* Complaint, *CAPPS v. DeVos*,

1:17-cv-00999-RDM (D.D.C. May 24, 2017), ECF No. 1 [hereinafter CAPPS Compl.], those Regulations create upheaval in the regulation of postsecondary schools without a legal basis or rational justification.  Four core provisions of the Borrower Defense Regulations are unlawful and may threaten the very existence of many schools.

*First*, the Borrower Defense Regulations radically alter the grounds and processes for student borrowers to raise "borrower defenses" to Title IV loan repayment (the "Borrower Defense Provisions").  The Regulations include provisions that transform those *defenses* into affirmative causes of action that would ultimately leave schools and taxpayers with the bill for a massive new loan forgiveness regime.  *See, e.g.*, Final Rule, *supra*, at 75,926, 75,954-56, 75,970-71; 34 C.F.R. § 685.222 (2017).  *Second*, the Regulations impose sweeping new requirements regarding a school's financial responsibility (the "Financial Responsibility Provisions").  *See* Final Rule, *supra*, at 76,074-75.  Under those new provisions, the determination that an institution is not financially responsible is made, in whole or in part, based on specific "triggering events" that bear no relation to an institution's overall financial health.  *Id.* at 76,073-74.  *Third*, the Regulations require a new loan repayment rate warning that applies only to proprietary institutions (the "Repayment Rate Provisions").  *See id.* at 76,071.  This requirement unjustifiably discriminates against proprietary schools, penalizes institutions whose students are repaying their loans pursuant to income-based plans, and punishes schools based on students' educational and financial background.  *Finally*, the Regulations unlawfully bar schools from enforcing arbitration provisions and class action waivers in existing agreements with students, and impermissibly prohibit those schools from executing new agreements with arbitration

provisions and class action waivers (the "Arbitration and Class Action Provisions"). *See id.* at 76,066-67; 34 C.F.R. § 685.300(e)-(f) (2017).

On May 24, 2017, CAPPS filed a lawsuit in this Court against the Department, challenging the Borrower Defense Regulations as exceeding the Department's statutory authority, violating the Administrative Procedure Act ("APA"), and contravening the Constitution. *See generally* CAPPS Compl. CAPPS requested a preliminary injunction to bar the enforcement of the Arbitration and Class Action Provisions. *See* Mot. for Prelim. Inj., *CAPPS v. DeVos*, 1:17-cv-00999-RDM (D.D.C. June 2, 2017), ECF No. 6.

Shortly thereafter, the Department issued the § 705 Stay in a final rule postponing the effective date of certain portions of the Regulations, including all four of its major operative provisions, pending the resolution of the Borrower Defense litigation. *See* § 705 Stay, *supra*, at 27,621. The Department issued the § 705 Stay pursuant to its authority under 5 U.S.C. § 705, which allows agencies to postpone the effective date of an agency action pending litigation if the agency finds that "justice so requires." As a result of the § 705 Stay, CAPPS withdrew its motion for a preliminary injunction. *See* Notice of Withdrawal of Mot., *CAPPS v. DeVos* (D.D.C. June 14, 2017), ECF No. 21. The Borrower Defense litigation remains pending.

In October 2017, the Department issued the 2018 Delay, which confirmed that the provisions of the Regulations subject to the § 705 Stay would not take effect until July 1, 2018, at the earliest. 2018 Delay, *supra*. The Department issued the 2018 Delay pursuant to the master calendar requirement of the HEA, *see* 20 U.S.C. § 1089 ("master calendar requirement"), which provides that regulations promulgated under the HEA will become effective at the beginning of an award year, on July 1 of a given year.

4

As the Department appropriately recognized, the Borrower Defense Regulations are of questionable validity and threaten to cause significant, unjustified injury to schools, especially if the Regulations are implemented with inadequate warning and while challenges to their legality remain unresolved.  The § 705 Stay and the 2018 Delay are necessary to prevent unwarranted and irreparable harm to schools and students and are amply justified on that basis, among others. Under the proper test, the Department's actions were lawful and justified under the APA.[1]

*First*, the Department satisfied the statutory requirements of § 705 when it found that justice required that the Department delay the effective date of the Regulations pending the resolution of the Borrower Defense litigation.  The Department's invocation of § 705 was reasonable, explained appropriately, and satisfied applicable procedural requirements.

*Second,* in promulgating the 2018 Delay, the Department followed the proper procedures and reasonably interpreted the master calendar requirement to prevent the drastic harm that regulated entities would sustain if the Regulations went into effect before July 1, 2018.

