**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Commonwealth of Massachusetts *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>BETSY DEVOS, in her official capacity as Secretary of Education, and THE DEPARTMENT OF EDUCATION<br><br>              Defendants. | Civil Action No. 1:17-cv-1331 (RDM) |

<u>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

## <u>TABLE OF CONTENTS</u>

I.     PLAINTIFFS LACK STANDING ................................................................... 2

     A.     Plaintiffs Suffer No Injury That Is Actual, Imminent, And Traceable To
          The Temporary Delay Of The Final Rule's Effective Date ................................... 3

     B.     The Plaintiff States Lack Standing To Bring This Action Against The
          Federal Government As *Parens Patriae* ................................................................. 7

II.    THE DECISION OF WHETHER TO POSTPONE THE EFFECTIVE DATE OF
     AGENCY ACTION PENDING JUDICIAL REVIEW IS COMMITTED TO
     AGENCY DISCRETION BY LAW ................................................................. 8

III.   THE DEPARTMENT ADEQUATELY JUSTIFIED THE SECTION 705
     NOTICE .......................................................................................................... 12

     A.     The 705 Notice Explicitly Delays The Relevant Provisions Of The Final
          Rule Pending Judicial Review In CAPPS ............................................................. 12

     B.     Plaintiffs Do Not Demonstrate That The Department Was Obligated To
          Use The Four-Factor Test Employed By Courts ................................................... 14

     C.     The Department Appropriately Determined That Justice Required The
          Delay .................................................................................................................. 15

IV.    PLAINTIFFS DO NOT DEMONSTRATE THE IFR IS INVALID .............................. 19

     A.     The Department's Interpretation Is Entitled To *Chevron* Deference .................... 19

     B.     The Department's Interpretation Is Reasonable .................................................. 21

     C.     The IFR Was Adequately Justified ...................................................................... 23

V.     PLAINTIFFS DO NOT DEMONSTRATE ADDITIONAL PROCEDURES
     WERE REQUIRED .......................................................................................... 24

VI.    ANY RELEVANT REMEDY ISSUES SHOULD BE ADDRESSED IN
     SUPPLEMENTAL BRIEFING .......................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ................................................................................................ 7

*Am. Great Lakes Ports Assoc. v. Zukunft,*
    __ F. Supp. 3d__, 2017 WL 5128999 ................................................................... 25

*Am. Lung Ass'n v. EPA,*
    134 F.3d 388 (D.C. Cir. 1998) .............................................................................. 25

*Arizona v. Thompson,*
    281 F.3d 248 (D.C. Cir. 2002) .............................................................................. 20

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .................................................................................. 6

*Becerra v. U.S. Dep't of Interior,*
    __ F. Supp. 3d __, 2017 WL 3891678 (N.D. Cal. Aug. 30, 2017) ......................... 24

*California v. U.S. Bureau of Land Management,*
    __F. Supp. 3d __, 2017 WL 4416409 (N.D. Cal. Oct. 4, 2017), *appeal filed,*
    No. 17-17456 (9th Cir. 2017) ......................................................................... 14, 24

*Career College Association v. Riley,*
    No. 94-1372, 1994 WL 454713 (D.D.C. Aug. 9, 1994) ........................................ 20

*Chesapeake Climate Action Network v. Export-Import Bank of the United States,*
    78 F. Supp. 3d 208 (D.D.C. 2015) .......................................................................... 6

*Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) .............................................................................................. 21

*CityFed Fin. Corp. v. OTC,*
    58 F.3d 738 (D.C. Cir. 1995) ................................................................................ 10

*Crossroads Grassroots Policy Strategies v. FEC,*
    788 F.3d 312 (D.C. Cir. 2015) ............................................................................ 3, 4

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ................................................................................ 8

*Dickson v. Secretary of Defense,*
    68 F.3d 1396 (D.C. Cir. 1995) ............................................................................ 8, 9

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) .............................................................................................. 10

*Drake v. FAA*,
 291 F.3d 59 (D.C. Cir. 2002) ........................................................................... 9

*Equal Rights Ctr. v. Post Properties, Inc.*,
 657 F. Supp. 2d 197 (D.D.C. 2009) ................................................................. 5

*Ethyl Corp. v. EPA*,
 541 F.2d 1 (D.C. Cir. 1976) ........................................................................... 16

*Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.*,
 28 F.3d 1268 (D.C. Cir. 1994) ........................................................................ 5

*Fla. Pub. Telecomms. Ass'n v. FCC*,
 54 F.3d 857 (D.C. Cir. 1995) ......................................................................... 11

*Fund for Animals v. Norton*,
 512 F. Supp. 2d 49 (D.D.C. 2007) ................................................................. 17

*Fund for Animals, Inc. v. Norton*,
 322 F.3d 728 (D.C. Cir. 2003) ........................................................................ 4

*Government of Province of Manitoba v. Zinke*,
 --- F. Supp. 3d ----, 2017 WL 3437658 (D.D.C. Aug. 10, 2017) ................... 8

*Great Lakes Comnet, Inc. v. FCC*,
 823 F.3d 998 (D.C. Cir. 2016) ....................................................................... 13

*Heckler v. Chaney*,
 470 U.S. 821 (1985) ......................................................................................... 9

*Mail Order Ass'n of Am. v. U.S. Postal Serv.*,
 986 F.2d 509 (D.C. Cir. 1993) ....................................................................... 18

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ...................................................................................... 7, 8

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923) ......................................................................................... 7

*Md. People's Counsel v. FERC*,
 760 F.2d 318 (D.C. Cir. 1985) ........................................................................ 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
 463 U.S. 29 (1983) ......................................................................................... 18

*Nat'l Venture Capital Ass'n v. Duke*, Civ. A.,
 No. 17-1912 (JEB), 2017 WL 5990122 (D.D.C. Dec. 1, 2017) ................... 18

*NRDC v. SEC*,
　606 F.2d 1031 (D.C. Cir. 1979) ........................................................................ 17

*Oceana v. Bureau of Ocean Energy Mgmt.*,
　37 F. Supp. 3d 147 (D.D.C. 2014) ..................................................................... 17

*Petro-Chem Processing, Inc. v. EPA*,
　866 F.2d 433 (D.C. Cir 1989) .............................................................................. 5

*Sierra Club v. Gorsuch*,
　715 F.2d 653 (D.C. Cir. 1983) ........................................................................... 17

*Sierra Club v. Jackson*,
　833 F. Supp. 2d 11 (D.D.C. 2011) ..................................................................... 15

*Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*
　841 F. Supp. 2d 349 (D.D.C. 2012) ................................................................... 25

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*,
　85 F. Supp. 3d 197 (D.D.C. 2015) ..................................................................... 25

*UC Health v. NLRB*,
　803 F.3d 669 (D.C. Cir. 2016) ........................................................................... 19

