**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS<br>  One Ashburton Place, 18th Floor<br>  Boston, MA 02108<br><br>PEOPLE OF THE STATE OF CALIFORNIA *ex rel.*<br>XAVIER BECERRA, Attorney General<br>  300 South Spring Street, Suite 1702<br>  Los Angeles, CA 90013<br><br>STATE OF CONNECTICUT<br>  P.O. Box 120<br>  Hartford, CT 06141<br><br>STATE OF DELAWARE<br>  820 North French Street<br>  Wilmington, DE 19801<br><br>DISTRICT OF COLUMBIA<br>  441 4th Street, N.W., 6th Floor<br>  Washington, DC 20001<br><br>STATE OF HAWAII<br>  425 Queen Street<br>  Honolulu, HI 96813<br><br>PEOPLE OF THE STATE OF ILLINOIS<br>  100 West Randolph Street<br>  Chicago, IL 60601<br><br>STATE OF IOWA<br>  1305 E. Walnut Street<br>  Des Moines, IA 50319<br><br>STATE OF MAINE<br>  6 State House Station<br>  Augusta, ME 04333<br><br>STATE OF MARYLAND<br>  200 St. Paul Place, 16th Floor<br>  Baltimore, MD 21202<br><br>STATE OF MINNESOTA<br>  445 Minnesota Street, Suite 1100<br>  St. Paul, MN 55101-2130<br><br>STATE OF NEW MEXICO<br>  408 Galisteo Street<br>  Santa Fe, NM 87501 | Civil Action No. 17-1331 (RDM)<br><br><br><br><br><br><br><br><br><br>**SECOND AMENDED<br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

STATE OF NEW YORK
   120 Broadway, 3rd Floor
   New York, NY 10271

STATE OF NORTH CAROLINA *ex rel.*
JOSH STEIN, Attorney General
   114 W. Edenton Street
   Raleigh, NC 27603

STATE OF OREGON
   Oregon Department of Justice
   1162 Court Street, NE
   Salem, OR 97301

COMMONWEALTH OF PENNSYLVANIA
   15th Floor, Strawberry Square
   Harrisburg, PA 17120

STATE OF RHODE ISLAND
   150 South Main Street
   Providence, RI 02903

STATE OF VERMONT
   109 State Street
   Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA, *ex rel.* MARK
R. HERRING, Attorney General
   202 N. Ninth Street
   Richmond, VA 23219

     and

STATE OF WASHINGTON
   Office of the Washington Attorney General
   1125 Washington Street SE
   P.O. Box 40100
   Olympia, WA 98504,
                 Plaintiffs,
   v.

UNITED STATES DEPARTMENT OF EDUCATION,
   400 Maryland Avenue, S.W.
   Washington, D.C. 20202

    and

BETSY DEVOS, *in her official capacity as Secretary
of Education,*
   400 Maryland Avenue, S.W.
   Washington, D.C. 20202,
              Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The Commonwealth of Massachusetts, by and through Attorney General Maura
Healey; the People of the State of California, by and through Attorney General Xavier Becerra;
the State of Connecticut, by and through Attorney General George Jepsen; the State of Delaware,
by and through Attorney General Matthew P. Denn; the District of Columbia, by and through
Attorney General Karl A. Racine; the State of Hawaii, by and through Acting Attorney General
Russell A. Suzuki; the People of the State of Illinois, by and through Attorney General Lisa
Madigan; the State of Iowa, by and through Attorney General Thomas J. Miller; the State of
Maine, by and through Attorney General Janet T. Mills; the State of Maryland, by and through
Attorney General Brian E. Frosh; the State of Minnesota, by and through Attorney General Lori
Swanson; the State of New Mexico, by and through Attorney General Hector Balderas; the State
of New York, by and through Attorney General Eric T. Schneiderman; the State of North
Carolina *ex rel.* Josh Stein, Attorney General; the State of Oregon, by and through Attorney
General Ellen F. Rosenblum; the Commonwealth of Pennsylvania, by and through Attorney
General Josh Shapiro; the State of Rhode Island, by and through Attorney General Peter F.
Kilmartin; the State of Vermont, by and through Attorney General Thomas J. Donovan, Jr.; the
Commonwealth of Virginia, by and through Attorney General Mark R. Herring; and the State of
Washington, by and through Attorney General Robert W. Ferguson (the "States"), file this
Complaint against Defendants Secretary of Education Betsy DeVos and the United States
Department of Education (the "Department"), alleging the following:

## INTRODUCTION

2.      This lawsuit challenges the Department's summary and unlawful rescission of a
final agency regulation known as the "Borrower Defense Rule" that was designed to hold

abusive postsecondary institutions accountable for their misconduct and to relieve their students

from federal loan indebtedness incurred as a result of that misconduct.

3.      The Department duly promulgated the Borrower Defense Rule on November 1,

2016, after an extensive negotiated rulemaking process in which the Department reviewed over

10,000 comments, including those of students, postsecondary institutions, state government

actors, and consumer advocates. The Department, moreover, allowed affected schools more than

half a year to prepare for implementation of the Borrower Defense Rule, making it effective on

July 1, 2017.

4.      The Borrower Defense Rule was designed to ensure "that students who are lied to

and mistreated by their school get the relief they are owed, and that schools that harm students

are held responsible for their behavior." Press Release, Department of Education, *U.S.*

*Department of Education Announces Final Regulations to Protect Students and Taxpayers from*

*Predatory Institutions* (Oct. 28, 2016) ("October 2016 Press Release"), *available at*

https://www.ed.gov/news/press-releases/us-department-education-announces-final-regulations-

protect-students-and-taxpayers-predatory-institutions. The Borrower Defense Rule deters

institutions from engaging in predatory behavior and restores the rights of students injured by a

school's misconduct to seek relief in court.

5.      Despite the pendency of the Borrower Defense Rule for more than seven months,

on June 14, 2017, little more than two weeks before the effective date, the Department issued a

short notice purporting to delay the effective date of large portions of the Borrower Defense Rule

indefinitely (the "705 Delay"). The Department simultaneously announced its intent to issue a

new regulation to replace the Borrower Defense Rule. By "delaying" the Borrower Defense

Rule, the Department effectively canceled a duly promulgated regulation without soliciting,

4

receiving, or responding to any comment from any stakeholder or member of the public, and without engaging in a public deliberative process.

6.　　The 705 Delay cites the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, and states that a delay is necessary pending the resolution of litigation challenging the Borrower Defense Rule. However, both the language of the 705 Delay and the circumstances of its announcement belie this rationale and make clear that the Department's reference to the pending litigation is a mere pretext for repealing the Borrower Defense Rule and replacing it with a new rule that will remove or dilute student rights and protections.

7.　　On October 24, 2017, the Department published an interim final rule ("IFR") purporting to further delay the Borrower Defense Rule until July 1, 2018 on the basis of its previous unlawful delay. The Department issued the IFR without engaging in public consultation, negotiated rulemaking, or notice-and-comment rulemaking, as required under the Higher Education Act ("HEA") and the APA. The Department sought to invoke the "good cause" exception to these rulemaking requirements that applies when compliance with these procedures is either impracticable or unnecessary.

8.　　In attempting to make a showing of good cause and to justify the IFR, the Department offers a rationale that is both legally inaccurate and logically unsound. The Department claims that, due to the HEA's "master calendar requirement," no rule can apply to the period between July 1, 2017 and June 30, 2018 unless it was effective on July 1, 2017. The Department claims that the Borrower Defense Rule was not effective because of the implementation delay *instituted by the Department itself*. This circular argument both misstates the HEA's master calendar requirement and cannot possibly constitute "good cause" to forego notice and comment rulemaking. A delay that the Department created cannot be sufficient to

5

show that it would be impracticable or unnecessary for the Department to comply with the HEA and APA's rulemaking requirements. In effect, the Department is claiming that simply by invoking 5 U.S.C. § 705, it can both avoid implementing a duly-promulgated rule for a year in order to work on its replacement and circumvent required rulemaking procedures.

9.      In yet a further attempt to prevent the implementation of the Borrower Defense Rule, the Department published a third delay rule—the 2018 Delay—on February 14, 2018, three weeks after briefing was completed on the parties' cross-motions for summary judgment in this matter. This most recent delay rule seeks to further delay the Borrower Defense Rule until July 1, 2019 for the explicit purpose of giving the Department enough time to issue new regulations without ever complying with its obligation to implement the Borrower Defense Rule.