*Finally,* while CAPPS maintains that the Department promulgated both the § 705 Stay and the 2018 Delay lawfully, if the Court concludes otherwise, it should remand to the Department without vacatur so that the Department can quickly remedy any issues that might be

---

[1] CAPPS agrees with the Department on the threshold issue of standing.  As CAPPS has explained in its Opposition to the Motions to Intervene in the Borrower Defense litigation, *see* CAPPS's Opposition to the Motions to Intervene by States and Borrowers 5-15, *CAPPS v. DeVos*, 1:17-cv-00999-RDM, (D.D.C. July 12, 2017), ECF No. 39, and as the Department notes in its Motions, *see* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. 14-21, *Massachusetts v. Dep't of Educ.*, 1:17-cv-1331-RDM (D.D.C. Dec. 1, 2017), ECF No. 56-1 ("Defs.' Mot. in State Case"); Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. 15-17, *Bauer v. DeVos*, 1:17-cv-1330-RDM (D.D.C. Dec. 1, 2017), ECF No. 35-1 ("Defs.' Mot. in Borrower Case"), the States and Borrowers fail to establish the basic requirements of Article III standing, and their Motions for Summary Judgment and complaints should be dismissed on that ground alone.

identified by the Court.  The Regulations threaten to cause significant disruption to schools and students, especially if the Regulations are implemented with inadequate warning in the middle of an award year, with the possibility that they will be revamped or invalidated in the near future. Such an abrupt shift will cause chaos in the industry, irreparable harm to CAPPS schools, and confusion for students, who may rely to their detriment on interim provisions that ultimately are invalidated, rewritten, or delayed again.  Under controlling D.C. Circuit precedent, that is exactly the situation in which remand without vacatur is most warranted.

## ARGUMENT

## I.   THE DEPARTMENT SATISFIED THE REQUIREMENTS OF § 705.

The § 705 Stay constitutes a lawful exercise of the Department's authority.  The APA directs courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  The arbitrary and capricious standard of review is narrow, and requires a court to determine whether an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  A court may not "substitute its judgment for that of the agency," and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 513-14 (citations omitted).

The § 705 Stay is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  Under 5 U.S.C. § 705, "[w]hen an agency finds that justice so requires, it

may postpone the effective date of action taken by it, pending judicial review."[2]  Even assuming

arguendo that an agency's decision pursuant to § 705 is reviewable – and the Department

forcefully argues it is not, *see* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. 21-24,

*Massachusetts v. Dep't of Educ.*, 1:17-cv-1331-RDM (D.D.C. Dec. 1, 2017), ECF No. 56-1

("Defs.' Mot. in State Case"); Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. 17-21,

*Bauer v. DeVos*, 1:17-cv-1330-RDM (D.D.C. Dec. 1, 2017), ECF No. 35-1 ("Defs.' Mot. in

Borrower Case") – this language grants agencies considerable discretion to postpone a rule's

effective date, so long as the agency "finds that justice so requires" and delays the effective date

"pending judicial review."  5 U.S.C. § 705.  The Department satisfied both of these

requirements.  In addition, the Department followed the appropriate procedures for issuing the

§ 705 Stay.

> **A.**   **The Department Reasonably Concluded That Justice Required Issuing the § 705 Stay.**
>
> > 1.   Whether "Justice So Requires" Is a Broad Standard that Gives the Department Considerable Discretion.

As ably explained by the Department and the Trade Association *Amici*, whether "justice

so requires" is a broad standard that grants ample discretion to the Department to postpone the

---

[2] Section 705 provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

effective date of a regulation.  *See* Defs.' Mot. in State Case 31; Defs.' Mot. in Borrower Case

21-23; Br. of the Trade Ass'n Coalition as *Amici Curiae*, *Massachusetts v. Dep't of Educ.*, 1:17-

cv-01331-RDM (D.D.C. Dec. 8, 2017), ECF No. 59-1 ("Trade Ass'n Br.").  As the Department

recognized when it issued the § 705 Stay, CAPPS "raised serious questions [in the Borrower

Defense litigation] concerning the validity of certain provisions of the [Regulations] and ha[s]

identified substantial injuries that could result if the final regulations go into effect before those

questions are resolved."  § 705 Stay, *supra*, at 27,621.  The Department also acknowledged that,

absent the § 705 Stay, regulated entities, such as CAPPS schools, would incur significant costs,

including those associated with "modify[ing] their contracts in accordance with the arbitration

and class action waiver regulations."  *Id.*  Surely findings that (i) a substantial question exists as

to a rule's legality and (ii) the questionable rule, if implemented, would cause substantial harm

support a stay in the interest of justice.  At the very least, the Department was not arbitrary in so

holding.  *See, e.g.*, *Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 924, 926-27 (D.C. Cir. 2013)

(requiring only that an agency decision be "reasonable and reasonably explained").