*Village of Barrington v. Surface Transp. Bd.*,
　636 F.3d 650 (D.C. Cir. 2011) ........................................................................... 17

*Watervale Marine Co. v. DHS*,
　55 F. Supp. 3d 124 (D.D.C. 2014) ....................................................................... 9

## STATUTES

5 U.S.C. § 705 ........................................................................................... 1, 8, 10, 12

5 U.S.C. §§ 701-706 ....................................................................................... 11

## REGULATIONS

34 C.F.R. § 685.206 ......................................................................................... 5

Program Integrity and Improvement,
　80 Fed. Reg. 67,126 (Oct. 30, 2015) .................................................................. 23

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
　Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher
　Education Assistance for College and Higher Education Grant Program,
　81 Fed. Reg. 75,926 (Nov. 1, 2016) ..................................................................... 2

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher
    Education Assistance for College and Higher Education Grant Program,
    82 Fed. Reg. 49,116 (Oct. 24, 2017)......................................................................................... 20

Pursuant to specific statutory authority in 5 U.S.C. § 705, the Department of Education (the "Department") postponed, pending judicial review, the effective date of certain provisions of a regulation addressing borrower defense discharges (the "Final Rule") because it found that "justice so require[d]."  The Department then provided notice that, pursuant to a long-standing Department interpretation of a provision of the Higher Education Act ("HEA"), and a corresponding practice of implementing financial aid regulations only at the beginning of award years, the postponed regulatory provisions would become effective, at the earliest, at the beginning of the next award year on July 1, 2018.  Plaintiffs would like to see the Final Rule provisions implemented sooner. However, the only injury Plaintiffs allege they will suffer from delayed implementation results from Plaintiffs' own strategic choices in response to hypothesized future violations by third parties (institutions of higher education), rather than directly from illegal conduct by Defendants.  This is insufficient to confer Plaintiffs with standing.  Moreover, the D.C. Circuit has made clear that Plaintiffs' asserted "*parens patriae*" interest in the "economic health and well-being of their residents," is inadequate to support standing in suits, like this one, against the federal government.

Even if Plaintiffs had standing, they do not demonstrate that the Department's actions were unlawful. As described below, Section 705's plain text, and the Administrative Procedure Act's ("APA") statutory scheme as a whole, demonstrate Congress' intent to commit to agency discretion the decision whether to stay the effective date of an action pursuant to Section 705. Moreover, even if an agency's action under Section 705 were reviewable, that review must give due deference to the statute's inherently flexible and discretionary standard.  Plaintiffs' attempt to impose on the Department obligations beyond finding that "justice so requires" a delay would essentially treat actions pursuant to Section 705 the same as action taken pursuant to the APA's substantive rulemaking provisions, rendering Section 705 a nullity.  Because such interpretations

1

are disfavored, and the Department made the only finding it was required to, the Court should grant summary judgment for Defendants on the 705 claims.

Plaintiffs' challenges to the Interim Final Rule ("IFR") fare no better. The IFR merely provides notice of the provisions' earliest possible effective date under the Department's long-standing interpretation of the "master calendar" provision of the HEA, which is entitled to *Chevron* deference. Plaintiffs claim that *Chevron* deference should not apply because the Department claimed it did not have discretion to set an effective date earlier than it did, and that *Chevron* applies only to interpretations which reflect discretionary acts. But Plaintiffs' argument conveniently confuses discretion in interpreting a statute (which the Department clearly exercised here), with discretion to act in light of the interpretation. Only lack of the former precludes *Chevron* deference, but the Department (pursuant to the exercise of its delegated authority to interpret the HEA), only lacks the latter here. Plaintiffs' allegation that the Department's interpretation is unreasonable is similarly unavailing because it is based on erroneous statements of law and fact. The text and objectives of the master calendar provision, as well as the Department's historical practice, all support the Department's interpretation. The Court should grant summary judgment to Defendants on the IFR claims, as well.

## I.    PLAINTIFFS LACK STANDING

As stated in the preamble to the Final Rule, the "purpose of the borrower defense regulations is to protect student loan borrowers from misleading, deceitful, and predatory practices" by "institutions participating in the Department's student aid programs." 81 Fed. Reg. 75,926 (AR-A at 10).   Plaintiffs, a group of 18 states and the District of Columbia, devote a significant portion of their opposition brief to arguing that this Rule was nonetheless designed to provide the states (as opposed to the borrowers) with concrete benefits, and that a temporary delay

of the Rule (as opposed to independent actions of the higher education institutions) would deprive the states of these hypothesized benefits. Primarily, they contend that the Rule "formalizes the role of state enforcement actions in the borrower defense framework." Plaintiffs' Opposition and Reply Brief, ECF No. 73 ("Pls.' Opp.") at 5. But the mere fact that the Rule incorporates state enforcement actions (as bases for a student borrower to assert a defense to repayment and for the Department to commence a collection action), confers no tangible benefits on the states themselves. Indeed, the harms the states allege they will suffer as the result of delayed implementation are primarily in the form of resources voluntarily diverted towards enforcing their own consumer protection schemes, which remain in effect and with which the Department's challenged actions do not interfere. Because such harms are not cognizable under Article III, and because in any case they are dependent on the unfettered choices of third parties not before the Court (*i.e.*, the regulated educational institutions) and only tenuously connected to the Department's actions, Plaintiffs cannot demonstrate their own standing. Moreover, they are barred by well-established law from asserting standing as *parens patriae* on behalf of their citizens.

### A. Plaintiffs Suffer No Injury That Is Actual, Imminent, And Traceable To The Temporary Delay Of The Final Rule's Effective Date

Plaintiffs, citing a pair of D.C. Circuit decisions addressing the standing of an intervenor to defend a challenged agency action, attempt to characterize this case as one in which they "benefit[ ] from agency action" that has been challenged and they would lose that benefit if the challenge is successful. Pls.' Opp. at 9. Far from providing support for Plaintiffs' theory of standing in this case, these cases demonstrate the necessity of a much closer connection between the challenged agency action and a party's claimed benefit in that action than exists here.

In *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312 (D.C. Cir. 2015), the Federal Election Commission (FEC) had dismissed an administrative complaint against

Crossroads GPS alleging that it was a political committee required to register under the Federal Election Campaign Act (FECA).  The complainant, Public Citizen, then exercised its right under the FECA to challenge the dismissal in district court, and Crossroads sought to intervene to defend the dismissal.  The court found that the agency action at issue involved potential "direct regulation of Crossroads – i.e., a determination of whether Crossroads was a political committee required to register with the FEC. . . .  Crossroads thus has a significant and direct interest in the favorable action shielding it from further litigation and liability; and the threatened loss of that favorable action constitutes a concrete and imminent injury."  *Id.* at 318; *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (finding that the government of Mongolia had standing to intervene in an action seeking to classify the Mongolian argali sheep as an endangered species, and cancel hunting permits for argali sheep, because such permits "are the primary source of funding" for the Mongolian government's argali conservation program and granting the relief requested in the action would directly result in a loss of funding for that program).