10.     The Department's three delay rules are not merely procedural delays; they plainly operate to amend or rescind the Borrower Defense Rule and are explicitly justified on the ground that they will facilitate the Borrower Defense Rule's replacement.

11.     The APA does not permit the Department to delay a duly promulgated regulation in order to work on a replacement, without first satisfying the statute's substantive standards for a stay of agency action.

12.     The 705 Delay violates the APA in at least the following respects: (1) the Department failed to undertake notice and comment rulemaking prior to issuing the 705 Delay, which operates as an amendment to or rescission of the Borrower Defense Rule; (2) the Department failed to apply, or even acknowledge, the requisite legal standard for a stay of agency regulations; (3) the Department did not adequately base its justification for delaying the Borrower Defense Rule on the pending litigation referenced in the 705 Delay; and (4) the Department failed to offer a reasoned analysis explaining its change of position regarding the

6

Borrower Defense Rule. The 705 Delay should therefore be vacated and set aside pursuant to 5

U.S.C. § 706(2).

13.     Likewise, the IFR violates the APA and should be set aside because it was

adopted without public consultation, a negotiated rulemaking, or an opportunity for notice and

comment, as required by the HEA, 20 U.S.C. 1098a and the APA, 5 U.S.C. § 553; and is

arbitrary, capricious, otherwise contrary to law, and in excess of the Department's statutory

authority, in violation of the APA, 5 U.S.C. § 706(2).

14.     Finally, the 2018 Delay violates the APA in numerous respects. First, the 2018

Delay is arbitrary, capricious, and otherwise contrary to the law, in violation of the APA,

5 U.S.C. § 706(2). In issuing the 2018 Delay, the Department failed to offer a reasoned analysis

explaining its change of position regarding the Borrower Defense Rule. Instead, the Department

justifies the 2018 Delay by claiming that an agency may delay a duly promulgated regulation for

the purpose of replacing it without justifying its change of position. The Department further fails

to take account of the harms caused by delay and ill-advisedly relies on the legitimacy of the first

two invalid delay rules. Second, the Department issued the 2018 Delay without adhering to the

HEA's public consultation and negotiated rulemaking requirements, in violation of the APA,

5 U.S.C. § 706(2).

## JURISDICTION

15.     This action arises under the APA, 5 U.S.C. §§ 553, 701-706. This Court has

subject matter jurisdiction over this action because it is a case arising under federal law, 28

U.S.C. § 1331.

16.     This is an action against an officer and agency of the United States. Therefore,

venue is proper in this Court under 28 U.S.C. § 1391(e). Additionally, venue is proper in this

Court because Defendant Department of Education resides in this judicial district, Defendant Secretary Betsy DeVos performs her official duties in this judicial district, and the events giving rise to this action took place in this judicial district.

## THE PARTIES

17.     Plaintiff the Commonwealth of Massachusetts brings this action by and through Attorney General Maura Healey.

18.     Plaintiff People of the State of California brings this action by and through Attorney General Xavier Becerra.

19.     Plaintiff the State of Connecticut brings this action by and through Attorney General George Jepsen.

20.     Plaintiff the State of Delaware brings this action by and through Attorney General Matthew P. Denn.

21.     Plaintiff the District of Columbia brings this action by and through Attorney General Karl A. Racine.

22.     Plaintiff the State of Hawaii brings this action by and through Acting Attorney General Russell A. Suzuki.

23.     Plaintiff People of the State of Illinois brings this action by and through Attorney General Lisa Madigan.

24.     Plaintiff the State of Iowa brings this action by and through Attorney General Thomas J. Miller.

25.     Plaintiff the State of Maine brings this action by and through Attorney General Janet T. Mills.

26.     Plaintiff the State of Maryland brings this action by and through Attorney General Brian E. Frosh.

27.     Plaintiff the State of Minnesota brings this action by and through Attorney General Lori Swanson.

28.     Plaintiff the State of New Mexico brings this action by and through Attorney General Hector Balderas.

29.     Plaintiff the State of New York brings this action by and through Attorney General Eric T. Schneiderman.

30.     Plaintiff the State of North Carolina brings this action by and through Attorney General Josh Stein.

31.     Plaintiff the State of Oregon brings this action by and through Attorney General Ellen F. Rosenblum.

32.     Plaintiff the Commonwealth of Pennsylvania brings this action by and through Attorney General Josh Shapiro.

33.     Plaintiff the State of Rhode Island brings this action by and through Attorney General Peter F. Kilmartin.

34.     Plaintiff the State of Vermont brings this action by and through Attorney General Thomas J. Donovan, Jr.

35.     Plaintiff the Commonwealth of Virginia brings this action by, through, and at the relation of Attorney General Mark R. Herring.

36.     Plaintiff the State of Washington brings this action by and through Attorney General Robert W. Ferguson.

37.     Plaintiff the District of Columbia brings this action by and through Attorney General Karl A. Racine.

38.     The States herein, by and through their Attorneys General, are charged with enforcing their respective state consumer protection statutes. These statutes prohibit unfair and deceptive acts or practices.[1]

39.     The States have initiated numerous costly and time-intensive investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes.

40.     State investigations and enforcement actions are afforded a legally significant status under the Borrower Defense Rule. *See* 34 C.F.R § 685.222(b) (providing that a judgment obtained by a governmental agency against a postsecondary institution based on state law will give rise to a borrower defense to loan repayment); 34 C.F.R §§ 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C), and 685.206(c)(4)(iii) (providing that a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to commence a collection action against the school).

---

[1] *See, e.g.*, Cal. Bus. & Prof. Code § 17200 *et seq.*; 815 ILCS 505/2; Conn. Get. Stat. Sec. 42-110b; Iowa Consumer Fraud Act, Iowa Code § 714.16; 5 M.R.S. § 205A *et seq.*; Md. Code Ann., Com. Law §§ 13-101 *et seq.*; Massachusetts Consumer Protection Act, M.G.L. c. 93A; Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 and Minnesota's Deceptive Trade Practices Act, Minn. Stat. § 325D.44; New York General Business Law §§ 349 and 350; NMSA 1978, §§ 57-12-1 to -26 (1967, as amended though 2017); New York Executive Law § 63(12); N.C. Gen. Stat. Chapter 75; Oregon Unlawful Trade Practices Act, Oregon Revised Statutes 646.605 *et seq.*; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*; Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §6-13.1-1, *et seq.*; Virginia Consumer Protection Act, Va. Code §§ 59.1-196 through 59.1-207; 9 V.S.A. §§ 2451, *et seq.*; Washington Consumer Protection Act, RCW 19.86.010, et seq.; Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

41.     The States have an interest in the timely implementation of the Borrower Defense Rule, which enhances the effectiveness of state enforcement efforts, improves the remedies available for violations of state law, deters misconduct by educational institutions, and protects the wellbeing of the States' respective residents. The Borrower Defense Rule provides a joint federal and state process for protecting students and providing relief to injured students. The Department's stay of the Borrower Defense Rule deprives the States of benefits to their enforcement systems and injures the States' residents by removing the rights and protections provided by the Borrower Defense Rule.

42.     Defendant United States Department of Education is an executive agency of the United States government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

43.     Defendant Betsy DeVos is the Secretary of the United States Department of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

### A.  Federal Student Loans and For-Profit Schools

44.     The federal government provides financial assistance in the form of loans to students pursuing higher education under Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1071 *et seq.* The federal student loan programs are central components of the financial aid provided to students under Title IV. These programs are designed to provide critical assistance to prospective students and expand access to higher education to students who could not otherwise afford to pursue a degree or certificate.

45.     The Department administers multiple programs under Title IV, including the

Federal Family Education Loan Program ("FFEL Program") and the William D. Ford Direct

Student Loan Program ("Direct Loan Program").

46.     Title IV student loans have become a significant source of revenue for many

postsecondary institutions, including and especially for-profit schools.

47.     For-profit schools, which award various degrees and certificates, are owned and

operated as businesses. Several of them are publicly traded. Like any for-profit businesses, a

principal function of these schools is to produce returns for owners and shareholders. *For Profit

Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student

Success*, United States Senate, Health, Education, Labor and Pensions Committee, at 1 (July 30,

2012) ("Senate Report") *available at*

https://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.