      2.    The Conclusion that the Regulation Would Cause Substantial Harm to
               Schools and Students Is Amply Justified by the Record.

      The Department's determination that the Regulations would cause "substantial injuries"

to schools – and, therefore, ultimately to students – is amply supported by the record.  Indeed,

the impact that the Borrower Defense Regulations will have on many schools is dramatic.

      As the Department observed in its Final Rule, many of the provisions in the Borrower

Defense Regulations would cause massive financial disruption for CAPPS schools, among

others.  The Regulations impose burdensome requirements, estimated to cost schools across the

country almost $10 million a year in paperwork alone.  *See* Final Rule, *supra*, at 76,046.

Implementing those requirements abruptly and while CAPPS's legal challenges to the

Regulations remain unresolved will undermine postsecondary institutions' ability to make

rational budgetary decisions. *See, e.g.*, Bill Bennett, *Taxpayers Shouldn't Have to Pay for*

*Unhappy College Students*, Time (July 27, 2016), http://time.com/4426095/college-loan-fraud/;

Anthony T. Caso, *No Good Reason For New Student Loan Forgiveness Rules*, Law360 (July 22,

2016), https://www.law360.com/articles/817923/no-good-reason-for-new-student-loan-

forgiveness-rules.

        As many schools observed during the Borrower Defense Regulations proceedings, the

increased costs and threat of meritless claims and litigation generated by the Regulations will be

crippling for many schools.  *See* Bennett, *supra*.  Historically black colleges and universities

("HBCUs") and other traditional postsecondary institutions have voiced concerns about the

profound, negative, and unjustified impact the Regulations would have on their institutions,

including the effects on students who are underrepresented in higher education.  *See* United

Negro College Fund, the Thurgood Marshall College Fund, and the National Association for

Equal Opportunity in Higher Education, Comment Letter on Borrower Defense Regulations 2,

No. ED-2015-OPE-0103 (July 29, 2016) (noting that certain aspects of the Borrower Defense

Provisions and Financial Responsibility Provisions may be "unduly injurious and burdensome to

HBCUs and [predominantly black institutions], potentially causing financial calamity for some

schools"); Spelman College, Comment Letter on Borrower Defense Regulations 1, No. ED-

2015-OPE-0103 (July, 28, 2016) (urging the Department to consider the proposed Regulations'

"sweeping scope and potentially damaging financial impact on [HBCUs]").

The Regulations also are specifically and unfairly targeted at proprietary schools.  *See*
CAPPS, Comment on Borrower Defense Regulations 2, No. ED-2015-OPE-0103 (Aug. 1, 2016).
As a result, a sudden implementation of the Regulations would have a disproportionate negative,
and unwarranted, impact on proprietary schools, which serve large percentages of minority, low-
income, and non-traditional students.  *See* CAPPS, Comment on Borrower Defense Regulations,
Declaration of Jonathan Guryan, Ph.D. 4-7, No. ED-2015-OPE-0103 (Aug. 1, 2016).   If the
Regulations abruptly are implemented, they will upend the stability of many proprietary schools,
and non-traditional students in particular are likely to find themselves faced with fewer
educational options because many traditional institutions deem such students at-risk.  *See*, *e.g.*,
Judah Bellin, *A Gateway to the Working World*, City J. (Spring 2015), https://www.city-
journal.org/html/gateway-working-world-13724.html; Henry Bienen, *In Defense of For-Profit
Colleges*, Wall St. J. (July 24, 2010),
https://www.wsj.com/articles/SB10001424052748703724104575378933954267308.  The
upheaval caused by the Regulations, particularly if they are implemented with inadequate notice
and with the possibility that they will be revised or invalidated, cannot be overstated.

Plaintiffs imply that, because CAPPS sought a preliminary injunction only with respect to
the Arbitration and Class Action Provisions, CAPPS did not take issue with the harm caused by
other provisions.  *See* Mem. of P. & A. in Supp. of Pls.' Renewed Mot. for Summ. J. 24-25,
*Massachusetts v. Dep't of Educ.*, 1:17-cv-1331-RDM (D.D.C. Nov. 11, 2017), ECF No. 50-1
("States' Mot."); Mem. of P. & A. in Supp. of Pls.' Renewed Mot. for Summ. J. 35, *Bauer v.
DeVos*, 1:17-cv-1330-RDM (D.D.C. Nov. 10, 2017), ECF No. 35-1 ("Borrowers' Mot.").  But
this is not accurate.  CAPPS and other educational organizations have outlined, time and again,

the far-reaching harm that would be caused by *each* of the Regulations' four major provisions. *See generally* CAPPS Compl.  The Department acted reasonably in determining that these substantial harms warranted a temporary stay of the Regulations, pending determination of their legality.