Thus, in both *Crossroads* and *Fund for Animals*, the party seeking to demonstrate standing to uphold agency action was able to clearly connect that agency action with a direct, concrete, imminent injury – in *Crossroads*, exposure to further litigation before the FEC and civil liability; in *Fund for Animals*, a tangible reduction in funding of a specific program.[1]  Here, on the other hand, Plaintiffs claim only an incidental benefit in the Final Rule (that, in seeking to protect student borrowers by regulating institutions of higher education, the Rule will incidentally compel greater compliance with state laws prohibiting misconduct by the same institutions) and an even more incidental alleged harm in the delayed implementation of the Final Rule.  Plaintiffs do not dispute

---

[1] Plaintiffs' also point to *Accrediting Council for Independent Colleges and Schools v. DeVos*, *see* Pls.' Opp. at 10, 14, but the Court need accord no weight to the cursory analysis in that unpublished and non-binding district court decision.

either that state consumer protection laws remain equally valid and enforceable even without the regulations encompassed in the Final Rule, or that state enforcement actions – the incorporation of which in the new rule they place so much emphasis on – can form the basis for borrower defense claims under the regulations that are currently in place, *see* 34 C.F.R. § 685.206(c).  The benefits they claim, then, are in the form of "increase[d] compliance" with state law, Pls.' Opp. at 6, and other alleged enhancements to their existing enforcement mechanisms.  Such "benefits" amount to little more than an ability to save enforcement resources by diverting them away from consumer protection violations by institutions of higher education.  But as made clear in the Defendants' opening brief, such a "self-inflicted diversion of resources" is insufficient to confer Article III standing.  *Equal Rights Ctr. v. Post Properties, Inc.*, 657 F. Supp. 2d 197, 201 (D.D.C. 2009).

Contrary to Plaintiffs' assertion, this doctrine is not so limited that it only disqualifies expenses incurred in connection with the very litigation in which a plaintiff seeks to assert standing.  *See* Pls.' Opp. at 12.  "[Q]uintessentially . . . strategic choice[s],' of course, are not limited to litigation expenses," and a plaintiff must establish "that the injuries it suffered were *not* due to a self-inflicted diversion of resources."  *Equal Rights Ctr.*, 657 F. Supp. 2d at 201 (citation omitted).  Because the injuries Plaintiffs identify are the result of their own strategic choices in response to hypothesized future violations by institutions of higher education, which are not parties to this case, as opposed to a direct result of some illegal conduct on Defendants' part, they are insufficient to confer Article III standing.  *See Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (organization does not show standing based on its "diversion of resources from one program to another"); *see also Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir 1989) (a "self-inflicted" injury is "so completely due to the [complainant's] own fault as to break the causal chain" (citation omitted)).

Plaintiffs' tortured attempts to find a direct "benefit" in the Final Rule highlight the primary problem with their theory of standing: because the Rule does not directly regulate the Plaintiffs nor provide them any benefits, the only injuries they can claim are results of actions of third parties not before this Court.  Plaintiffs do not dispute that where this is the case, standing is "substantially more difficult to establish," *Chesapeake Climate Action Network v. Export-Import Bank of the United States*, 78 F. Supp. 3d 208, 216 (D.D.C. 2015) (citation omitted), and that D.C. Circuit case law requires "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress," *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).  Plaintiffs have failed to establish such a causal connection here.  That the Rule incorporates state enforcement actions into its mechanism for deterring misconduct by higher education institutions is just a recognition of the role state law has always played in the Department's scheme for determining a borrower's entitlement to a defense to repayment; that incorporation does not provide "substantial evidence" that states (as opposed to individual borrowers therein) would receive any direct benefit from the new rule, or that the Rule would alter the behavior of higher education institutions vis-à-vis *the states* in a concrete way.

Moreover, it is not enough to argue, as Plaintiffs do, that the Final Rule was "expressly designed . . . to achieve the benefits of which the States are [now] being deprived."  Pls.' Opp. at 15.  As noted above, that Rule was "expressly designed" to "protect student loan borrowers," and Plaintiffs' speculation about how it would also benefit the states does not show how the Rule's effect on third parties would benefit Plaintiffs in a concrete way.  Nor does that speculation show that any harm the states do suffer is traceable to the delay itself, as opposed to non-compliance

with state law by regulated institutions.   Therefore, Plaintiffs have failed to demonstrate the presence of a direct, concrete injury directly traceable to illegal conduct by Defendants.[2]

### B.    The Plaintiff States Lack Standing To Bring This Action Against The Federal Government As *Parens Patriae*

Plaintiffs assert that they have standing as *parens patriae* to protect certain "quasi-sovereign" interests on behalf of their residents.  Pls.' Opp. at 16.  No doubt a state can sometimes sue in that capacity to protect its citizens; but "it is no part of its duty or power to enforce [citizens'] rights in respect of their relations with the federal government.  In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate . . . ."  *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n. 16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government.").

Notwithstanding this general rule that "the *parens patriae* interest is inadequate to support standing in suits against the federal government," *Md. People's Counsel v. FERC*, 760 F.2d 318, 321 (D.C. Cir. 1985), Plaintiffs attempt to invoke the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007) ("*Massachusetts*"), to justify their standing here.  But that case, involving a state's asserted interest in protecting the physical contours of its sovereign territory, does not "reject[]" the rule that states cannot assert standing as *parens patriae* against the federal

---

[2] Plaintiffs lack standing for an additional reason.  Their claimed injuries are not redressable because they stem entirely from delayed implementation of the Final Rule, but the HEA's master calendar requirement prevents the Rule from becoming effective before July 1, 2018.  Although Plaintiffs challenge the Department's interpretation of the master calendar provision, as set forth below, their arguments fail and they have not shown an entitlement to any relief requiring the Rule to become effective before July 1, 2018.  As Plaintiffs have not demonstrated an entitlement to the relief they seek, summary judgment is appropriate for the Defendants whether Plaintiffs' challenge to the Department's interpretation is considered on the merits or in the context of standing.

government.  Pls.' Opp. at 19.[3]  As this Court recently recognized, the Supreme Court's decision "never once mentioned a role for Massachusetts as *parens patriae*," *Government of Province of Manitoba v. Zinke*, --- F. Supp. 3d ----, 2017 WL 3437658, at *15 (D.D.C. Aug. 10, 2017), and "did not change [the above-referenced] longstanding limitations on a state's standing to sue the federal government as *parens patriae*," *id*. at *17.  Because the *Massachusetts* decision "carefully avoided" that doctrine, it remains the case that "a state cannot sue the United States in the state's role as *parens patriae*," *id*., at least where, as here, the state asserts no cognizable injury of its own.