48.     For-profit schools receive the vast majority of their revenue from the federal

government in the form of federal student loans and grants. In 2009, the fifteen publicly traded

for-profit education companies received 86 percent of their revenues from taxpayer-funded

loans. *Id.* at 3. Taxpayers invested $32 billion in for-profit schools in the 2009-10 academic year,

more than the annual budget of the U.S. Department of Justice and the U.S. Department of State

during that time period. *Id.* at 15; Office of Mgmt. & Budget, Exec. Office of the President,

Historical Tables, Budget of the United States Government, Fiscal Year 2012 (2011), Table 4.1

*available at* https://www.gpo.gov/fdsys/pkg/BUDGET-2012-TAB/pdf/BUDGET-2012-

TAB.pdf.

49.     For-profit schools typically advertise themselves to students with modest financial

resources who are eligible for federal funds in the form of grants and loans. Many such students

are the first in their families to enroll in an institution of higher education. For-profit schools have directed their marketing toward low-income and minority students, particularly low-income women of color.

50.     Nationwide, in 2011-2012, 26 percent of undergraduates at for-profit schools were African American, as compared with 15 percent of students at public institutions and 14 percent of students at private nonprofit institutions. *A Profile of Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions*, U.S. Department of Education, National Center for Education Statistics (2007) at 13, *available at* https://nces.ed.gov/pubs2017/2017416.pdf. Certificate programs at for-profit schools enroll a greater percentage of African American, Hispanic, and female students as compared with certificate programs at nonprofit and public institutions. Kevin Lang & Russell Weinstein, *Evaluating Student Outcomes at For-Profit Colleges*, National Bureau of Economic Research (2012) at 10, *available at* http://www.nber.org/papers/w18201.pdf.

51.     Additionally, for-profit schools recruit people who are unemployed and thus eligible for federal workforce retraining monies, and veterans who are eligible for federal veteran benefits.

52.     The vast majority of students in for-profit institutions take out federal loans to pay for their education. In 2009 and 2010, for-profit schools enrolled about 10 percent of post-secondary students, but these schools accounted for nearly a quarter of all federal educational loans and grants. Senate Report at 3 and 15.

53.     For-profit programs are typically expensive for the students who attend them. The Senate Report found that the average certificate programs at a for-profit school cost 4.5 times more than a comparable program at a community college. *Id.* at 36. The tuition charged by for-

profit schools is often a product of company profit goals, rather than anticipated academic and instructional expenses. *Id.* at 3.

54.     Profit goals also drive and the types of expenses incurred at for-profit schools. For-profit schools spend relatively little on education; the Senate Report found that only 17.2 percent of for-profit schools' revenue was spent on instruction, less than the amount allocated for marketing, advertising, recruiting, and admissions staffing, and less than the amount allocated as profit. *Id.* at 6.

55.     Despite the high costs of for-profit programs, students attending for-profit institutions often fail to realize the returns on their investment in education—facing high default rates on their loans and high unemployment rates after leaving school. Nearly a quarter of students who attend for-profit schools default on their loans within three years of graduation, and approximately half of such students will default over the lifetime of their loans. *Id.* at 8 and 18. Overall, students at for-profit schools nationally accounted for about half of all federal student loan defaults in 2009. *Id.* at 8. Furthermore, students who attend for-profit schools are more likely to face unemployment after leaving their schools. *Id.*

56.     While for-profit schools benefit from the loans their students incur to finance tuition, the students themselves struggle under the burden of student loan debt they cannot afford after working towards expensive degrees or certificates that may be of questionable value to them.

57.     Nonetheless, enrollment in for-profit schools grew significantly in the past two decades. From 2000 to 2010, undergraduate enrollment at degree-granting private for-profit institutions quadrupled. *The Condition of Education at a Glance*, Department of Education,

National Center for Education Statistics, (May 2017), *available at*

https://nces.ed.gov/programs/coe/indicator_cha.asp.

**B. Institutional Misconduct and State and Federal Enforcement Actions**

58.     In order to maintain and increase their revenue from Title IV student loans, some

for-profit schools engage in a variety of abusive and deceptive practices. Such practices include

coercive and harassing recruitment tactics, deceptive marketing, and misrepresentations about

students' future career prospects, completion rates, and the reputation or accreditation of the

school. For-profit recruiters are trained to use aggressive tactics and often create a false sense of

urgency to enroll. Some for-profit colleges train and encourage recruiters to identify prospective

students in dire financial straits, and then use that fact to pressure the individuals to enroll.

59.     Prospective students may be misled by for-profit schools about their likelihood of

finding employment upon completion of their programs. Although most programs at for-profit

schools are career or vocational programs, many students are unable to obtain jobs in their career

fields after completing their programs.

60.     Additionally, students who are harmed by the misconduct of for-profit schools are

often unable to seek a remedy in court. For-profit schools have used mandatory arbitration

agreements and class action waivers to avoid negative publicity and to thwart legal actions by

students who have been harmed by their schools' abusive conduct.

61.     The States, by and through their Attorneys General, initiate numerous

investigations and enforcement actions against proprietary and for-profit schools for violations of

the States' consumer protection statutes. Many of these actions have resulted in judgments

against the schools.

62.     State enforcement actions initiated against for-profit schools since 2012 include:

- **Career Education Corporation (including the Sanford Brown schools)**
  - Assurance of Discontinuance obtained by New York on August 19, 2013. *See* Press Release, A.G. Schneiderman Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit Education Company That Inflated Job Placement Rates To Attract Students (Aug. 19, 2013) *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-groundbreaking-1025-million-dollar-settlement-profit.

- **The Career Institute, LLC.**
  - Complaint, Massachusetts v. The Career Institute, LLC. *et al.*, No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015) *available at* http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf; Final Judgment by Consent, Massachusetts v. The Career Institute, LLC. *et al.*, No. 13-4128H (Mass. Super. Ct. June 1, 2016) *available at* http://www.mass.gov/ago/docs/consumer/aci-consent-judgment.pdf.

- **Corinthian Colleges, Inc. ("Corinthian")**
  - Complaint, Massachusetts v. Corinthian Colleges, Inc. *et al.* No. 14-1093 (Mass. Super. Ct. Apr. 3, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/everest-complaint.pdf.
  - $1.1 billion judgment, *People of the State of California v. Corinthian Colleges, Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016) *available at* https://oag.ca.gov/system/files/attachments/press_releases/Corinthian%20Final%20Judgment_1.pdf.
  - California's Objection to Bankruptcy Plan Confirmation, *In re Corinthian Colleges, Inc. et al.*, No. 15-10952, Doc. No. 824 (Bankr. D. Del., Aug. 21, 2015).
  - Illinois investigation initiated on 12/14/2011; Opp. to Debtor's Obj. with findings, Doc. No. 1121, In re: Corinthian Colleges, Inc. *et al.* No. 15-10952 (KJC) (U.S. Bankr. Ct. Dist. of Del., Dec. 9, 2015).

- **DeVry University**
  - Assurance of Discontinuance obtained by New York on January 27, 2017. See Press Release, A.G. Schneiderman Obtains Settlement with DeVry University Providing $2.25 Million in Restitution for New York Graduates Who Were Misled About Employment and Salary Prospects After Graduation (January 31, 2017); *available at* https://ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-devry-university-providing-225-million-restitution.
  - Assurance of Discontinuance obtained by Massachusetts on June 30, 2017. See Press Release, AG Healey Secures $455,000 in Refunds for Students Deceived by Online For-profit School (July 5, 2017); available at http://www.mass.gov/ago/news-and-updates/press-

releases/2017/2017-07-05-refunds-for-students-deceived-by-online-for-profit-school.html.

- **Education Management Corporation** (including The Art Institutes and Brown Mackie College)
  - o Complaint, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consent Judgment, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015).
  - o Consumer Protection Division v. Education Management Corporation, *et al*. Case No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015).
  - o Complaint, State of New York v. Education Management Corp., *et al*., No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Consent Order and Judgment (N.Y. Sup. Ct. Jan. 14, 2016).
  - o Complaint, State of North Carolina v. Education Management Corporation, *et al*, No. 15-CV-015426 (N.C. Sup. Ct. Wake County Nov. 16, 2015); Consent Judgment, State of North Carolina v. Education Management Corporation, *et al*, No. 15-CV-015426 (Sup. Ct. Wake County Nov. 16, 2015).
  - o Complaint, State of Washington v. Education Management Corp., *et al*., Case No. 15-2-27623-9 SEA (King County Sup. Ct. Nov. 16, 2015); Consent Decree (King County Sup. Ct. Nov. 16, 2015).
  - o District of Columbia v. Education Management Corporation, *et al.* Case No. 2015 CA 8875 B (D.C. Sup. Ct.) (Consent Order entered on January 20, 2016).
  - o $95.5 million global settlement, intervention by States of California, Illinois, Minnesota, and others, *United States ex rel. Washington v. Education Management Corp., et al.*, No. 07-00461 (W.D. Pa., Nov. 13, 2015).