(a)     *The Borrower Defense Provisions Would Cause Substantial Harm.*

The Borrower Defense Provisions represent a sea change in Department policy.  These provisions expand liability for schools in an unprecedented manner by allowing borrowers to initiate an action for affirmative debt relief through a request to a Department official – and allow that Department official to then pursue schools for the cost of the forgiven loans.  *See* Final Rule, *supra*, at 75,956.  Additionally, the Borrower Defense Provisions implement an amorphous and unspecified new federal standard for claims of misrepresentation.  *See id.* at 75,926; 34 C.F.R. § 685.222.  These provisions also create a new "group borrower defense" process, apparently allowing the Department to both prosecute and adjudicate claims concerning groups of students, akin to a class or collective action.  *See, e.g.*, Final Rule, *supra*, at 75,960, 75,964-65.

If the Borrower Defense Provisions were implemented mid-award year, schools would have to pivot to react to a potential flood of specious claims of misrepresentation.  As several commenters noted during the comment period for the Regulations, many institutions "could be subject to inaccurate and frivolous claims of misrepresentation, resulting in significant costs that would severely undermine [those] institutions and divert precious resources that should be spent on serving students."  United Negro College Fund, the Thurgood Marshall College Fund, and the National Association for Equal Opportunity in Higher Education, Comment Letter on Borrower

11

Defense Regulations 3, No. ED-2015-OPE-0103 (July 29, 2016).  As the Secretary has

recognized, portions of the Regulations such as the Borrower Defense Provisions could mean

that "all one had to do was raise his or her hands to be entitled to so-called free money" – and to

force one's alma mater to foot the bill.  Jonathan Oosting, *DeVos on Mackinac: 'Washington*

*Knows Best' is Over*, Detroit News (Sept. 22, 2017),

http://www.detroitnews.com/story/news/politics/2017/09/22/mackinac-devos-romney-

mcdaniel/105897636/.  The Department's decision to delay implementation of the Regulations is

appropriate, especially in light of the possibility that the Regulations could be invalidated

entirely due to the ongoing Borrower Defense litigation.

> (b)  *The Financial Responsibility Provisions Would Cause Substantial*
> *Harm.*

Additionally, many schools, even those that are financially responsible by any reasonable

definition, will be subjected to significant costs if the Financial Responsibility Provisions are

implemented.  As CAPPS explained in its complaint, the Department already has an established

formula based on accounting principles to determine whether schools are financially responsible.

*See* CAPPS Compl. ¶¶ 73-74.  But the Department's new Financial Responsibility Provisions

would layer a host of non-fiscal considerations on top of the existing test by deeming schools

financially irresponsible whenever certain "triggers" are tripped, or when the existence of those

triggers could have a negative impact on the schools' existing financial responsibility "score."

Final Rule, *supra*, at 76,074.  Those triggers include the mere existence of a pending lawsuit;

certain perfectly lawful actions taken by publicly traded companies; or the late filing of a report

with the Securities and Exchange Commission ("SEC") even when the SEC itself has granted a

filing extension.  *See id.* at 76,073-74.  Tripping a trigger may result in the requirement that a school obtain a very costly letter of credit for 10% of the prior years' Title IV funds.  *Id.* at 76,076.

As CAPPS and others explained during the comment period for the Borrower Defense Regulations, each letter of credit generally is required to be backed by cash collateral.  *See, e.g.*, CAPPS, Comment on Borrower Defense Regulations 4, No. ED-2015-OPE-0103 (Aug. 1, 2016). As a result, when a triggering event occurs, such as the pendency of even a meritless lawsuit against an institution, that institution may incur costs that amount to millions of dollars under the new Regulations.  *See id.*  This may jeopardize an institution's very existence.  *See* Career Education Colleges and Universities, Comment Letter on Borrower Defense Regulations 4-5, No. ED-2015-OPE-0103 (Aug. 1, 2016) (noting the "tremendous financial burden" that obtaining letters of credit will place on both non-profit and proprietary institutions).  Moreover, institutions will have to redirect a vast amount of resources to train compliance officers in accordance with burdensome and time-sensitive reporting requirements mandated by the Financial Responsibility Provisions.  *See* Final Rule, *supra*, at 76,074.