## II.   THE DECISION OF WHETHER TO POSTPONE THE EFFECTIVE DATE OF AGENCY ACTION PENDING JUDICIAL REVIEW IS COMMITTED TO AGENCY DISCRETION BY LAW

Section 705 grants an agency discretion to "postpone the effective date of action taken by it, pending judicial review," any time the agency "finds that justice so requires."  5 U.S.C. § 705. It does not provide any further guidance for an agency to exercise this broad discretion or for a court to review the agency's exercise of discretion.  Section 705 accordingly vests an agency, so long as it bases its action on a finding that "justice so requires," with unreviewable discretion to effect a temporary stay of its action during the limited period of judicial review of that action.

Plaintiffs' primary argument in favor of reviewability is that the D.C. Circuit's decision in *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995), is "controlling" in this case.  Pls.' Opp. at 22.  But while *Dickson* addressed similar language ("in the interest of justice") as is

---

[3] Nor does it entitle the states to "special solicitude" in the standing analysis here.  The D.C. Circuit has recognized that the holding in *Massachusetts* "turned on the unique circumstances of that case," and accordingly limited the holding to its facts.  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476-77 (D.C. Cir. 2009).  In particular, the D.C. Circuit noted that it was "critical" that Massachusetts sought to assert "its own rights as a state," rather than the rights of its citizens, and clarified that the "special solicitude" afforded to Massachusetts in the Court's standing analysis was "due to Massachusetts's interests in ensuring the protection of the land and air within its domain, and its 'well-founded desire to preserve its sovereign territory.'"  *Id*. at 476 (quoting *Massachusetts*, 549 U.S. at 519)).  Here, of course, the Plaintiff states assert no such similar interest, unique to them as states, that would warrant similar "special solicitude."

contained in Section 705, it involved a different statutory provision within a different statutory scheme. The relevant case law makes clear that courts considering whether a statute commits a particular determination to an agency's discretion do not simply read the statutory text in isolation, but consider "a variety of factors," including "the language and structure of the statute that supplies the applicable legal standards," and Congress' overall intent to "commit the matter fully to agency discretion as evidenced by, among other things, the statutory scheme." *Watervale Marine Co. v. DHS*, 55 F. Supp. 3d 124, 137-38 (D.D.C. 2014). Because the key inquiry is into the statutory scheme as a whole and, ultimately, into congressional intent in enacting that scheme, *Dickson's* holding is not directly controlling in this case. *See Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) (court considers "both the nature of the administrative action at issue and the language and structure of the statute").

Plaintiffs attempt to brush off Defendants' argument that the statutory scheme in which Section 705 exists evinces congressional intent to preclude judicial review by noting the APA's general presumption of reviewability. Pls.' Opp. at 22 n.11. However, the court must consider "the function and purpose of the statute as a whole" to determine, among other things, whether it provides "guidance or standards from other portions of the statute," or whether "a deferential attitude on the part of Congress … permeates the overall structure of the statute." *Watervale Marine Co.*, 55 F. Supp. 3d at 139 (citations omitted). An analysis of Section 705 within its proper context reveals congressional intent, which did not exist in *Dickson*, to commit the relevant decision to agency discretion.[4]

---

[4] Unlike in *Dickson*, which involved the narrow decision of whether to excuse an untimely request for correction of military records, an agency's determination of whether "justice so requires" a temporary postponement pending judicial review involves "a complicated balancing of factors which are *peculiarly within [the agency's] expertise*." *Dickson*, 68 F.3d at 1403 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). As described below, such factors include not only the

As discussed in the Defendants' opening brief, Section 705 sets forth differential standards for agencies on the one hand, and courts on the other, to exercise their authority to provide "relief pending review" of a particular agency action.   5 U.S.C. § 705.   While an agency's limited authority is conditioned upon it making a finding that "justice so requires," courts are granted the authority, as necessary to prevent "irreparable injury," to "issue all necessary and appropriate process" not only to postpone an effective date pending its review, but also to "preserve status or rights."   *Id*.   Congress' decision to use the term "irreparable injury" in connection with a court's Section 705 authority is a clear indication that it intended courts to employ traditional standards for awarding temporary injunctive relief.   *See, e.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that … he will suffer irreparable injury . . . ."); *CityFed Fin. Corp. v. OTC*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("[t]he basis of injunctive relief in the federal courts has always been irreparable harm" (alteration in original) (citation omitted)).   The second sentence of Section 705 (which addresses *court* stays of agency action) thus sets forth a well-established *judicial* standard for courts to grant temporary relief, *i.e.*, the four-factor test for awarding preliminary injunctive relief which is premised upon preventing irreparable injury, during the pendency of judicial review.

By contrast, Section 705's first sentence (which addresses *agency* stays of agency action) does not contain any reference to either "irreparable injury" or any other factor a court would use in awarding temporary injunctive relief.   Congress' decision to set forth a discrete, manageable standard incorporating an established body of law for a court to apply, while choosing not to do the same with respect to an agency's action under the same statute, suggests that the lack of a

---

relative merits of the legal challenge, but also whether the agency is likely to reconsider or revise the challenged action from a policy perspective, and whether, in light of such a policy change, the costs of bringing the regulated industry into compliance with existing policy is justified.

standard in the first sentence was intentional and that Congress did not intend for the courts to have any role in reviewing agency action taken pursuant to that sentence (as opposed to the underlying agency action, review over which it is the purpose of Section 705's first sentence to enable). *See Fla. Pub. Telecomms. Ass'n v. FCC*, 54 F.3d 857, 860 (D.C. Cir. 1995) ("when Congress uses different language in different sections of a statute, it does so intentionally").

Moreover, the broader statutory scheme reveals Congress' intent to carve out and insulate from the APA's judicial review provisions an agency's decision to delay the effective date of its action pending judicial review of that action. The APA sets forth a carefully delineated mechanism for review of agency action. Congress' placement of Section 705's specific and limited agency authority – to postpone temporarily, pending judicial review, an effective date of an agency action – within the very provisions of the APA that govern judicial review reveals that an agency's action under Section 705 is designed to facilitate judicial review of the underlying action, and that it does not constitute the type of final agency action reviewable itself by a court under the normal APA review provisions. Specifically, 5 U.S.C. §§ 701-706 comprise Chapter 7 of the APA, titled "judicial review." These provisions generally establish a right of judicial review for individuals suffering legal wrong as the result of agency action – except to the extent judicial review does not apply because either judicial review is precluded by statute or the agency action in question is committed to agency discretion by law. Section 704 defines the types of actions that are reviewable and Section 706 describes the scope of judicial review of such actions. The intervening section, Section 705, provides that both agencies and courts can act to provide "relief pending review" of an underlying agency action subject to judicial review. Section 705 does not limit a court's ability to review the underlying agency action (indeed, its purpose is to facilitate such review by freezing the status quo and providing a court adequate time to consider a legal challenge)

11

under the normal APA standards for reviewing agency action.  That the APA's judicial review provisions define the actions that are subject to judicial review, as well as delineate the scope of such judicial review, while separately providing for an agency to afford a limited form of relief pending such review, provides clear evidence that Congress did not intend for the agency's action granting "relief pending review" to itself be reviewable under the APA or any other source of law.