- **ITT Educational Services, Inc.**
  - o Complaint, Massachusetts v. ITT Educ. Servs. Inc., No. 16-0411 (Mass. Super. Ct. Mar. 31, 2016).

- **Kaplan Higher Education, LLC**
  - o Assurance of Discontinuance, In the Matter of Kaplan, Inc., Kaplan Higher Education, LLC, No. 15-2218B (Mass. Super. Ct. July 23, 2015) *available at* http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf.

- **Lincoln Technical Institute, Inc.**
  - o Complaint, Massachusetts v. Lincoln Tech. Inst., No. 15-2044C (Mass. Super. Ct. July 8, 2015); Consent Judgment, Massachusetts v. Lincoln Tech. Inst., No. 15-2044C (Mass. Super. Ct. July 13, 2015)

*available at* http://www.mass.gov/ago/docs/press/2015/lincoln-tech-settlement.pdf.

- **MalMilVentures, LLC, d/b/a Associated National Medical Academy**
  - o  Statement of Charges, Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, *et al.*, CPD Case No.: 10-009-182059 (In the Consumer Protection Division, Feb. 22, 2010); Final Order by Consent, Consumer Protection Division, Office of the Attorney General of Maryland v. MalMilVentures, LLC, d/b/a Associated National Medical Academy, *et al.*, OAG Case No.: 041006571 (In the Consumer Protection Division, June 7, 2010).

- **Minnesota School of Business, Inc. and Globe University, Inc.**
  - o  Complaint, Minnesota v. Minnesota School of Business, Inc. *et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014); Findings of Fact, Conclusions of Law and Order, Minnesota v. Minnesota School of Business *et al.*, No. 27-CV-14-12558 (Minn. Dist. Ct. September 8, 2016).

- **The Salter School**
  - o  Complaint, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 9, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-complaint.pdf; Final Judgment by Consent, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 11, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-judgment-by-consent.pdf.

- **Sullivan & Cogliano Training Centers, Inc.**
  - o  Complaint, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No. 13-0357B (Mass. Super. Ct. Apr. 3. 2013) *available at* http://www.mass.gov/ago/audioandvideo/s-and-c-complaint.pdf; Consent Judgment, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No. 13-0357B (Mass. Super. Ct. Oct. 28, 2013).

- **Westwood College, Inc.**
  - o  Complaint, People of the State of Illinois v. Westwood College, Inc. *et al.*, No. 12 CH 01587 (Cir. Ct. Cook County Jan. 18, 2012); Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (U.S. Dist. Ct., N. Dist. Ill. Sept. 30, 2014); Settlement entered on October 9, 2015.

63.     Through these investigations and enforcement actions, the States have uncovered

a wide array of predatory practices employed by abusive for-profit schools. These practices

commonly include unfair and harassing recruitment tactics, false and misleading representations to consumers and prospective students designed to induce enrollment in the schools, the recruitment and enrollment of students unable to benefit from the education sought, and the creation, guarantee, and funding of predatory private student loans.

64.     In fact, the Borrower Defense Rule was promulgated in large part as a result of state and federal investigations into for-profit schools, in particular with respect to the misconduct of Corinthian, formerly one of the largest educational institutions in the United States with over a hundred thousand students at campuses throughout the country.

65.     State and federal investigations uncovered that Corinthian committed numerous violations of state and federal law in advertising, recruiting, enrolling, and providing financing to students. The judgments against Corinthian of well over a billion dollars, largely for restitution of tuition and fees paid by students injured by Corinthian's misconduct, were never paid when Corinthian closed its schools and subsequently filed for bankruptcy.

66.     In the wake of such investigations and enforcement actions against for-profit schools, state attorneys general have attempted to help students affected by institutional misconduct obtain federal student loan forgiveness.

**C. Promulgation of the Borrower Defense Rule**

67.     Recognizing the damaging impact of institutional misconduct on student borrowers, Congress called on the Secretary of Education to promulgate regulations governing the process by which students could seek loan discharges based on the conduct of their schools. *See* 20 U.S.C. § 1087e(h).

68.     Pursuant to Section 492 of the HEA, the Secretary of Education was required to undertake a negotiated rulemaking process and obtain public involvement in the development of proposed regulations relating to Title IV programs. 20 U.S.C. § 1098a.

69.     In August 2015, the Department announced that it would begin a new negotiated rulemaking. 80 Fed. Reg. 50,588 (Aug. 20, 2015). One goal of the new rulemaking was "to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges." 81 Fed. Reg. 75,926 (Nov. 1, 2016).

70.     The Department held public hearings in September 2015 to solicit comments on the topics to be included as part of the rulemaking. The Department also invited parties to submit written comments. 80 Fed. Reg. at 50,589.

71.     After soliciting nominations for negotiators, the Department established a negotiated rulemaking committee comprised of individuals representing students/borrowers, private/nonprofit institutions, two-year public institutions, four-year public institutions, private/for-profit institutions, minority-serving institutions, FFEL Program lenders and loan servicers, FFEL Program guaranty agencies and guaranty agency servicers, state attorneys general, state higher education executive officers, financial aid administrators, accreditors, legal assistance organizations, consumer advocacy organizations, and U.S. military service members and veterans. The rulemaking committee met three times to develop regulations. 81 Fed. Reg. 39,329 (June 16, 2016), at 39,333-34.

72.     The Department received and reviewed more than 10,000 comments prior to promulgating the Borrower Defense Rule.

73.     State attorneys general participated in the negotiated rulemaking that resulted in
the Borrower Defense Rule, serving on the negotiating committee, providing input on draft
provisions through the state attorney general representatives on the negotiating committee, and
submitting comments to the Department throughout the process. *See* 81 Fed. Reg. at 39,333-34
(announcing Bernard Eskandari of the Office of the Attorney General of California as a member
of the negotiating committee and Mike Firestone of the Massachusetts Office of the Attorney
General as an alternate member of the negotiating committee).

74.     The Department promulgated the Borrower Defense Rule on November 1, 2016,
81 Fed. Reg. 75,926 (Nov. 1, 2016), and added supplemental "Borrower Defense Procedures" to
the Borrower Defense Rule on January 19, 2017, 82 Fed. Reg. 6253 (Jan. 19, 2017).

75.     The effective date of the Borrower Defense Rule is July 1, 2017.

76.     The Borrower Defense Rule was designed to "protect student loan borrowers
from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises
by, institutions participating in the Department's student aid programs," 81 Fed. Reg. at 75,926,
by (*inter alia*):

- creating standards for loan discharge and clarifying the process by which
  students can seek to have their federal loans discharged on the basis of their
  schools' misconduct;

- providing students with access to "consistent, clear, fair, and transparent
  processes to seek debt relief . . . ," *Id.*;

- "[e]mpowering the Secretary to provide debt relief to borrowers without
  requiring individual applications in instances of widespread

misrepresentations," (October 2016 Press Release), an important
accompaniment to the state enforcement process;

- "protect[ing] taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government" when their illegal conduct results in discharges of borrowers' loans, 81 Fed. Reg. at 75,926;

- requiring institutions with poor loan repayment outcomes to provide warnings about their loan repayment rates in plain language in advertising and promotional materials in order to help students make more informed decisions concerning their educational choices, 81 Fed. Reg. at 75,927; and

- prohibiting schools participating in the Direct Loan Program from using mandatory predispute arbitration agreements or class action waivers to resolve claims with students.  81 Fed. Reg. at 75,926-27.

77.     The Borrower Defense Rule affords a legally significant status to enforcement actions and investigations undertaken by state attorneys general. A successful enforcement action brought against a postsecondary institution by a state attorney general gives rise to a borrower defense to loan repayment. *See* 81 Fed. Reg. at 76,083; 34 C.F.R. § 685.222(b). Additionally, a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to seek repayment from the school for any amounts forgiven. *See* 81 Fed. Reg. at 76,085; 34 C.F.R. §§ 685.222(e)(7)(iii)(C), 685.222(h)(5)(iii)(C), and 685.206(c)(4)(iii).