Causing such an extraordinary and unnecessary fiscal impact on schools will put many institutions at risk.  This, in turn, will harm students who are attending schools that are burdened by the mid-award year regulatory shift.  The Department was amply justified in finding that the possibility of these and similar harms counseled in favor of a stay.

> (c)     *The Repayment Rate Provisions Would Cause Substantial Harm.*

The Borrower Defense Regulations also include provisions requiring that, in certain situations, a proprietary institution – and only a proprietary institution – include in all

promotional materials a warning regarding its former students' repayment rates ("Repayment Rate Provisions"). Final Rule, *supra*, at 76,071. Under the Regulations, schools would suffer unjustified reputational injury because the warnings are, as CAPPS has alleged, discriminatory, unlawful, and unwarranted. In addition to the cost of being forced to re-create all of their promotional materials, schools may be viewed unjustifiably and unfairly as being unstable. The damage is especially severe if they are required to issue these warnings mid-year, thereby harming schools' recruitment and fundraising efforts. *See* National Association of College and University Business Officers (NACUBO), Comment Letter on Borrower Defense Regulations 5, 11, No. ED-2015-OPE-0103 (Aug. 1, 2016) (highlighting impact that certain warnings required under the proposed Borrower Defense Regulations could have on potential donors and prospective students). Avoiding these injuries surely justifies a temporary stay.

> (d)   *The Arbitration and Class Action Provisions Would Cause Substantial Harm.*

Finally, many CAPPS schools and other postsecondary schools have arbitration clauses and class action waivers in their existing enrollment agreements with students that would be prohibited and rendered unenforceable by the Arbitration and Class Action Provisions. If those Provisions are implemented, CAPPS schools instantly will be deprived of the contracted-for benefits of arbitration, which have been acknowledged and protected by Congress through the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and recognized repeatedly by the Supreme Court, *see, e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (per curiam); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Schools also will need to quickly amend their agreements and will be compelled, in conflict with their previous

agreements, to litigate cases, including class actions, in federal and state court.  *See, e.g.*,

Johnson Decl. ¶ 12; Declaration of West Coast University ¶¶ 13-14, *CAPPS v. DeVos*, 1:17-cv-

00999-RDM (D.D.C. June 2, 2017), ECF No. 6-7 [hereinafter West Coast Decl.]; Declaration of

American Career College ¶¶ 13-14, *CAPPS v. DeVos*, 1:17-cv-00999-RDM (D.D.C. June 2,

2017), ECF No. 6-3 [hereinafter ACC Decl.].  This, in turn, will require schools to divert

resources on short notice from students' education toward a possible flood of litigation,

potentially disrupting students' progress in their courses and career paths.  West Coast Decl. ¶¶

13-14; ACC Decl. ¶¶ 13-14.

        CAPPS schools also may be required to send notices to borrowers indicating that they

will not enforce existing agreements.  Final Rule, *supra*, at 76,067; 34 C.F.R. § 685.300(e)(3)(ii),

(f)(3)(ii).  Moreover, if these provisions go into effect with little warning, and are revised or

invalidated later in the Borrower Defense litigation, institutions will be forced to shift back and

forth in amending policies, training (and re-training) staff, and developing litigation strategies in

response to the sudden implementation and possible future repeal of these sweeping changes.

*See* Johnson Decl. ¶ 11.  Accordingly, implementing the Borrower Defense Regulations  while

significant legal challenges to the Regulations are unresolved would severely and unreasonably

harm institutions and their students, as the record reflects and as the Department rightly

recognized.

3.      The Department Permissibly Balanced the Equities.

After balancing the equities involved in postponing the effective date of the Borrower

Defense Regulations, the Department reasonably found that justice required issuing the § 705

Stay.[3]  *See* § 705 Stay, *supra*, at 27,621; Defs.' Mot. in State Case 30-33; Defs.' Mot. in

Borrower Case 23-26.  That balancing was eminently reasonable in light of the aforementioned

substantial harms and the serious legal questions raised by CAPPS's challenge to the

Regulations.  Though the Plaintiffs may disagree with the Department's weighing of these

considerations, the fact that some might have weighed the considerations differently is not

reflective of a failure to reasonably determine that justice required issuing the § 705 Stay.  *See*

*Fox Television*, 556 U.S. at 513-14 ("[A] court is not to substitute its judgment for that of the

agency, and should uphold a decision . . . if the agency's path may reasonably be discerned.")

(internal quotation marks and citations omitted); *Cytori Therapeutics, Inc.*, 715 F.3d at 924, 926-

27 (requiring that an agency decision be "reasonable and reasonably explained"); *Nat'l Tel. Co-*

*op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (same).  As a result, the Department acted

reasonably in finding that justice required the issuance of the stay.