## III.   THE DEPARTMENT ADEQUATELY JUSTIFIED THE SECTION 705 NOTICE

In order to invoke its authority to postpone an effective date under Section 705, all an agency need do is "find[] that justice so requires." 5 U.S.C. § 705.  As explained in the Defendants' opening brief, the Department made this finding, referencing a host of relevant factors including the presence of the CAPPS litigation and the serious questions it raised about the validity of the Final Rule, the harm that implementation during the pendency of judicial review would impose on the regulated community, the costs savings to the United States, the extent to which any harm a temporary delay might cause to student borrowers would be mitigated by the Department's ongoing processing of borrower defense claims under existing law, and the practical reality that the Department was (and remains) actively considering whether to revise its Borrower Defense regulations through appropriate procedures.  To the extent judicial review of this determination is available, the Department's finding satisfies Section 705's inherently flexible standard.  Plaintiffs' arguments to the contrary conflate the Department's limited action pursuant to Section 705 with a substantive rulemaking repealing the Final Rule, and their attempts to impose requirements on the Department's Section 705 authority that do not appear in the text should be rejected.

### A.   The 705 Notice Explicitly Delays The Relevant Provisions Of The Final Rule Pending Judicial Review In CAPPS

As discussed in its opening brief, the Department made clear in the 705 Notice that it was effecting a temporary postponement of certain provisions of the Final Rule based on, among other

things, the "serious questions" that the CAPPS litigation had raised about the validity of those provisions, and tied its postponement to the pendency of the Court's review in the CAPPS litigation.  Plaintiffs take issue with the fact that the Department also noted in its 705 Notice that it was separately planning to review and revise the regulations through the negotiated rulemaking process and, remarkably, argue that "Section 705 does not authorize the Department to stay a duly promulgated regulation for reasons other than pending judicial review."  Pls.' Opp. at 24.  This is a flat misstatement of the governing standard which allows an agency, during the pendency of judicial review, to postpone the effective date of its action upon finding that "justice so requires." The reason it must give is not simply that judicial review is pending (although that is a necessary condition), but that justice requires a delay during the pendency of that review.  Plaintiffs' reading of Section 705 – that it "does not permit an agency to delay implementation of a final rule for reasons unrelated to pending litigation," *id*. at 25 – would read the words "justice so requires" out of the statute and turn a statutory directive to act based on a holistic consideration of what justice might require in an individual case into a limited command to postpone agency action only because litigation is pending.  Not only is such a reading inconsistent with Plaintiffs' overall theory of the case (which would have the Department base a delay under Section 705 on, among other things, an assessment of "the *costs* of its § 705 delay" and the "multitude of rights and protections established by the Borrower Defense Rule," Pls.' Opp. at 32), but it violates the well-established principle that, "when construing a statute courts 'give effect, if possible, to every clause and word.'"  *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (citation omitted).[5]

---

[5] Furthermore, even if Section 705 provided that only litigation-related reasons are appropriate justifications for staying agency action pending judicial review, Defendants are entitled to summary judgment.  Even standing alone, the litigation-related reasons set forth in the 705 Notice sufficiently justify the Department's finding that justice requires staying implementation.

Applying the appropriate "justice so requires" standard, there is nothing in the text of Section 705 that requires an agency's consideration of justice to focus solely on the underlying action under judicial review or that forbids that consideration from taking note of the practical reality that the action in question is subject to reconsideration pursuant to the APA's procedures for doing so. The 705 Notice does not itself repeal or reconsider the Final Rule, and Plaintiffs' concern that the Department is using the Section 705 postponement to "achieve other ends," Pls.' Opp. at 25, is a fallacy. A 705 Notice can achieve no ends other than to temporarily postpone the effective date of agency action during the pendency of judicial review. That Plaintiffs continue to ignore this and conflate the Department's limited action pursuant to Section 705 with a substantive repeal or new rulemaking does not change the limited effect that the 705 Notice actually has or prevent an agency from exercising its lawful authority to review and reconsider the Rule through valid APA procedures and take note of that fact in its 705 Notice.[6]

### B.   Plaintiffs Do Not Demonstrate That The Department Was Obligated To Use The Four-Factor Test Employed By Courts

As described both above and in Defendants' opening brief, although the plain text of Section 705 authorizes a *court* to take action as necessary to prevent irreparable injury, it does not require an *agency*, in postponing its action pursuant to Section 705, to consider irreparable injury or any other factor a court would consider in determining whether to grant preliminary injunctive relief. Nonetheless, Plaintiffs continue to rely on *Sierra Club v. Jackson*, 833 F. Supp. 2d 11

---

[6] Plaintiffs' citation to *California v. U.S. Bureau of Land Management*, __ F. Supp.3d __, 2017 WL 4416409 at *10 (N.D. Cal. Oct. 4, 2017), appeal filed, No. 17-17456 (9th Cir. 2017), for the proposition that an agency's reference to "serious questions" concerning the validity of its action is insufficient to satisfy the "justice so requires" standard, Pls.' Opp. at 26, is of limited persuasive value. Applying Section 705 requires a contextual analysis of what justice requires in a given case, which does not lend itself to categorical rules about the sufficiency of an agency's justification under the statute. Moreover, that case is inapposite because it involves a 705 postponement that was issued after the relevant agency action had already become effective.

(D.D.C. 2011), and legislative history for the argument that "[Section] 705 affords *the same* authority to agencies and courts." Pls.' Opp. at 29.  As described in Defendants' opening brief, *Sierra Club*'s holding on this point is poorly reasoned and provides no basis for ignoring the clear text of Section 705.  Nor does the legislative history, which is inconclusive at best and stops well short of demonstrating any affirmative requirement that agencies and courts employ the same standard or engage in the same analysis.