78.     By incorporating state enforcement actions and investigations into the Department's borrower defense framework, the Borrower Defense Rule enhances the effectiveness of state enforcement efforts and the remedies available for violations of state law.

79.     The Borrower Defense Rule provides additional important assistance to the States' enforcement efforts by substantially increasing deterrence of institutional misconduct through provisions that allow the Department to recoup the cost of borrower defense discharges from schools engaging in misconduct and provide for mass discharge of student debt in cases of widespread misconduct, and by requiring public disclosures concerning a school's financial condition and loan repayment rates in certain contexts. *See* 81 Fed. Reg. at 75, 960, 75,964-65, 76,070-71, and 76,085.

80.     Additionally, by enabling borrowers to seek redress in court for their schools' misconduct, the Borrower Defense Rule's prohibitions on mandatory arbitration and class-action waivers restore an important component of the States' consumer protection frameworks, which incorporate private lawsuits to supplement government enforcement efforts and facilitate greater enforcement of state laws. *See* 81 Fed. Reg. at 76,087-89.

## D. Pending Litigation and the Department's Delayed Implementation of the Borrower Defense Rule

81.     On May 24, 2017, Secretary DeVos announced that the Department was reevaluating the Borrower Defense Rule. In her testimony before a congressional subcommittee, Secretary DeVos referred to the Borrower Defense Rule and stated "that is something that we are studying carefully and looking at and we will have something further to say on that within the next few weeks." *See*, Elisabeth DeVos testimony before House Appropriations Subcommittee, at 1:20 in response to question by Rep. Katherine Clark, https://www.c-span.org/video/?428714-1/education-secretary-betsy-devos-pressed-accountability-charter-schools (last accessed June 26, 2017).

82.     The same day, the California Association of Private Postsecondary Schools ("CAPPS"), a trade organization including mostly for-profit schools, filed a lawsuit challenging the Borrower Defense Rule.

83.     On June 2, 2017, CAPPS moved for a preliminary injunction to bar implementation of specific provisions prohibiting participating schools from using mandatory arbitration agreements and class action waivers to block students from bringing private suits in court.

84.     On June 14, 2017, the Department issued the 705 Delay—a final rule delaying the implementation of numerous provisions included in the Borrower Defense Rule. Dept. of Educ., Notification of Partial Delay of Effective Dates (June 14, 2017), at 4, https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-12562.pdf. The two-page 705 Delay was formally published in the Federal Register on June 16, 2017. 82 Fed. Reg. 27,621 (June 16, 2017).

85.     The Department did not engage in notice and comment rulemaking regarding its delay of the Borrower Defense Rule prior to issuing the 705 Delay.

86.     As authority to delay its implementation of the Borrower Defense Rule, the Department sought to rely on 5 U.S.C. § 705, which provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

87.     The 705 Delay cursorily states that the Department's delay of the Borrower Defense Rule was initiated due to the pending CAPPS litigation.

88.     Despite invoking the CAPPS litigation, the 705 Delay stays the implementation of specific provisions of the Borrower Defense Rule that have not been explicitly challenged and which are not clearly at issue in the CAPPS litigation. For example, the 705 Delay stays the implementation of provisions that govern automatic discharges for students who attend a school that closes. *See* 34 C.F.R. §§ 674.33, 682.402, and 685.214. The Department failed to provide any explanation or justification for delaying the particular assortment of provisions specified in the 705 Delay.

89.     The language of the 705 Delay and the Department's official announcements indicate that the Department's invocation of 5 U.S.C. § 705 and the CAPPS litigation is a pretext to avoid the required notice and comment process and allow the Department to defer implementation of the Borrower Defense Rule pending the Department's wholesale reevaluation of the Borrower Defense Rule.

90.     The 705 Delay, by its own terms, is intended to facilitate a new rulemaking and operates as an amendment to or a rescission of the Borrower Defense Rule. The 705 Delay expressly states that the Department intends to use the implementation delay to replace the Borrower Defense Rule:

> [T]he Department is announcing its plan to review and revise the regulations through the negotiated rulemaking process required under section 492 of the HEA. The postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters.

82 Fed. Reg. at 27,6222.

91.     In the first official statement announcing the 705 Delay, the Department stated that it would undertake a "regulatory reset" and initiate a new negotiated rulemaking process regarding the Borrower Defense Rule. The Secretary referred to the Borrower Defense Rule as

establishing "a muddled process" and to the rulemaking effort that led to the Borrower Defense

Rule as a "missed opportunity." Press Release, Department of Education, *Secretary DeVos*

*Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, (June 14,

2017) ("June 2017 Press Release") *available at* https://www.ed.gov/news/press-

releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-

institutions. This press release demonstrates that the delay and effective rescission of the

Borrower Defense Rule is part and parcel of the Department's new rulemaking initiative and not

a bona fide response to pending litigation.

92.     On October 24, 2017, the Department took further unlawful action to prevent the

Borrower Defense Rule from being implemented before the Department proposes, finalizes and

implements its replacement. That day, the Department both issued the IFR, 82 Fed. Reg. 49,114

(Oct. 24, 2017), which purports to delay the Borrower Defense Rule until July 1, 2018, and

published a Notice of Proposed Rulemaking ("NPRM"), 82 Fed. Reg. 49,155 (Oct. 24, 2017),

proposing to further delay the Borrower Defense Rule until July 1, 2019.

93.     The Department issued the IFR without providing notice or an opportunity for

public comment and without engaging in negotiated rulemaking. In an effort to justify its failure

to comply with these requirements, the Department sought to invoke the "good cause" exception

to the APA and HEA's rulemaking requirements, claiming that compliance would be both

impracticable and unnecessary.

94.     The Department's rationale for invoking the "good cause" exception and its

justification of the Borrower Defense Rule rely on inadequate and inaccurate assumptions and

analysis. In part, the Department relies on an inaccurate interpretation of the HEA's master

calendar requirement.

95.     The Department attempts to use the IFR to bootstrap its original 705 Delay into a

yearlong delay by claiming that the mere fact that the Department issued the original 705 Delay

requires the Borrower Defense Rule to be delayed until July 1, 2018. 82 Fed. Reg. at 49,117.

96.     The master calendar requirement provides that: "[A]ny regulatory changes

initiated by the Secretary affecting [Title IV] programs . . . that have not been *published in final

form* by November 1 prior to the start of the award year shall not become effective until the

beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c) (emphasis

added).

97.     The Borrower Defense Rule was published in final form on November 1, 2016,

and the IFR acknowledges as much. 82 Fed. Reg. at 49,114.

98.     Absent the IFR, the Borrower Defense Rule's original effective date of July 1,

2017 would be restored in the event that the Court vacates the 705 Delay, and the Borrower

Defense Rule would go into effect immediately. That effective date would comply with the

master calendar requirement.

99.     The Department failed to consider other important factors as well. Although the

Department justified the IFR on the basis of its 705 Delay, the Department failed to address or

even acknowledge the pending lawsuits challenging the legality of the 705 Delay.

100.     The Department also ignored the effect of the IFR on borrowers and engaged in a

cost analysis that omitted relevant considerations. Despite focusing on schools' costs of

compliance with the Borrower Defense Rule, the Department failed to accurately or adequately

consider the negative effect of further delay on borrowers. The Department failed to account for

the impact of delaying the economic benefits that the Borrower Defense Rule would provide to

borrowers, taxpayers, and the economy as a whole. The Department repeats its inaccurate and

deficient claim that borrowers will not be harmed because the Department is "continuing to process borrower defense claims." 82 Fed. Reg. at 49,115.

101.    The Department also reiterated its plan to revisit and replace the Borrower Defense Rule as a justification for delaying the Borrower Defense Rule's implementation. 82 Fed. Reg. at 49,116. The IFR includes an announcement of the Department's intention to issue an NPRM proposing to delay the Borrower Defense Rule by an additional year in order "to allow for completion of the negotiated rulemaking process before regulatory changes become effective in this area." 82 Fed. Reg. at 49,117. The Department suggests that such further delay may be "desirable to avoid the costs to regulated parties of implementing regulations that may be subject to change in the near future." *Id.*

102.    On February 14, 2018, mere weeks after the parties' cross-motions for summary judgment were fully briefed in this matter, the Department published the delay rule proposed in the NPRM. This rule—the 2018 Delay—seeks to further delay the Borrower Defense Rule until July 1, 2019. 83 Fed. Reg. 6,458.