**B.      The Department Issued the § 705 Stay "Pending Judicial Review" of the Borrower Defense Regulations.**

The Department issued the § 705 Stay pending the resolution of the Borrower Defense

litigation.  As the Department explains, *see* Defs.' Mot. in State Case 32; Defs.' Mot. in

---

[3] As the Department and the Trade Association Coalition have explained, there is no sound basis for the Plaintiffs' argument that the Department was required to consider the four factors that courts apply when deciding whether to grant a preliminary injunction as opposed to merely considering the dictates of justice.  *See* Defs.' Mot. in State Case 35-40; Defs.' Mot. in Borrower Case 26-30; Trade Ass'n Br.

16

Borrower Case 23, it articulated a rational connection between the Borrower Defense litigation and the § 705 Stay.  Additionally, contrary to  the Plaintiffs' contentions, the Department was not prohibited from acknowledging its plans to reconsider the Borrower Defense Regulations.  As the Department notes, *see* Defs.' Mot. in State Case 33-34, the text of § 705 does not prohibit agencies from having more than one reason for postponing the effective date of a rule.  *See* 5 U.S.C. § 705.  Nor would such a prohibition make sense.  An agency's willingness to reevaluate an action based, in part, on a judicial challenge to that action, is a natural and desirable side-effect of such a legal challenge.  Interpreting § 705 as prohibiting agencies from delaying the effective date of a rule pending litigation if the agency also is planning to review and revise the challenged rule has no basis in the text of the statute, and yields the detrimental result of restricting an agency's reconsideration of a rule with potential legal flaws.  *See, e.g.*, Exchange Act Rule 13p-1 and Form SD, Exchange Act Release No. 72079, 79 Fed. Reg. 26,297-01 (May 2, 2014) (SEC) (issuing stay and adapting rule in light of judicial review);  National Primary Drinking Water Regulations, 57 Fed. Reg. 22,178-01 (May 1992) (EPA) (issuing stay of and reexamining regulation subject to legal challenges).

The Plaintiffs also assert that the Department acted arbitrarily and outside the scope of § 705 because the Department delayed the effective date of certain provisions that CAPPS did not challenge in the Borrower Defense litigation.  *See* States' Mot. 24-25.  Such a restrictive interpretation of § 705 is unwarranted.  Again, the text of § 705 lacks any requirement that the agency postpone the effective date *only* of particular provisions of the rule that a party has challenged in the related litigation.  *See* 5 U.S.C. § 705.  This limitation would prevent an agency from determining, based on its experience administering its regulatory regime, that if the

17

challenged provisions are delayed, so too should the effective dates of other, potentially related provisions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto., Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that a court must not vacate an agency's decision unless, among other things, it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

The Department did not act arbitrarily or capriciously when predicating the § 705 Stay on the ongoing Borrower Defense litigation. Rather, it explained that there were "serious questions" regarding the Regulations' validity and then weighed various equitable factors counseling in favor of a stay. *See Fox Television*, 556 U.S. at 513-14. This decision was both reasonable and reasonably explained. *Cytori Therapeutics, Inc.*, 715 F.3d at 926.

### C.   The Department Was Not Required to Engage in Notice and Comment Rulemaking Before Issuing the § 705 Stay.

Plaintiffs contend that the Department was required to engage in notice-and-comment rulemaking before postponing the effective date of the Regulations pursuant to § 705. That assertion is incorrect as a matter of law, statutory interpretation, and Congressional intent.[4]

Despite Plaintiffs' claims to the contrary, *see* States' Mot. 14-19; Borrowers' Mot. 47, the language and structure of the APA indicate that § 705 does not include a notice and comment requirement. Section 705 provides agencies and courts with a mechanism to maintain the status quo while a court evaluates the lawfulness of a challenged agency action. Nowhere does the APA or its history suggest that this "stay" function, which has more to do with judicial review

---

[4] Additionally, as the Department explains, it was not required to undertake negotiated rulemaking under the HEA to issue the § 705 Stay. *See* Defs.' Mot. in State Case 25-30; Defs.' Mot. in Borrower Case 36-37.

than rulemaking *per se*, is intertwined with the notice and comment provisions of the APA.