Plaintiffs' reference to the fact that some other agencies have at times voluntarily chosen to employ the four-factor test when applying Section 705 does not demonstrate that *all* agencies are *required* to consider the same four factors every time they exercise their statutory authority. Defendants do not dispute that consideration of such factors might sometimes be relevant to an agency's finding that justice requires a temporary postponement in a given situation.[7]  Plaintiffs argue, however, that Section 705 imposes a mandatory obligation on an agency to consider the preliminary injunction factors as a necessary precondition before exercising its authority.  Such a statutory obligation is not created by the mere fact that some other agencies "have a history of employing the preliminary injunction test" when invoking Section 705. Pls.' Opp. at 29-30.[8]

## C.     The Department Appropriately Determined That Justice Required The Delay

---

[7] Indeed, the 705 Notice reflects consideration of the factors that inform a preliminary injunction analysis,  insofar as it determined that (1) the plaintiffs "have raised serious questions concerning the validity of certain provisions of the final regulations," (2) there were "substantial injuries that could result if the final regulations go into effect before those questions are resolved," including the modification of existing contracts, (3) the balance of harms favored postponement because implementation "could impose substantial costs" on institutions while "the postponement of the final regulations will not prevent student borrowers from obtaining relief" under existing regulations, and (4) the public interest favored postponement because "the United States will suffer no significant harm" and postponement would avoid "significant costs to the Federal government and ultimately the Federal taxpayer." AR-A at 1-2.

[8] In any case, as pointed out in the Trade Association Coalition's amicus brief, agencies' use of the preliminary injunction factors is far from a uniform practice, and agencies often issue Section 705 stays without referring to those factors. *See* ECF No. 62 at 10-11.

Plaintiffs further argue that "[t]he Department's explanation for the [705 Notice] failed to meet the APA's minimum requirements even if the four-part standard were not applicable."  Pls.' Opp. at 30.  Plaintiffs' interpretation of these "minimum requirements," however, would ignore the text of Section 705, which only requires an agency to make a simple finding that "justice so requires" a temporary postponement, and instead impose a *requirement* that the agency "consider *both* the costs and benefits of delay," *id*. at 31, and "give reasoned explanations" for any changes in its assessments of such costs and benefits from those reflected in the Final Rule, *id*. at 33, in the same manner it would if it were actually rescinding or revising the Final Rule.  But as explained above and in Defendants' opening brief, the 705 Notice is a temporary procedural device that merely postpones the effective date of the Final Rule pending judicial review in the CAPPS litigation; it does not alter or rescind the Final Rule and the Department was accordingly not obligated to supplement its "justice so requires" finding with any further justification that might be required if it were announcing a new or different policy.

Assuming *arguendo* that the arbitrary and capricious standard of review applies to impose any obligation on an agency above and beyond what the text of Section 705 requires, the standard is "highly deferential," "presumes agency action to be valid," and "forbids the court's substituting its judgment for that of the agency."  *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976).  It cannot be applied to swallow the text of Section 705 and replace the Department's assessment of what justice required in this situation with Plaintiffs' preferred weighing of the relevant considerations.  Section 705 imposes no requirement that an agency consider any specific factors or make any particular findings, and it is well-established that "the APA's arbitrary and capricious standard alone [does not] require[] an agency to engage in cost-benefit analysis."  *Village of*

16

*Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011).[9]  Moreover, when an agency does not actually change policy, as when it acts pursuant to Section 705, the cited line of cases requiring a reasoned explanation for the change, *see* Pls.' Opp. at 33, is "inapposite."  *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 165 n.18 (D.D.C. 2014).

Agency action can take many forms, and it is simply not the case that all agency action needs to be justified in the same way or that there exists some overarching "arbitrary and capricious" standard of review that requires, in every situation, an agency to justify its action with voluminous findings and a detailed analysis of the costs and benefits associated with that action.  Rather, the APA's default standard "encompasses a range of levels of deference to the agency," *Fund for Animals v. Norton*, 512 F. Supp. 2d 49, 54 (D.D.C. 2007), and "requires reviewing courts to adjust their inquiry according to the particular agency action under review," *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983).  *See also NRDC v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) (arbitrary and capricious review "depends upon analysis of a number of factors, including the intent of Congress," "the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the courts effectively to evaluate the questions posed").  Indeed, Plaintiffs' proffered application of the arbitrary and capricious standard would essentially render Section 705 a nullity.  As Plaintiffs recognize, the Department has the authority to either amend or fully repeal the Final Rule through the rulemaking provisions of the APA.  Section 705, on the other hand, allows an agency to take the limited step of delaying the effective date of an action pending judicial review upon making the simple finding that "justice so requires."  Were an

---

[9] Because it finds no basis in Section 705's text, and relies on an oversimplified definition of "justice," the Court should accord no weight to the statement in *California v. Bureau of Land Management*, cited by Plaintiffs, that "justice so requires" imposes a requirement to weigh, like "the iconic statute of the blindfolded goddess," Pls.' Opp. at 31, the costs and benefits of a delay.

agency, every time it invoked its authority under Section 705, required to justify its action in the same manner it must justify substantive repeal of the delayed action, Section 705 would serve no independent purpose and be rendered superfluous.  *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993) ("[W]e are to construe statutes, where possible, so that no provision is rendered 'inoperative or superfluous, void or insignificant.'" (citation omitted)).

The particular agency action at issue here is a temporary delay under Section 705, and thus review must focus simply on whether the Department made the finding that justice requires a temporary postponement.  As described above, there is nothing inappropriate about basing that finding, to some degree, on the reality that the Department is reconsidering the Rule through negotiated rulemaking procedures.  To note as part of a larger consideration of the requirements of justice that it would be wasteful and inefficient to have regulated entities incur the cost of complying with a Rule that might soon be revised is not "inconsistent with fundamental tenets of administrative law," as Plaintiffs contend, Pls.' Opp. at 33.  Instead, it is a recognition that "[e]lections have consequences," *id*. (quoting *Nat'l Venture Capital Ass'n v. Duke*, Civ. A. No. 17-1912 (JEB), 2017 WL 5990122, at *11 (D.D.C. Dec. 1, 2017)).  The Department is entitled to reevaluate its regulatory priorities in light of a change in administration, so long as it follows the procedures set forth by Congress.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) (noting that a change in administration is a "perfectly reasonable basis for an [ ] agency's reappraisal of …its programs and regulations," so long as it "remains within the bounds established by Congress").  Moreover, as described above, the Department's consideration, as party of its overall assessment of whether justice requires postponing an effective date pending judicial review, of the fact that the action under judicial review may be substantively revised is fully

consistent with Section 705's text and overall purpose. At bottom, then, Section 705 is a lawful source of authority that allows an agency to effect the temporary postponement at issue here. [10]

## IV.   PLAINTIFFS DO NOT DEMONSTRATE THE IFR IS INVALID

### A.   The Department's Interpretation Is Entitled To *Chevron* Deference

The IFR providing notice of the effective date of the Final Rule is based on the Department's long-standing interpretation of the master calendar provision of the HEA, which is entitled to *Chevron* deference. Plaintiffs' arguments against *Chevron* deference mischaracterize the facts and rely on erroneous statements of law, and therefore should be rejected.