103.    The Department issued the 2018 Delay without engaging in negotiated rulemaking or public consultation as required by the HEA, 20 U.S.C. § 1098a. In an effort to justify its failure to comply with these requirements, the Department sought to invoke the "good cause" exception to the HEA's rulemaking requirements.

104.    The Department's rationale for invoking the "good cause" exception is patently inadequate. The Department claimed that it had good cause to forego the HEA's rulemaking requirements because negotiated rulemaking "is a time-consuming and resource-intensive process" and, as such, it would be impossible for the Department to complete a negotiated rulemaking in time for the delay to take effect by July 1, 2018.  83 Fed. Reg. at 6,464. In

essence, the Department's "good cause" justification amounts to nothing more than an argument

that the Department should be permitted to evade rulemaking requirements because the

obligations imposed on the Department by Congress require time, and it would not have been

able to achieve its goals if it had followed the law. Such an argument is plainly inadequate to

justify an agency's circumvention of statutorily-mandated rulemaking procedures.

105.    The Department expressly justified the 2018 Delay on the ground that this

additional delay would allow the Department to replace the Borrower Defense Rule. The

Department explained that, "[t]he Secretary is delaying the 2016 final regulations to ensure that

there is adequate time to conduct negotiated rulemaking and develop revised regulations." 83

Fed. Reg. at 6,459. The Department emphasized its goal of avoiding implementation of the

Borrower Defense Rule altogether, explaining that the 2018 Delay "would prevent a scenario in

which the 2016 final regulations might become effective for a short period of time before new

regulations . . . take effect." *Id.* at 6,464.

106.    Although the Department's justification for the 2018 Delay relies on its plan to

replace the Borrower Defense Rule, the Department claims that the 2018 Delay "does not amend

the substance of the 2016 final regulations" and that the Department need not "identify any

specific deficiencies" that justify substantive changes to the Borrower Defense Rule at this point.

*Id.* To the contrary, the Department has clearly indicated that the very purpose of its delay of the

Borrower Defense Rule is to replace the Borrower Defense Rule. This delay is explicitly

intended to function as a *rescission.* The APA does not permit an agency to achieve a two-year

delay of a duly-promulgated regulation for the explicit purpose of *undoing* the regulation without

justifying its change of position and undertaking the necessary rulemaking requirements.

107.    Furthermore, the Department's assumption that its ongoing rulemaking process will result in rolling back the Borrower Defense Rule is entirely inappropriate where the public has not yet had an opportunity to comment on any proposed rules arising from that rulemaking process. The Department may not, at this juncture, unilaterally conclude that future regulations will undo the Borrower Defense Rule without considering public input. Relying on such an anticipated future event to justify the effective rescission of a final rule is inconsistent with the public accountability imposed upon the Department by the APA and the HEA.

108.    As with its explanation for the IFR, the Department's justification for the 2018 Delay ignores the effect of additional delay on borrowers and incorporates a cost-benefit analysis that omits relevant considerations. The Department failed to accurately or adequately consider the negative effect of further delay on borrowers, stating that it "does not agree that borrowers will be significantly harmed by changing the effective date of the 2016 final regulations to July 1, 2019." *Id.* at 6,460. This cursory conclusion contradicts the Department's own findings and previous determinations, and is an inadequate response to comments submitted to the Department in response to the NPRM. In seeking to justify its conclusion, the Department once again claims that the pre-2016 regulations are an adequate stand-in for the Borrower Defense Rule. *Id.* at 6,461. In so doing, the Department ignores its own findings about the inadequacy of the pre-2016 regulations and disregards critical differences between those regulations and the Borrower Defense Rule.

109.    Additionally, the 2018 Delay relies on and presupposes the validity of the two previous delay rules—the 705 Delay and the IFR—without acknowledging the multiple legal challenges to these rules, including the present action.

110.    The 705 Delay, the IFR, and the 2018 Delay, which have the status of law, affect regulated parties' rights and obligations and have a direct impact on the States.

111.    Failure to implement the Borrower Defense Rule on its effective date deprives the States of benefits to their respective consumer protection enforcement schemes, which benefits include, *inter alia*, the Borrower Defense Rule's: (1) incorporation of state investigations and enforcement actions into the borrower defense framework, (2) restoration of private rights of actions for students, and (3) deterrence of misconduct by for-profit schools. Such a failure also deprives the States of the economic contributions of students harmed by the misconduct of postsecondary institutions.

112.    Delayed implementation of the Borrower Defense Rule also denies critical rights and protections to the States' residents and disproportionately harms the States' low-income families and residents of color—who are more likely to be subjected to the abuses of for-profit schools. The loss of the rights and protections established by the Borrower Defense Rule causes a substantial injury to students who are unable to bring actions against abusive institutions because of mandatory arbitration agreements and class action waivers that remain in effect in the absence of the Borrower Defense Rule. The loss of rights and protections also causes substantial injury to students who cannot avail themselves of the Borrower Defense Rule's new streamlined process for obtaining loan discharges, and who will enroll in abusive institutions without receiving the warnings and information necessary to make an informed enrollment decision.

## CAUSES OF ACTION

### COUNT I

**705 Delay: Failure to Adhere to Procedures Required by Law
When Promulgating Regulations**

113. The States incorporate by reference paragraphs 1 through 112 of this Complaint.

114.     The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

115.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

116.     The APA requires an agency to give "(g)eneral notice of proposed rule making" and provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

117.     The HEA requires the Department to obtain public involvement in the development of proposed regulations related to student financial assistance programs and to "submit such regulations to a negotiated rulemaking process."  20 U.S.C. § 1098a(a)(1), (b)(2).

118.     An agency's delay of the effective date of a final regulation for the purpose of reevaluating such regulation operates as an amendment or rescission of the final regulation and is subject to the APA's notice and comment requirement.

119.     The 705 Delay, which stays implementation of the Borrower Defense Rule pending the reevaluation of the regulations, is a substantive rule requiring the Department to initiate notice and comment procedures and a new negotiated rulemaking.

120.     The Department did not engage in a notice and comment process or initiate a negotiated rulemaking regarding its delay of the Borrower Defense Rule prior to issuing the 705 Delay.

121.    The Department promulgated the 705 Delay without adhering to the procedural

requirements of 5 U.S.C. § 553 (b), (c) and 20 U.S.C. § 1098a. The 705 Delay should therefore

by vacated and set aside pursuant to 5 U.S.C. § 706(2)(D).

## COUNT II

### 705 Delay: Failure to Employ the Requisite Legal Standard

122.    The States incorporate by reference paragraphs 1 through 121 of this Complaint.

123.    The APA provides a general cause of action for parties adversely affected or

aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-

704.

124.    Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

125.    An agency seeking to justify a stay of its regulations on the basis of pending

litigation challenging those regulations must employ the four-part preliminary injunction test,

under which an agency must show that: (1) the plaintiff in the litigation is likely to prevail on the

merits, (2) the absence of a delay will irreparably harm the plaintiff, (3) others will not be

harmed by the delay, and (4) the public interest requires a delay. An agency's failure to do so

renders the agency's action arbitrary and capricious. *See Sierra Club v. Jackson*, 833 F. Supp. 2d

11, 30-31 (D.D.C. 2012).

126.    Despite purporting to delay the Borrower Defense Rule because of the CAPPS

litigation, the Department failed to employ—or even acknowledge—the requisite four-prong test

in the 705 Delay, which:

- does not refer to or address either party's probability of success on the merits;

- does not refer to or address irreparable harm or attempt to show that the plaintiff will suffer irreparable harm in the absence of a stay;

- without any discussion or analysis, conclusorily asserts that a delay "will not prevent student borrowers from obtaining relief because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement" 82 Fed. Reg. at 27,621; and

- does not discuss the public interest, except in its oblique and misleading statement that "the federal government and ultimately the federal taxpayer" will avoid incurring certain costs if the Borrower Defense Rule is not implemented. 82 Fed. Reg. at 27,622.

127.    With respect to the effect of the stay on students, the 705 Delay ignores significant injuries that students will suffer due to the delay of the Borrower Defense Rule. The 705 Delay does not mention or seek to address the harm caused to students by the postponement of provisions that provide for, *inter alia*: (1) the protection of students by streamlining the loan discharge process, including automatic loan discharge for groups of students victimized by widespread school misconduct; (2) the right to bring actions in court, both individually and collectively, against abusive schools; (3) the protection of enhanced disclosures from schools that have poor loan repayment outcomes; and (4) financial responsibility standards that protect students by deterring abusive conduct.