The language and structure of the APA indicate that § 705 is separate and distinct from other sections requiring notice and comment.  The text of § 705 contains no notice and comment requirement, and courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (citation omitted). Additionally, Congress included § 705 separate and apart from the sections that impose procedural requirements, such as notice-and-comment proceedings, on agency decisionmaking. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) (finding statutory structure to be instructive because it "reinforce[d] the conclusion drawn from the text"); *see also* S. Rep. No. 79-752, at 8-9 (1945) (noting that the section of the original bill in which § 705 was located was "law apart" from the sections addressing procedural rulemaking requirements, in a separate section addressing review provisions).  Furthermore, as noted in the Department's Motion, § 705 contains no cross-reference to the notice-and-comment rulemaking provisions despite Congress's clear cross-referencing of those provisions elsewhere in the APA.  *See* Defs.' Mot. in State Case 25-26; Defs.' Mot. in Borrower Case 33-34.

Additionally, § 705 would be rendered superfluous if the Court were to accept the Plaintiffs' contention that agencies must either engage in notice-and-comment rulemaking or invoke the good cause exception of 5 U.S.C. § 553 before employing § 705.  After all, an entire rule can be *repealed* through notice-and-comment rulemaking—and certainly a rule could be postponed via notice-and-comment rulemaking without necessitating resort to § 705.  If the Plaintiffs are correct, then § 705 would have no practical purpose or effect.  Because "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative

19

or superfluous, void or insignificant," this Court should not read § 705 simply to duplicate the procedure for issuing a new rule under § 553.  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted).

In sum, the Plaintiffs are attempting to graft notice-and-comment requirements from § 553 onto § 705 when the legislative history of the APA, language and structure of the APA, and Congressional intent all indicate that the Plaintiffs' view is incorrect.  This Court should reject the Plaintiffs' arguments and uphold the § 705 Stay.

## II.     THE DEPARTMENT LAWFULLY PROMULGATED THE 2018 DELAY.

The Plaintiffs' challenges to the 2018 Delay also are unavailing.  Under 20 U.S.C. § 1089(c) (the "effective date provision"), "any regulatory changes initiated by the Secretary [of the Department of Education] affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date."  The HEA defines an "award year" as "the period beginning July 1 and ending June 30 of the following year."  *Id.* § 1088(a)(1).

The master calendar requirement also sets forth deadlines that are meant "[t]o assure adequate notification and timely delivery of student aid funds."  *Id.* § 1089(a).  The master calendar requirement states that, before the beginning of an award year, the Secretary must "provide to institutions of higher education a list of reports and disclosures required," and the dates by which each report or disclosure must be completed.  *Id.* § 1089(e).  Taken together, these provisions reflect Congress's commitment to furnishing regulated entities and students with predictability and sufficient notice of their obligations before an award year begins.

20

The effective date provision demonstrates that Congress intended institutions to plan for regulatory changes with sufficient notice before the beginning of a given award year.  That provision reflects a legislative judgment that the effective date of regulations should correspond with the beginning of the award year.  Congress's determination that educational institutions be accorded sufficient notice of their regulatory obligations also is reflected in the HEA's legislative history.  *See Reauthorization of the Higher Education Act, 1985: Part Six of Hearings on Examination of Recommendations and Proposals of the Administration and Other Educational Councils Regarding the Reauthorization of the Higher Education Act Before the S. Subcomm. on Educ., Arts and Humanities*, 99th Cong. 311 (1986) (statement of Wyo. Tech. Inst.) ("The Master Calendar and Delay of Effective Date of Late Publications provisions . . . will be a dramatic improvement for those of us involved in day-to-day program administration.  There have been numerous occasions in the past, where regulatory changes are introduced with little or no time for the institutions to prepare. . . .  The implementation of the . . . provisions [is an] excellent management initiative[ ] to insure against the delay of aid delivery and provide lead-time to institutions for proper implementation."); 153 Cong. Rec. 20,001 (2007) (statement of Sen. Alexander) (emphasizing the value to university administrators of having sufficient notice regarding applicable rules and regulations); Defs.' Mot. in State Case 44; Defs.' Mot. in Borrower Case 40-41.

Here, the Borrower Defense Regulations did not take effect on July 1, 2017.  Pursuant to the § 705 Stay issued several weeks in advance of the effective date, institutions received affirmative notice that the Regulations would not go into effect by the beginning of the 2017-18 award year.  As a result, institutions continued to operate and plan under the existing rules.

Consistent with the purpose of the master calendar requirement, the Regulations should not be permitted to take effect before the beginning of the next award year.  Moreover, as a matter of common sense, if a given regulation did not take effect by the July 1 start date due to the Department's actions, then to avoid disruption well into an award year, the regulation may not take effect until, at the earliest, the next window of opportunity, namely July 1 of the following year.  Congress did not intend that regulations with such onerous requirements would take effect in the middle of an award year, and the statutory language and purpose of the master calendar requirement guard against that outcome.