First, the Court should reject Plaintiffs' claim that deference is inappropriate because "Defendants point to no ambiguity in the Master Calendar Provision requiring interpretation." Pls.' Opp. at 38. The Department's opening brief explicitly identified the statutory silence that its interpretation fills. Defs.' Mot. for Summ. J., ECF No. 56, at 41 ("Defs.' MSJ") ("The master calendar provision does not speak to the precise question at issue here – whether a regulation that was scheduled to become effective on July 1, but that does not take effect on that date, may go into effect sometime during the award year, or must wait for the next July 1 to go into effect"). Plaintiffs' choice to ignore this statement does not warrant eschewing *Chevron* deference.[11]

---

[10] Plaintiffs also take issue with the 705 Notice because it did not explicitly reference the Department's interpretation of the master calendar requirement. Pls.' Opp. at 25. This argument is unfounded because Section 705 does not require any specific findings and the rationale given in the 705 Notice was sufficient. In any case, as explained in the IFR, the delay required by the master calendar provision is only until July 1, 2018. Given the generally long duration of a complex civil litigation and how unlikely it is that the CAPPS litigation would conclude much in advance of July 1, 2018, the Department's not discussing in the 705 Notice the implementation date required by the master calendar is insufficient to render its action arbitrary or capricious.

[11] To the extent Plaintiffs' argument is that the Department was required to, but did not, state in the IFR what was ambiguous about the statute, the D.C. Circuit has made clear that it "does not require such statements." *UC Health v. NLRB*, 803 F.3d 669, 673 n.1 (D.C. Cir. 2016) (rejecting contention that an agency interpretation was not entitled to *Chevron* deference because the agency "never relied on *Chevron* nor stated explicitly that the statute is ambiguous").

Plaintiffs' further argument that *Chevron* deference should not apply because the Department referenced its lack of "discretion to set an effective date earlier than July 1, 2018." Pls.' Opp. at 38, should be rejected because it confuses discretion in interpreting a statute with discretion to act in light of the agency's interpretation.  Only lack of the former precludes *Chevron* deference, but the Department only lacks the latter here.  The Department does not contend that it did not have discretion in interpreting the HEA; it merely states that *once* it interpreted the statute as providing that regulations should become effective only on July 1, it did not, going forward, have discretion to implement the final regulations on a date other than July 1.  82 Fed. Reg. at 49,116-49,117 ("the Department has consistently interpreted and applied the master calendar requirement to provide that any regulatory change relating to student financial aid programs may take effect only at the beginning of an award year . . . Given the Department's limited discretion to set an effective date under [this interpretation of] the master calendar requirement, …").[12]

Finally, Plaintiffs' continued reliance on *Career College Association v. Riley*, No. 94-1372, 1994 WL 454713 (D.D.C. Aug. 9, 1994) is unavailing.  As noted in Defendants' opening brief, even if this case was binding, which it is not, it is irrelevant because it presented a different question than is before the Court here.  Namely, in *Riley*, the court noted that whether a regulation is in "final form" is a "procedural determination" that does not relate to subject matter entrusted to the Department's particular expertise.  1994 WL 454713, at *6.  In contrast, the question at issue here – whether the master calendar requirement prevents regulations from becoming effective in the

---

[12] Plaintiffs' citation to *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) ("deference …'is only appropriate when the agency has exercised its *own* judgment', not when it believes that [the] interpretation is compelled by Congress"), does not save their argument. Here, unlike in *Arizona*, the Department does not contend that there is only one *possible* interpretation of the HEA that is compelled by the statute; rather, the Department's position is that its interpretation is the most reasonable.  This does not preclude the Court from deferring to the Department's interpretation.

middle of an award year, based on the resulting disruptive effect and lack of notice to regulated entities and students – *does* implicate the Department's substantive expertise, and the Department's interpretation of this part of the statute should therefore be entitled to deference.

###    B.    The Department's Interpretation Is Reasonable

Having failed to establish that *Chevron* deference is inappropriate, Plaintiffs' remaining arguments are irrelevant because they ignore the appropriate deference due to the agency's interpretation, and that the only proper inquiry is whether the agency's interpretation was permissible.  Plaintiffs instead argue that the Court should reject the IFR because Plaintiffs believe "it has no basis in either the text of the provision or in its legislative history" and because Plaintiffs are unpersuaded that having all relevant regulations be implemented only at the beginning of an award year advances the statutory notice-giving objective.  Pls.' Opp. at 39.  But these arguments misapprehend the law.  The Department is only required to offer a *permissible* or *reasonable* interpretation. *See Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984).  Plaintiffs' opposition conveniently ignores the Defendants' explanation of why their interpretation is reasonable.  Namely, the Department contends that the statute is ambiguous as to whether regulations can *only* be implemented at the beginning of an award year, and that, based on other statutory language and objectives, the master calendar provision should be read to incorporate such a rule.  As described in Defendants' opening brief, that the relevant sub-section is titled "delay of effective date of late publications" reflects that there is only one "effective date" each year (*i.e.* the first day of the award year); if that date passes and a regulation is not implemented, it cannot become effective until the beginning of the next award year.  Defs.' MSJ at 42.  Plaintiffs offer no excuse for ignoring this argument or for arguing, baselessly, that the Department did not tie its interpretation to "the text of the Master Calendar Provision."  Pls.' Opp. at 39.

Plaintiffs' treatment of the legislative history is no more successful.  They continue to argue that, to the extent the purpose of the master calendar requirement is to provide notice, the regulated community has already been afforded the requisite level of notice and predictability because the Final Rule was published in final form by November 1, 2016, and, they allege, Defendants do not explain how *additional* notice would harm the legislative goal. Pls.' Mem. in Support of Renewed Mot. for Summ. J., ECF No. 50, at 52-53; Pls.' Opp. at 39.  But, as the Department noted in its opening brief, this argument ignores the effect of the CAPPS litigation and the 705 Notice, which identified significant legal concerns concerning the Borrower Defense regulations and created significant uncertainty about their future implementation.  In light of the active legal challenge to the regulations' validity, there is no basis to conclude that publication of the Rule in November 2016 provided the regulated industry the kind of advance notice the master calendar requirement deems necessary.  Without the added certainty of clarifying *when* a given regulation will become effective and in what form, mere notice of the existence of a substantive regulatory change does not allow the regulated industry to adjust in advance its behavior to comply with the regulatory requirements and prepare for the timely delivery of student aid funds.  Plaintiffs address these points only by erroneously claiming Defendants' argument means "the mere filing of a lawsuit [would] excuse[] regulated parties from preparing for and complying with … regulation[s]," Pls.' Opp. at 40.  But Defendants say nothing of the sort; and it is not the filing of the lawsuit that delayed the implementation date, but the agency determining – as Congress authorized it to – that, in light of the litigation, "justice so requires" staying the effective date of the regulation pending judicial review of the serious questions it provokes.