128.    Even if the Department had attempted to employ the proper legal test, the Department would have been unable to satisfy the test's requirements.

129.    The 705 Delay does not comply or attempt to comply with the legal test applicable to stays justified under 5 U.S.C. § 705. The 705 Delay is arbitrary and capricious and

34

not in accordance with law, and should by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III

### 705 Delay: Failure to Provide an Adequate Justification

130.    The States incorporate by reference paragraphs 1 through 129 of this Complaint.

132.    The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

132.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133.    Where an agency seeks to delay a regulation on the basis of pending litigation, the reasons used to justify the stay must be tied to the existence or consequences of the pending litigation.

134.    Despite invoking the CAPPS litigation and stating obliquely that the litigation raises "serious questions" and that the plaintiffs identified "substantial injuries," the reasoning provided in the 705 Delay to justify the Department's delay of the Borrower Defense Rule is not tied to the pending CAPPS litigation.

135.    Rather, the 705 Delay makes clear that the purpose of the stay is to allow the Department—independent of the litigation's outcome—to discard the Borrower Defense Rule and replace it with new regulations. The 705 Delay explicitly states that "[t]he postponement will allow the Department to consider and conduct a rulemaking process to review and revise the

final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters." 82 Fed. Reg. at 27,6222.

136.    In addition to avoiding the imposition of costs on regulated parties pending the replacement of the Borrower Defense Rule, the 705 Delay justifies the delayed implementation of the Borrower Defense Rule on the basis that such a postponement will help avoid significant costs to the federal government. The Department's cost-saving goals are unrelated to the CAPPS litigation.

137.    Moreover, the 705 Delay postpones implementation of multiple regulatory provisions that have not been explicitly challenged and which are not clearly at issue in the CAPPS litigation. The Department failed to provide any explanation or justification for delaying the particular provisions specified in the 705 Delay and has failed to base its delay of the specified provisions on the CAPPS litigation.

138.    The Department's rationale for issuing the 705 Delay and its failure to provide an adequate justification for the delayed implementation of the Borrower Defense Rule renders the 705 Delay arbitrary, capricious, not in accordance with law, and in excess of the Department's statutory authority under 5 U.S.C. § 705. The 705 Delay should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A), (C).

## COUNT IV

**705 Delay: Failure to Offer Reasoned Analysis for Rescission of the Borrower Defense Rule**

139.    The States incorporate by reference paragraphs 1 through 138 of this Complaint.

140.    The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

141.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

142.     To satisfy the APA, an agency reversing or departing from a previous policy or rescinding a rule must acknowledge and offer a reasoned analysis for its reversal or rescission.

143.    By its own terms, the 705 Delay is intended to facilitate the Department's replacement of the Borrower Defense Rule. The 705 Delay justifies staying implementation of the Borrower Defense Rule on the basis that such a stay would "allow the Department to consider and conduct a rulemaking process to review and revise the final regulations." 82 Fed. Reg. at 27,622.

144.    In its official statement announcing the 705 Delay, the Department simultaneously announced that it would undertake a "regulatory reset" and initiate a new negotiated rulemaking process to develop "improved" borrower defense regulations. June 2017 Press Release.

145.    Although the 705 Delay operates as an amendment to or rescission of the Borrower Defense Rule, the Department failed to supply a reasoned analysis for its change of position. The Department's failure to do so renders the 705 Delay arbitrary and capricious and not in accordance with law. The 705 Delay should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT V

### IFR: Failure to Observe Procedures Required by Law

146.    The States incorporate by reference paragraphs 1 through 145 of this Complaint.

147.     The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

148.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

149.     The IFR is a substantive rule that is subject to the notice and comment requirements of the APA, 5 U.S.C. § 553.

150.     The IFR is a regulation pertaining to Title IV and is subject to the public consultation and negotiated rulemaking requirements of the HEA, 10 U.S.C. § 1098a.

151.     The Department adopted the IFR without engaging in public consultation, a negotiated rulemaking, or notice and comment rulemaking.

152.     It was neither impractical nor unnecessary for the Department to engage in public consultation, a negotiated rulemaking, or notice and comment rulemaking prior to issuing the IFR. The Department did not have good cause to issue the IFR without following these required procedures.

153.     The Department's failure to observe procedures required by law contravenes the APA, 5 U.S.C. § 706(2)(D). The IFR should therefore by vacated and set aside.

## COUNT VI

### IFR: Agency Action that is Arbitrary, Capricious,
### Not in Accordance with Law, and in Excess of Statutory Authority

154.     The States incorporate by reference paragraphs 1 through 153 of this Complaint.

155.     The Department provided a justification for the IFR that is arbitrary, illogical, and erroneous.

156.    The Department's justification for the IFR relies on an inaccurate interpretation of the HEA's master calendar requirement and improperly seeks to use its first unlawful delay of the Borrower Defense Rule as the basis for a second unlawful delay. Contrary to the Department's assertions, the master calendar requirement would not prevent the Borrower Defense Rule—which was published in final form on November 1, 2016—from going into effect if the 705 Delay is vacated. The Department's assertion that the Borrower Defense Rule could not go into effect until July 1, 2018 is not in accordance with law. Similarly erroneous is the Department's suggestion that it could achieve a yearlong delay of a rule's effective date merely by invoking 5 U.S.C. § 705.

157.    Additionally, the Department ignored the interests of students and the public in the implementation of the Borrower Defense Rule, misrepresented the effect of the IFR on borrowers, and failed to consider or acknowledge important factors, including the pending legal challenges to the 705 Delay. These omissions are arbitrary and capricious, as is the Department's inadequate analysis of the costs and benefits associated with further delaying the Borrower Defense Rule.

158.    The Department's attempt to use the IFR to facilitate both its replacement of the Borrower Defense Rule and its circumvention of the APA and HEA's rulemaking requirements is arbitrary and capricious, and exceeds the Department's statutory authority.

159.    The Department's rationale for issuing the IFR is arbitrary, capricious, and not in accordance with law, and the Department's attempt to use the IFR to facilitate the replacement of a duly promulgated regulation exceeds the Department's statutory authority, in contravention of the APA, 5 U.S.C § 706(2)(A), (C).

## COUNT VII

### 2018 Delay: Failure to Observe Procedures Required by Law

160.    The States incorporate by reference paragraphs 1 through 159 of this Complaint.

161.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

162.    The 2018 Delay is a regulation pertaining to Title IV and is subject to the public consultation and negotiated rulemaking requirements of the HEA, 10 U.S.C. § 1098a.

163.    The Department issued the 2018 Delay without adhering to the HEA's public consultation and negotiated rulemaking requirements.

164.    The Department did not have good cause to issue the 2018 Delay without following these required procedures.

165.    The Department's failure to observe procedures required by law contravenes the APA, 5 U.S.C. § 706(2)(D). The 2018 Delay should therefore by vacated and set aside.

## COUNT VIII

### 2018 Delay: Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law

166.    The States incorporate by reference paragraphs 1 through 165 of this Complaint.

167.    The Department provided a justification for the 2018 Delay that is arbitrary, internally inconsistent, and inadequate.

168.    Despite justifying the 2018 Delay primarily on the Department's ongoing effort to replace the Borrower Defense Rule and its desire to avoid ever implementing the Borrower Defense Rule in its final published form, the Department failed to provide a sufficient explanation for its change of position regarding the Borrower Defense Rule. The Department's

assertion—without explanation—that this Court is "likely" to overturn certain provisions of the Borrower Defense Rule cannot justify the effective rescission of the Borrower Defense Rule.

169.     The Department's justification for the 2018 Delay misrepresented the harmful effect of further delay on borrowers, failed to explain the Department's change of position regarding the benefits of the Borrower Defense Rule and the inadequacy of pre-2016 regulations, and ignored concerns raised by commenters. Meanwhile, the Department's explanation for the 2018 Delay emphasized speculative costs to regulated entities without describing the nature of these purported costs or justifying the Department's adoption of a position regarding costs to industry that is inconsistent with its previously stated positions. The Department's justification for the 2018 Delay and its discussion of the costs and benefits of delay are, therefore, arbitrary and capricious.