Furthermore, the Department's decision to delay the effective date of the Borrower Defense Regulations until at least July 1, 2018, was reasonable in light of the harm that schools and students alike would sustain as a result of an abrupt implementation of the Regulations.  As explained above, many of the provisions in the Borrower Defense Regulations would cause massive disruption for CAPPS schools, HBCUs, other traditional postsecondary institutions, and students.  The Department's decision to delay the effective date of the Regulations is fully consistent with the purpose of the master calendar requirement, especially in light of the possibility that the Regulations could be invalidated due to the Borrower Defense litigation.  The master calendar requirement exists to avoid the very harms that would result if these sweeping regulations were implemented *mid-year* – harms that would undoubtedly be even greater than if schools had some opportunity for advanced planning.  Accordingly, the Department's reliance on the master calendar requirement was lawful and reasonable to avoid unjustified injury to CAPPS and other regulated entities.

22

In addition, as explained in the Department's brief, the 2018 Delay complied with applicable procedural requirements.  *See* Defs.' Mot. in State Case 52-55; Defs.' Mot. in Borrower Case 49-52.  The Department moved expeditiously to provide clarity to schools while striving in good faith to allow public participation during a 30-day comment period.  *See* 5 U.S.C. § 553(b)(3)(B), (d)(3) (allowing agency to forgo notice and comment rulemaking for good cause when notice and comment are "impracticable, unnecessary, or contrary to the public interest"); 20 U.S.C. § 1098a(b)(2) (allowing agency to forgo negotiated rulemaking under the same circumstances).  As a result, this Court should uphold the 2018 Delay.

## III.    IF THE COURT CONCLUDES OTHERWISE, THE COURT SHOULD REMAND WITHOUT VACATUR.

CAPPS maintains that the Department's actions are not arbitrary, capricious, or otherwise contrary to law, nor were they taken without observing the required procedures.  However, if the Court concludes otherwise, it should remand without vacating the Department's actions to allow the Department to address any defects identified by the Court.  Even "[a]n inadequately supported rule . . . need not necessarily be vacated."  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).  Remand without vacatur typically is appropriate when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand."  *Id.* at 151.  In deciding whether vacatur is justified, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Id.* at 150-51 (citation omitted).

23

Even assuming arguendo that the Court finds deficiencies in either the § 705 Stay or the 2018 Delay, which it should not, any purported deficiency can easily be remedied on remand— particularly if the Court simply determines that the Department should provide a more fulsome explanation for its actions.  *See Am. Lung Ass'n v. EPA*, 134 F.3d 388, 393 (D.C. Cir. 1998) (remanding without vacatur to allow agency "to explain . . . conclusions more fully").  Moreover, any possible error plainly is outweighed by the serious disruptive consequences, both to regulated postsecondary schools and to students, of immediate implementation of the Regulations.

Because the Regulations have not yet gone into effect, and because vacating the Department's actions will cause considerable harm to CAPPS schools and their students, as well as significant disorder in the postsecondary education market, the most prudent course, if the Court finds any shortcoming, is for the Court to leave the present regulatory regime in place while the Department addresses any deficiencies.  *See, e.g.*, *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remanding without vacatur in part because vacating agency action would "impos[e] significant transaction costs" on petitioner and its members, and cause disruptions to "uninvolved market participants"); *U.S. Telecom Ass'n v. FBI*, 276 F.3d 620, 627 (D.C. Cir. 2002) (noting that remand without vacatur is appropriate unless it is clear there are "no defensible grounds" for the agency's conclusions); *Allied-Signal*, 988 F.2d at 150. Accordingly, if the Court concludes that the Department's actions have any deficiencies, it should remand without vacatur.

## CONCLUSION

CAPPS respectfully requests that this Court grant summary judgment in the

Department's favor and dismiss the Plaintiffs' Motion for Summary Judgment.  Were the Court

to remand to the Department, CAPPS respectfully asks that the Court remand without vacatur.


Dated: December 15, 2017                       Respectfully submitted,

BORIS BERSHTEYN                               /s/ Clifford M. Sloan
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP       CLIFFORD M. SLOAN, DC Bar No. 417339
4 Times Square                                CAROLINE S. VAN ZILE, DC Bar No. 1017942
New York, NY 10036                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                              LLP
GREGORY BAILEY                                1440 New York Avenue, NW
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP       Washington, DC 20005
155 N Upper Wacker Dr. #2700                  T: 202/371-7000
Chicago, IL 60606                             F: 202/661-8340
                                              Email: cliff.sloan@skadden.com
ROBERT L. SHAPIRO, DC Bar No. 415854           Email: caroline.vanzile@skadden.com
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
                                              *Attorneys for CAPPS*

25