Plaintiffs' insistence that, if the Court invalidated the 705 Notice, the Final Rule could go into effect immediately because adequate notice has already been provided, should be rejected.  If

Plaintiffs were correct that the Final Rule could be implemented as soon as the Court ruled on the 705 issue, the regulated entities and the public would have no advance notice about *when* the rule would go into effect, and would have no preparation time to implement the Final Rule in advance of the Court's ruling, the timing of which neither regulated parties nor even the parties to the litigation can know in advance. An interpretation yielding such indeterminacy is inconsistent with the HEA's objectives of providing notice and a simplified process for applying for Federal aid.[13]

### C.      The IFR Was Adequately Justified

The Department demonstrated in its opening brief that Plaintiffs' arguments about the IFR being arbitrary and capricious are unavailing because where, as here, an agency action is limited to setting forth the agency's interpretation of its governing statute to provide notice to the regulated industry, the Court's inquiry is less demanding than if the Court were reviewing an agency's substantive policy decision within a complex regulatory scheme. Plaintiffs' attempt to argue that the Department claiming it "*lack[s]* discretion," in light of its interpretation of the master calendar requirement, to implement the Final Rule before July 1, 2018, undermines this position. Pls.' Opp. at 38. But, as described *supra*, Plaintiffs confuse exercising discretion in interpreting a statute with discretion to act in light of the agency's interpretation. The Department has consistently claimed it exercised the former, and lacked the latter.

---

[13] The Department's long-standing policy and practice of implementing financial aid regulations only at the start of an award year demonstrates that its interpretation of the master calendar requirement is reasonable. Plaintiffs attempt to mitigate the import of these regulations by noting that they do not explicitly articulate the policy. Pls.' Opp. at 39 n.22. But Plaintiffs offer no support for this purported requirement. And, in any event, all that matters is that the Department has a long-standing interpretation that is consistent with its interpretation here. Finally, Plaintiffs' reliance on a regulation that they claim sets forth a mid-award-year effective date is precluded by the regulation itself which explicitly states that the September 1 date Plaintiffs discuss is a compliance deadline and not an effective date. *See* 80 Fed. Reg. 67,126 ("Dates: *Effective date:* These regulations are effective July 1, 2016. *Compliance dates*: Compliance . . . is required" for certain provisions by September 1, 2016, July 1, 2017, and September 1, 2017) (emphasis added).

Ultimately, Plaintiffs' argument comes down to their assertion that the Court's inquiry here should not be less demanding than if the Court were reviewing a substantive policy determination, because it is, in fact, reviewing "a substantive action." *Id*. at 41.   But Plaintiffs' attempt to so categorize the Department's action does not make it so.[14]   As explained in Defendants' opening brief, the IFR did not itself effect a delay; it merely provided notice of the revised effective date of certain Final Rule provisions, pursuant to the long-standing interpretation of the HEA.   Because it is not a substantive rule, any discussion of costs and benefits related to delayed implementation as well as any consideration of the impact of the "delay" is irrelevant to implementation of the master calendar requirement and unnecessary to justify the delay reflected in the IFR.

## V.   PLAINTIFFS DO NOT DEMONSTRATE ADDITIONAL PROCEDURES WERE REQUIRED

Plaintiffs only claim that additional procedures were required for the 705 Notice because it was "a quintessentially substantive action that necessitates adherence to the APA's notice-and-comment requirements." *See* Pls.' Opp. at 35.   Because, as described above, the structure of the APA makes clear that Section 705 is intended to be treated differently than other substantive actions, and courts have recognized that notice and comment would not be required in connection with a properly invoked 705 Notice, *see Becerra v. U.S. Dep't of Interior*, __ F. Supp. 3d __, 2017 WL 3891678, at *11 (N.D. Cal. Aug. 30, 2017); *California*, 2017 WL 4416409, at *9, Plaintiffs have not shown that additional procedures were required for the 705 Notice.

With respect to the IFR, in their opening brief, Defendants explained that the "good cause" exceptions to notice and comment and negotiated rulemaking procedures excused their applicability here because the Department's lack of discretion to pick a different implementation

---

[14] Plaintiffs' argument that an agency "changing its course" is required to "supply a reasoned analysis for the change," Pls.' Opp. at 42, is irrelevant because the IFR does not "change course" from any previous policy or determination; it merely gives notice of an agency interpretation.

date rendered the procedures "unnecessary." Defs.' MSJ at 50. Therefore, Plaintiffs' claim that Defendants only rely on the interim nature of the IFR to excuse their failure to follow mandatory procedures, Pls.' Opp. at 43, is simply erroneous. In any event, Plaintiffs do not offer any argument for why the robust explanation of "good cause" actually offered by the Department is insufficient, and thus fail to show why any additional procedures are required in connection with the IFR.

## VI.   ANY RELEVANT REMEDY ISSUES SHOULD BE ADDRESSED IN SUPPLEMENTAL BRIEFING

Plaintiffs' opening brief argued that both the 705 Notice and the IFR should be "set aside" for various reasons. But those arguments focused on alleged deficiencies in the 705 Notice and the IFR and provided no explanation as to why vacatur would be the appropriate remedy for such alleged legal deficiencies. Plaintiffs did not even cite the relevant standard for evaluating the appropriateness of vacatur until their reply brief. Therefore the Court should, if necessary after ruling on the legality of the 705 Notice and the IFR, order separate briefing[15] on any appropriate remedy. *See, e.g.*, *Am. Great Lakes Ports Assoc. v. Zukunft*, __ F. Supp. 3d__, 2017 WL 5128999, at *18 (D.D.C. Nov. 3, 2017) (court "not inclined to decide the issue of remedy without additional briefing from the parties now that the issues in the cross-motions have been resolved"); *Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 362 (D.D.C. 2012) (determining remand, not vacatur, was the appropriate remedy after court-ordered supplemental briefing about this issue).

---

[15] *See St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015) (ordering, despite Defendant's silence as to remedy, supplemental briefing on remedy because court found it appropriate to have "benefit of argument from all parties"). Briefing the issue of remedy *after* the court decides the merits is more efficient. To brief these issues now, the parties would have to describe the appropriate remedy under multiple potential outcomes and different theories of liability. *See, e.g.*, *Am. Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998) (finding remand to agency was appropriate remedy where agency needed to explain its conclusions more fully). If the Court instead solicits supplemental briefs about remedy *after* it has ruled on the merits, the parties can tailor their arguments to the Court's specific ruling.

Dated:  January 19, 2018                    Respectfully submitted,

                                            CHAD A. READLER
                                            Principal Deputy Assistant Attorney General

                                            MARCIA BERMAN
                                            Assistant Branch Director

                                            */s/ R. Charlie Merritt*
                                            R. CHARLIE MERRITT
                                            Trial Attorney
                                            KAREN S. BLOOM
                                            Senior Counsel
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave. NW
                                            Washington, DC  20530
                                            (202) 616-8098
                                            robert.c.merritt@usdoj.gov

                                            *Counsel for Defendants*