170.     Additionally, the Department's justification is internally inconsistent. The Department simultaneously attempts to characterize the 2018 Delay as a mere temporary postponement of the Borrower Defense Rule, while acknowledging repeatedly that the purpose of the delay is to effectively replace the Borrower Defense Rule. Furthermore, the Department's reliance on its first two invalid delays in justifying the 2018 Delay renders the 2018 Delay invalid as well.

171.     The Department's rationale for issuing the 2018 Delay is arbitrary, capricious, and not in accordance with law, in contravention of the APA, 5 U.S.C. § 706(2).

## IV.     PRAYER FOR RELIEF

WHEREFORE, the States request that this Court enter judgment in their favor and grant the following relief after trial on the merits:

a.   Declare the 705 Delay, the IFR, and the 2018 Delay unlawful;

41

    b.   Vacate the 705 Delay, the IFR, and the 2018 Delay;

    c.   Order that the Borrower Defense Rule be implemented promptly;

    d.   Award Plaintiffs reasonable costs, including attorneys' fees; and

    e.   Grant such other and further relief as the Court deems just and proper.


Dated: February 28, 2018


            Respectfully Submitted,

            FOR THE COMMONWEALTH OF
            MASSACHUSETTS

            MAURA HEALEY
            ATTORNEY GENERAL

By:   */s/ Yael Shavit*
        Yael Shavit
        Max Weinstein
        Peter Leight
        Assistant Attorneys General
        Office of the Massachusetts Attorney General
        One Ashburton Place
        Boston, MA 02108
        (617) 963-2197 (Shavit)
        (617) 963-2499 (Weinstein)
        (413) 523-7706 (Leight)
        Yael.Shavit@state.ma.us
        Max.Weinstein@state.ma.us
        Peter.Leight@state.ma.us

        FOR THE STATE OF CALIFORNIA
        XAVIER BECERRA
        CALIFORNIA ATTORNEY GENERAL

By:   */s/ Bernard A. Eskandari*
        Bernard A. Eskandari
        Deputy Attorney General
        300 South Spring Street, Suite 1702
        Los Angeles, California 90013
        (213) 897-2652

bernard.eskandari@doj.ca.gov

FOR THE STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

By: */s/ Joseph J. Chambers*
        Perry Zin-Rowthorn
        Deputy Attorney General
        Joseph J. Chambers
        Assistant Attorney General
        Connecticut Office of Attorney General
        PO Box 120
        Hartford, CT 06141-0120
        (860) 808-5270
        joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

By: */s/Aaron Goldstein*
        Aaron Goldstein
        State Solicitor
        Carvel State Building, 6th Floor
        820 North French Street
        Wilmington, DE 19801
        (302) 577-8400
        Aaron.goldstein@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By: */s/ Philip Ziperman*
        Philip Ziperman
        Assistant Attorney General
        Attorney General for the District of Columbia
        441 4th Street, N.W., 6th Floor
        Washington, DC 20001
        (202) 442-9886
        Philip.Ziperman@dc.gov

FOR THE STATE OF HAWAII
RUSSELL A. SUZUKI
ACTING ATTORNEY GENERAL

By:   */s/ Bryan C. Yee*
Bryan C. Yee
Deputy Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
bryan.c.yee@hawaii.gov

PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

By:   */s/ Susan Ellis*
Susan Ellis
Consumer Fraud Bureau, Chief
Joseph Sanders
Assistant Attorney General
Consumer Fraud Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
(312) 814-6796 (Joseph)
sellis@atg.state.il.us
jsanders@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By:   */s/ Jessica Whitney*
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 281-8772
Jessica.Whitney@iowa.gov

FOR THE STATE OF MAINE
JANET T. MILLS
MAINE ATTORNEY GENERAL

By:   */s/ Linda Conti*
Linda Conti
Assistant Attorney General

6 State House Station
Augusta, ME 04333
(207) 626-8591
Linda.Conti@maine.gov

FOR THE STATE OF MARYLAND
BRIAN E. FROSH
ATTORNEY GENERAL

By: */s/ Christopher J. Madaio*
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585
Cmadaio@oag.state.md.us

FOR THE STATE OF MINNESOTA
LORI SWANSON
ATTORNEY GENERAL

By: */s/ Jason Pleggenkuhle*
Jason Pleggenkuhle
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 757-1147 (Voice)
(651) 296-1410 (TTY)
jason.pleggenkuhle@ag.state.mn.us

FOR THE STATE OF NEW MEXICO
HECTOR BALDERAS
ATTORNEY GENERAL

By: */s/ Joseph Yar*
Joseph Yar
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87501
(505) 490-4060
jyar@nmag.gov

FOR THE STATE OF NEW YORK

45

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF NEW YORK

By:  */s/ Jane M. Azia*
       Jane M. Azia
       Chief, Bureau of Consumer Frauds and
       Protection
       120 Broadway, 3rd floor
       New York, NY 10271
       Tel.: (212) 416-8727
       Jane.azia@ag.ny.gov

       FOR THE STATE OF NORTH CAROLINA
       JOSH STEIN
       ATTORNEY GENERAL OF NORTH
       CAROLINA

By:  */s/ Sripriya Narasimhan*
       Sripriya Narasimhan (D.C. Bar No.: 1029549)
       Deputy General Counsel
       North Carolina Department of Justice
       114 W. Edenton St.
       Raleigh, NC  27603
       P.O. Box 629
       Raleigh, NC  27602
       (919) 716-6421
       SNarasimhan@ncdoj.gov

       FOR THE STATE OF OREGON
       ELLEN F. ROSENBLUM
       ATTORNEY GENERAL

By:  */s/ Andrew Shull*
       Andrew Shull
       Assistant Attorney General
       Oregon Department of Justice
       1162 Court Street, NE
       Salem, OR 97301
       (503) 934-4400
       Andrew.shull@doj.state.or.us

       FOR THE COMMONWEALTH OF
       PENNSYLVANIA
       JOSH SHAPIRO
       ATTORNEY GENERAL

46

By:  */s/ John M. Abel*
　　　John M. Abel
　　　Senior Deputy Attorney General
　　　Office of the Pennsylvania Attorney General
　　　Bureau of Consumer Protection
　　　15th Floor, Strawberry Square
　　　Harrisburg, PA  17120
　　　(717) 783-1439
　　　jabel@attorneygeneral.gov

　　　Jesse Harvey
　　　Senior Deputy Attorney General
　　　Office of the Pennsylvania Attorney General
　　　Bureau of Consumer Protection
　　　6th Floor Manor Complex
　　　564 Forbes Avenue
　　　Pittsburgh, PA  15219
　　　(412) 565-2883
　　　jharvey@attorneygeneral.gov

　　　FOR THE STATE OF RHODE ISLAND
　　　PETER F. KILMARTIN
　　　ATTORNEY GENERAL

By:  */s/ Neil F.X.Kelly*
　　　Neil F.X.Kelly
　　　Deputy Chief, Civil Division
　　　Rhode Island Department of Attorney General
　　　150 South Main Street
　　　Providence, Rhode Island 02903
　　　(401) 274-4400
　　　nkelly@riag.ri.gov

　　　FOR THE STATE OF VERMONT
　　　THOMAS J. DONOVAN, JR.
　　　ATTORNEY GENERAL

By:  */s/ Christopher J. Curtis*
　　　Christopher J. Curtis
　　　State of Vermont
　　　Office of the Attorney General
　　　Chief, Public Protection Division
　　　109 State St.
　　　Montpelier, VT 05609
　　　(802) 828-5586
　　　christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By: */s/ Samuel T. Towell*
    Samuel T. Towell
    Deputy Attorney General, Civil Litigation
    Cynthia E. Hudson
    Chief Deputy Attorney General
    Barbara Johns Building
    202 N. Ninth St.
    Richmond, Virginia 23219
    (804) 786-6731
    stowell@oag.state.va.us

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By: */s/ Jeffrey T. Sprung*
    Darwin P. Roberts
    Deputy Attorney General
    Jeffrey T. Sprung (D.C. Bar No.: 384880)
    Benjamin J. Roesch
    Cynthia Alexander
    Assistant Attorneys General
    Office of the Washington Attorney General
    1125 Washington St. SE
    P.O. Box 40100
    Olympia, WA 98504
    (206) 326-5492 (Sprung)
    darwinr@atg.wa.gov
    jeff.sprung@atg.wa.gov
    benjaminr@atg.wa.gov
    cynthiaa@atg.wa.gov